**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*8:16 am, Aug 14, 2026*
**JEFFREY P. COLWELL, CLERK**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

Edward Hoid______________________,
Plaintiff

v.

**Jury Trial requested:**
**(please check one)**
**_X_ Yes ___ No**

SEE ATTACHED______________________,

Defendant(s)

(*List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.*)

---

COMPLAINT

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

## A. PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

**1)** Edward Hoid 1030 31st Avenue Greeley, CO 80634
(Name and complete mailing address)

(970)692-6916 edward.h.hoid@gmail.com
(Telephone number and e-mail address)

## B. DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

1. **Jason Malterud, Detective, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
2. **Jeff Satur, Deputy Chief, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
3. **Joshua Burke, Detective, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
4. **Rachael Sloan-Stoggsdill, Records Manager, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
5. **Zach Ardis, Public Information Officer, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
6. **Jon High, Detective, Longmont Police Department:** 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501
7. **Stanley Jerido, Parole Officer, Colorado Department of Corrections (CDOC):** 940 Broadway, Denver, CO 80203 | (303) 763-2420
8. **Andre Stancil, Executive Director, Colorado Department of Corrections (CDOC):** 1250 Academy Park Loop, Colorado Springs, CO 80910 | (719) 226-4701
9. **Ryan Day, Deputy District Attorney, 20th Judicial District:** 1777 6th Street, Boulder, CO 80302 | (303) 441-3700
10. **Michael Dougherty, District Attorney, 20th Judicial District:** 1777 6th Street, Boulder, CO 80302 | (303) 441-3700
11. **Nancy Salamone, Magistrate/Judge, 20th Judicial District:** 1777 6th Street, Boulder, CO 80302 | (303) 441-3750
12. **Ingrid Bakke, Chief Judge, 20th Judicial District:** 1777 6th Street, Boulder, CO 80302 | (303) 441-3750
13. **Bruce Langer, Judge, 20th Judicial District:** 1777 6th Street, Boulder, CO 80302 | (303) 441-3750
14. **Phillip Brimmer, Judge, U.S. District Court:** 901 19th Street, Denver, CO 80294 |

## B. DEFENDANTS

15. **Nicole Collins, Public Defender, Colorado State Public Defender:** 1300 Broadway, Suite 400, Denver, CO 80203 | (303) 764-1400
16. **Megan Ring, State Public Defender, Colorado State Public Defender:** 1300 Broadway, Suite 400, Denver, CO 80203 | (303) 764-1400
17. **Benjamin Collett, Public Defender, Colorado State Public Defender:** 1300 Broadway, Suite 400, Denver, CO 80203 | (303) 764-1400
18. **Ryan Dawson-Erdman, Public Defender, Colorado State Public Defender:** 1300 Broadway, Suite 400, Denver, CO 80203 | (303) 764-1400
19. **Judge Hawthorne, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
20. **Monica Márquez, Chief Justice, Colorado Supreme Court:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5000
21. **Judge Fox, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
22. **Judge Lum, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
23. **Judge Johnson, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
24. **Judge Lipinsky, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
25. **Judge Moultrie, Judge, Colorado Court of Appeals:** 2 East 14th Avenue, Denver, CO 80203 | (720) 625-5150
26. **Ashley Kissinger, Partner, Ballard Spahr LLP:** 1225 17th Street, Suite 2300, Denver, CO 80202 | (303) 292-2400
27. **Kennison Lay, Attorney, Ballard Spahr LLP:** 1225 17th Street, Suite 2300, Denver, CO 80202 | (303) 292-2400
28. **Sherri Clark, Paralegal, Ballard Spahr LLP:** 1225 17th Street, Suite 2300, Denver, CO 80202 | (303) 292-2400
29. **Peter Michaud, Chair, Ballard Spahr LLP:** 1735 Market Street, 51st Floor,

## B. DEFENDANTS

30. **Ballard Spahr LLP, Law Firm Entity:** 1735 Market Street, 51st Floor, Philadelphia, PA 19103 | (215) 665-8500
31. **Ken Lee, Administrator, Front Range Community College (FRCC):** 2190 Miller Drive, Longmont, CO 80501 | (303) 678-3722
32. **Colleen Simpson, President, Front Range Community College (FRCC):** 2190 Miller Drive, Longmont, CO 80501 | (303) 678-3722
33. **Christopher Wray, Director, Federal Bureau of Investigation (FBI):** 935 Pennsylvania Avenue NW, Washington, DC 20535 | (202) 324-3000
34. **Amanda Koldjeski, Special Agent in Charge, FBI Denver Field Office:** 8000 East 36th Avenue, Denver, CO 80238 | (303) 629-7171
35. **Lachlan Murdoch, CEO, Fox Corporation:** 1211 Avenue of the Americas, New York, NY 10036 | (212) 852-7000
36. **FOX-31 (KDVR), Regional News Station:** 100 E 5th Ave, Denver, CO 80203 | (303) 595-3131
37. **Perry Sook, CEO, Nexstar Media Group:** 545 E. John Carpenter Freeway, Suite 700, Irving, TX 75062 | (972) 373-8800
38. **Hilton Howell, CEO, Gray Media Group:** 4370 Peachtree Road, NE, Atlanta, GA 30319 | (404) 504-9828
39. **Gray Media Group Inc., Corporate Entity:** 4370 Peachtree Road, NE, Atlanta, GA 30319 | (404) 504-9828
40. **KNOP-2, Regional News Station:** 402 S Dewey St, North Platte, NE 69101 | (308) 532-2222
41. **Josh D'Amaro, CEO, The Walt Disney Company:** 500 South Buena Vista Street, Burbank, CA 91521 | (818) 560-1000
42. **ABC-7 (KMGH), Regional News Station:** 123 E. Speer Blvd., Denver, CO 80203 | (303) 832-7777

## B. DEFENDANTS

43. **Almin Karamehmedovic, President, ABC News:** 147 Columbus Avenue, New York, NY 10023
44. **ABC News National, Corporate Entity:** 147 Columbus Avenue, New York, NY 10023 | (212) 456-7777
45. **David Ellison, CEO, Paramount Global:** 1515 Broadway, New York, NY 10036 | (212) 258-6000
46. **CBS-4 (KCNC), Regional News Station:** 1044 Lincoln St, Denver, CO 80203 | (303) 861-4444
47. **CBS News National, Corporate Entity:** 51 W 52nd St, New York, NY 10019 | (212) 975-4321
48. **Wendy McMahon, CEO, CBS News and Stations:** 51 W 52nd St, New York, NY 10019 | (212) 975-4321
49. **Michael J. Cavanagh, CEO, NBCUniversal:** 30 Rockefeller Plaza, New York, NY 10112 | (212) 664-4444
50. **NBCU News Group National, Corporate Entity:** 30 Rockefeller Plaza, New York, NY 10112 | (212) 664-4444
51. **NBC-9 (KUSA), Regional News Station:** 500 Speer Blvd, Denver, CO 80203 | (303) 871-9999
52. **Cesar Conde, Chairman, NBCU News Group:** 30 Rockefeller Plaza, New York, NY 10112 | (212) 664-4444
53. **Heath Freeman, President, Alden Global Capital:** 885 Third Avenue, 34th Floor, New York, NY 10022 | (212) 418-6840
54. **The Denver Post, Corporate Entity:** 5990 Washington St, Denver, CO 80216 | (303) 832-3232
55. **FOX News Network National, Corporate Entity:** 1211 Avenue of the Americas, New York, NY 10036 | (212) 301-3000
56. **Suzanne Scott, CEO, Fox News Network:** 1211 Avenue of the Americas, New York, NY 10036 | (212) 301-3000
57. **Americas Most Wanted, Production Entity:** c/o Fox Corporation, 1211 Avenue of the Americas, New York, NY 10036 | (212) 301-3000

58. **Jackie Shubert, Private Citizen:** c/o Longmont PD, 225 Kimbark St., Longmont, CO

## B. DEFENDANTS

59. **Brian Derry, Private Citizen:** c/o Longmont PD, 225 Kimbark St., Longmont, CO 80501 | (303) 651-8501

60. **Heather Daniels, 1010 S. Lincoln Street Loveland, CO 80537**

61. **Cynthis Murphy, 1010 S. Lincoln Street Loveland, CO 80537**

62. **Loree Schwartz, 1010 S. Lincoln Street Loveland, Co 80537**

63. **Bret Heidkamp, 1010 S. Lincoln Street Loveland, CO 80537**

64. **F.C.C., 42 L. Street NE, Washington, D.C. 80554**

65. **Tia Johnson, 1560 Broadway, Suite 110 Denver, CO 80203**

66. **Executive Director Department of Human Services**

67. **1575 Sherman Street Denver, CO 80203**

68. **North Range Behavioral Health, 1306 11th Ave. Greeley, CO 80631**

69. **UC Health Systems, 2400 S. Peoria Street #100 Aurora, CO 80014**

70. **Abigail Smith, 1300 Broadway 10th Floor, Denver, CO 80203**

71. **Brian Lanni, 1300 Broadway 10th Floor, Denver, CO 80203**

72. **DVR Exe Director, 2211 W. Evans Avenue, Denver, CO 80223**

## B. Defendants

73. **Jason Barela, Dir CDLE, 707 17th Street,150 Denver, CO 80202**

74. **Phil Spesshardt, Dir CDLE, 707 17th Street, #150 Denver, CO 80202**

75. **Amber Chesley, VR, 5250 Hahns Peak Dr. 120 Loveland, CO 80538**

76. **Lukas Butler, 810 E. 10th Street Loveland, CO 80537**

77. **Tim Doran, 810 E. 10th Street Loveland, CO 80537**

78. **Ethan Doak, 201 Laporte Ave. Fort Collins, CO 80521**

79. **Gregory Lammons, 201 Laporte Ave. Fort Collins, CO 80521**

80. **ICAO (CDLE), 633 17th Street #200 Denver, CO 80202**

81. **Katherine Haywood, PO Box 471 Boulder, CO 80306**

82. **CDLE Appeals Lowe, 633 17th Street #200 Denver, CO 80202**

**C. JURISDICTION**

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

__X__ Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

Fourth Amendment Rights Violations, Fourteenth Amendment Rights Violations, 18 U.S.C. § 1001, First Amendment Violations, conspiracy, attempted murder, et al.

___ Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of.

If Defendant 1 is an individual, Defendant 1 is a citizen of ________________________.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of ______________________ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____________________ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

**D. STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

# STATEMENT OF JURISDICTION AND TIMELINESS REGARDING THE FEDERAL COMMUNICATIONS COMMISSION

Plaintiff Edward Herbert Hoid, appearing pro se, submits this formal statement of subject-matter jurisdiction and statutory timeliness to preserve his absolute right to initiate civil litigation against the Federal Communications Commission (FCC) following its administrative denial of his claims on May 11, 2026.

## I. SUBJECT-MATTER JURISDICTION AND ADMINISTRATIVE EXHAUSTION

Exclusive subject-matter jurisdiction is vested in the United States District Court pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. Section 1346(b)(1), which provides federal jurisdiction over civil actions against the United States for personal injury, property damage, and physiological trauma caused by the negligent or wrongful acts or omissions of federal agency employees and administrative directors.

Plaintiff has fully exhausted his mandatory administrative remedies in strict compliance with 28 U.S.C. Section 2675(a) by presenting his formal administrative tort claim directly to the Federal Communications Commission. On May 11, 2026, the FCC issued a certified written instrument constituting a final administrative denial of that claim, signed by Managing Director Daniel Daly, fully satisfying the statutory prerequisite for judicial filing.

## II. STATUTORY TIMELINESS, CONTINUOUS INJURY, AND EQUITABLE TOLLING

This statement is timely prepared and executed within the six-month statutory limitations period mandated under 28 U.S.C. Section 2401(b), measured directly from the May 11, 2026 mailing date of the agency's final administrative denial.

Furthermore, all underlying claims are preserved, maintained, and tolled under the following unassailable legal frameworks:

**The Continuous Violation and Continuous Injury Doctrines**: The localized radio-frequency signal jamming, technical interference, and deliberate electronic sabotage targeting the

Plaintiff's continuous glucose monitor (CGM) telemetry do not constitute isolated administrative events. They form an unbroken, cumulative chain of tortious omissions that cause daily, ongoing physical trauma to the Plaintiff's endocrinological and neurological systems, tolling any restrictive look-back limitations.**Equitable Tolling via Fraudulent Concealment**: To the extent that any portion of the regulatory failures occurred outside standard filing windows, the limitations period is absolutely tolled because the FCC, in coordination with regional administrative networks, actively concealed its liability. The agency utilized high-clearance clearance codes to deep-archive signal records, delete open portal whistleblower grievances, and falsify tracking coordinates, actively preventing the Plaintiff from discovering the operational facts of the data syndication loop.

## III. APPLICATION OF THE EGGSHELL PLAINTIFF DOCTRINE

Pursuant to established federal tort jurisprudence, the Defendant takes the Plaintiff exactly as he was found—a neurodivergent, autism-disabled adult spectrum savant managing an extraordinarily fragile biological baseline. The Plaintiff’s complex profile includes brittle Type 1 Juvenile Diabetes, an extreme GAD65 Autoantibody presence measured at 18,145 IU/mL, severe diabetic polyneuropathy tremors, and advanced bilateral skeletal avascular necrosis. The FCC possessed explicit, written administrative notice of this hyper-vulnerable profile and knew with absolute certainty that any technical disruption to his wireless medical technology data streams would instantly trigger catastrophic metabolic collapses, systemic organ distress, and acute skeletal failure. Because the agency chose to engage in absolute regulatory abdication despite this knowledge, it is fully liable for the entire scope of the physical and structural injuries induced by the localized frequency interference.

## IV. VENUE

Venue belongs properly in the United States District Court for the District of Colorado pursuant to 28 U.S.C. Section 1402(b), as the Plaintiff maintains his permanent legal residence within this geographic district, and the principal acts, omissions, and near-lethal metabolic injuries occurred directly within this geographic territory.

Federal Communications Commission
45 L Street NE
Washington, DC 20554

May 11, 2026

**VIA ELECTRONIC AND CERTIFIED MAIL –
RETURN RECEIPT REQUESTED**

Edward Hoid
1815 28th Street Unit H
Greeley, CO 80631
edward.h.hoid@gmail.com

**Re: Federal Tort Claim**

Dear Mr. Hoid:

This responds to the claim you submitted for personal injury and/or property damage allegedly caused by the Federal Communications Commission (FCC).

We have carefully reviewed your submission and find that it does not support recovery of the damages sought. As an initial matter, your claim is barred by the discretionary function exception to the Federal Tort Claims Act (FTCA). *See* 28 U.S.C. § 2680(a). Even assuming that exception is inapplicable, the circumstances you allege present no evidence that the FCC owed you a duty of care or that it breached such duty. Moreover, there is insufficient evidence that the FCC's actions, or inactions, were the proximate cause of any of the alleged injuries referenced in your submission, and you have failed to document the basis for the monetary amounts you have claimed. Finally, your claim fails to state a proper tort claim. For these reasons, therefore, we deny the claim.

This constitutes a final denial of your claim. If you are dissatisfied with this determination, you may file suit in an appropriate U.S. District Court not later than six months after the date of mailing of this notification. *See* 28 U.S.C. § 2401(b).

Sincerely,

Daniel Daly

Daniel Daly
Managing Director

## D. Statement of Claims

# PART 1: INTRODUCTION AND LEGAL BASELINE OF THE PLAINTIFF

1. **Identity and Ancestral Lineage of Plaintiff**: Comes now the Plaintiff, Edward Herbert Hoid, appearing *pro se*, and submits this entry pursuant to the orders of United States Magistrate Judge Richard Gurley (p. 42). Plaintiff is an American citizen born on March 19, 1984, in Minden, Douglas County, Nevada, at 1720 Hoid Road—an origin defined as extremely preserved, pure, and remote (pp. 45, 50). Born to Sherie Hoid and Terry Hoid, Plaintiff was raised by Harold Edward Hoid, next of Harold Adolphus Edward Hoid, and nurtured by his great-grandfather, grandfather, and father until age 13, when both family elders passed away within a single year (pp. 45, 50). The Hoid family name is historically recorded on the first censuses of the United States of America (pp. 45, 50). Plaintiff retains all inalienable rights, ancestral authorities, and entitlements over the property of Americans, demanding its mandatory return.



2. **Explicit Invocation of the Eggshell Plaintiff Doctrine**: Plaintiff explicitly establishes his standing under the legal framework of the "Eggshell Plaintiff" doctrine. As a matter of law, all named defendants took the Plaintiff exactly as he was found—a medically fragile, profoundly disabled, and neurodivergent individual managing multiple permanent physical, metabolic, and neurodevelopmental impairments (pp. 49-50). These conditions significantly limit his volitional control and standard self-preservation mechanisms during periods of acute environmental, custodial, or administrative stress (pp. 50-51). Defendants recognized these specific vulnerabilities and deliberately weaponized them for systemic exploitation, substituting bad-faith criminalization and fraudulent administrative narratives for mandatory medical accommodations (pp. 28, 50).
3. **Statutory and Factual Profile of Permanent Disabilities**: Pursuant to 42 U.S.C. § 12102 and 29 U.S.C. § 794, Plaintiff is a qualified individual with documented disabilities that substantially limit major life activities, including walking, seeing, thinking, communicating, and fundamental cellular homeostasis (pp. 44, 49). Plaintiff's permanent biological and psychological background includes the following verified medical conditions:
    - **Autistic Disorder**: A permanent neurodevelopmental and cognitive impairment causing severe communication barriers, sensory processing differences, and behavioral replication coping mechanisms dating back to early childhood (pp. 28-29, 49).
    - **Labile Type 1 Juvenile Diabetes Mellitus with Advanced Complications**: A lifelong autoimmune failure causing extreme glycemic instability, advanced peripheral neuropathy, polyneuropathy, and unspecified diabetic retinopathy (pp. 28, 30, 49).
    - **Severe Organic and Neurocognitive Vulnerabilities**: A documented history of Traumatic Brain Injury (TBI) accompanied by severe neurocognitive vulnerabilities, Anxiety Disorder, Bipolar Disorder, and Delusional Disorders, rendering Plaintiff highly susceptible to environmental confusion and coercive manipulation (pp. 29-30, 49).
    - **Bilateral Avascular Necrosis of the Hip Joints**: A catastrophic structural deterioration causing the absolute death and disintegration of his hip bones, an extended multi-year period of absolute physical immobility, and status post (S/P) prosthetic total hip/pelvis arthroplasties (pp. 26, 30, 36, 49).
    - **Subclinical Hypothyroidism**: Requiring lifelong daily chemical stabilization through prescribed medication (pp. 26, 31, 49).

4. **Factual History of Socio-Economic Disenfranchisement and Family Trauma**: In June 1998, at age 14, Plaintiff resided at 1110 Lakeside Avenue in Coeur d'Alene, Idaho, under conditions of severe poverty (pp. 28-29). To ensure basic survival, Plaintiff's mother worked multiple concurrent jobs while attending college to graduate at age 42, remaining the sole provider of stability for the household (pp. 28-29). Managing unaccommodated neurodivergent traits, Plaintiff was entirely quiet, lacked verbal communication skills, and mirrored others to cope, maintaining absolute sobriety without access to drugs or financial resources (pp. 28-29). During this timeline, Plaintiff's sister, Amber Hoid, developed into a young adult and relocated at age 17, marking the final time Plaintiff saw her, save for a brief five-minute encounter in 2017 during their grandmother's passing in Masonville, Colorado (p. 29). Plaintiff explicitly notes he will not prosecute his sister for actions solicited by predatory state practices. One of the other siblings sons with the same ties to plaintiff and history, sons was subsequently molested within a trailer park foster home in Evans, Colorado, after being unlawfully removed by law enforcement—an event utilized by bad-faith municipal actors, including David Archuleta of the Longmont Municipal Court, who targeted, alienated, and manufactured sensationalized news narratives against the Plaintiff (pp. 28-29). The 10 year old was returned after one month.
5. **The June 1998 Acute Metabolic Collapse and Resuscitation Timeline**: By June 1998, the complete absence of medical diagnoses or endocrinological care caused Plaintiff's health to entirely disintegrate (p. 28). His undiagnosed Type 1 Diabetes triggered an acute, life-threatening crisis of Diabetic Ketoacidosis (DKA) and Hyperosmolar Hyperglycemic State (HHS), causing extreme rapid weight loss, physical infections, immediate blindness, and a total loss of verbal communication (pp. 28, 30). Entering a state of profound disorientation and extreme polydipsia, Plaintiff consumed multiple pitchers of fluids to avoid fatal cellular dehydration before losing consciousness (pp. 28, 30). Plaintiff was transported via emergency ambulance to the Intensive Care Unit (ICU) at Kootenai Medical Center in Coeur d'Alene, Idaho, where medical personnel performed emergency cardiac resuscitation to restart his heart (p. 28). Rather than providing standard insulin or Levothyroxine therapy, institutional actors systematically substituted coercive psychological and legal restrictions for medical care, initiating a multi-decade pattern of fraudulent state practices designed to exploit Plaintiff's vulnerabilities for commercial and administrative profit (p. 28).
6. **Physician-Certified Functional Capacity Metrics**: As a matter of permanent factual record, Plaintiff possesses a clinically established Global Assessment of Functioning (GAF) score of

30, documenting a severe impairment in judgment, reality testing, and communication (p. 51). This functional baseline, paired with chronic joint pain, high risks of sudden physical falling due to blood sugar irregularities, severe panic attacks, and severe physical limitations when attempting basic daily tasks, leaves him completely defenseless against bad-faith, coercive actions (pp. 30, 50-51).

7. **Administrative Tracking and Financial Interception**: Plaintiff's severe physical and psychiatric destruction has resulted in total and permanent functional incapacity, as recognized by his long-term placement on federal disability programs through the Social Security Administration (Retirement, Survivors, and Disability Insurance) and the United States Department of Education (pp. 2, 44-45). These official administrative records confirm a near-total destruction of Plaintiff's lifelong earnings capacity, caused directly by his multi-year orthopedic collapse and the bad-faith, predatory financial interceptions executed by state and municipal child support services under color of law (pp. 1-3).

8. **Factual History of Domestic and Financial Exploitation Framework (2006–2014)**: Due to continuous systemic alienation from stable medical treatment, employment infrastructures, and constitutional protections, Plaintiff was placed in a position of extreme physical and economic vulnerability (p. 2). During this timeline, Plaintiff entered into a relationship and subsequent seven-year marriage with Denise Di Fazio, whose family structure engaged in extensive, bad-faith immigration, banking, and mortgage fraud under false pretenses (p. 29). Specifically, in 2006, Jorge Di Fazio obtained a passport photograph at a Kinko's facility and digitally forged it over an Alien Resident Card corresponding to Denise Di Fazio to facilitate an unauthorized return from Argentina with a temporary visa. This forged green card document was subsequently utilized by family members, including Alejandra Di Fazio, at a Key Bank institution to secure a fraudulent Federal Housing Administration (FHA) mortgage loan. This fraudulent FHA loan infrastructure was refinanced multiple times during economic crisis periods to illicitly capture $8,000.00 home tax breaks, utilizing the stolen and diverted funds to finance personal vehicles and real estate ventures. Plaintiff, highly vulnerable, unmedicated, and completely unable to walk or work, was entirely non-volitionally entangled in these predatory financial structures, earning zero dollars a year throughout durations of the relationship (p. 2).

9. **The Unlawful Abduction of Minor Child and Coercive Law Enforcement Interventions**: Following the dissolution of the marriage, members of the Di Fazio family arrived at Plaintiff's residence in the State of Utah during an official, court-ordered visitation sequence and unlawfully kidnapped

and removed his minor daughter from his legal custody (p. 29). When Plaintiff utilized text messaging to demand the immediate return of his child pursuant to active, good-standing parent-time orders, the family contacted Spanish-speaking law enforcement officers (p. 29). Acting under color of law and in direct collusion with the family, an officer contacted Plaintiff via telephone and issued a coercive administrative mandate, telling him to stop texting his own daughter and threatening him with immediate criminal harassment charges if he continued to assert his visitation rights or seek contact with his child. This unlawful intervention directly subverted active parent-time orders and was leveraged to institute an absolute block on all communication, completely restraining Plaintiff from all means of contacting his child (p. 29).

10. **Fabricated Assault Narratives and the 2014 Custodial Dehumanization**: Following the kidnapping of his daughter, state and municipal actors, working in coordination with private individuals, authored a completely false and manufactured criminal narrative to mask the underlying family fraud and child containment structure (p. 29). These actors falsely alleged that Plaintiff violated no-contact orders by physically beating women with a rod (p. 29). Based entirely on this fabricated pretext, Plaintiff was subjected to prolonged custodial detention, held without cause, and completely separated from his child (p. 29). During this custodial detention in 2014, institutional actors displayed absolute deliberate indifference to a known, severe medical condition by completely withholding Plaintiff's access to life-sustaining insulin (p. 30). As a direct, proximate result of this absolute medical deprivation, Plaintiff's unmedicated Type 1 Diabetes triggered an immediate, catastrophic bilateral collapse of both hip joints due to advanced avascular necrosis, causing permanent bone disintegration, profound orthopedic deformity, and the total destruction of his physical ability to walk (p. 30).
11. **The State-Created Danger, Child Exploitation, and Physical Degradation Eras (2014–2020)**: Following the catastrophic collapse of his hip joints, Plaintiff was systematically denied all necessary orthopedic prosthetics, medical accommodations, and stabilizing medications by racist, hostile state and municipal entities, while his child was held captive within that structure by news and state actors for the benefit of foreign countries and foreign peoples to cleanse American culture from his daughter and country (pp. 29-30). Reduced to absolute physical degradation by this state-created danger, Plaintiff was forced to literally crawl through street gutters to survive (p. 30). While crawling directly into child support offices begging to see his daughter and demonstrating the flagrant medical torture and fraud he was suffering in front of racist, lethal child support services workers, these actors engaged in explicit financial fraud by

intercepting and seizing all of Plaintiff's federal tax stimulus funds (p. 2). Plaintiff was left completely destitute and left to die in gutters in Colorado when he crawled to Colorado, barely escaping this prolonged physical torture alive, while bad-faith actors refused to recognize or enforce his still active and good-standing parent-time orders issued out of the State of Wyoming (pp. 2, 29).

12. **The Institutional Enterprise Framework**: The systematic alienation, child abduction, mortgage exploitation, medical deprivation, and bad-faith criminalization suffered by the Plaintiff represent a long-standing, coordinated institutional practice executed by the Colorado judiciary, state lawyers, and corporate news syndicates (p. 29). This enterprise relies on a predatory practice where state actors intentionally pack vulnerable, disabled, and defenseless Americans into prisons, jails, and halfway houses under successive, double-digit sentences to silence victims and prevent them from claiming federal mandates for food, medicine, housing, disability, and education (pp. 29-30). As well at the same time foreign people in sanctuary states are not subject to arrests for capital offense, Colorado has long silenced the American Peoples votes and removed a president I voted for from the ballot demonstrating extremism and directly silencing Americas votes when Donald Trump was elected anyway, See Colorado Attorney General Griswald. This practice turns to the media to broadcast fake services, driven by what Plaintiff describes as a "trench coat mafia" supreme court of Colorado and a gothic judiciary, an entity whose blatantly unconstitutional practices are documented as erasing civil protections. Plaintiff asserts that this state practice involves the staging of mass casualty events, specifically tracking back to the timeline of the Columbine High School shooting in 1999, utilizing manufactured narratives and systemic alienation to populate 20 state prisons with vulnerable citizens (p. 29). Once an individual is structurally incapacitated, the enterprise coordinates with corporate news broadcast providers to distribute highly sensationalized, completely false narratives of "murder, rape, and robbery" without actual charges on the record (p. 29). These media campaigns are actively sponsored by the judiciary to incite public vigilantism, terrorism, and threats from vigilantes against the Plaintiff, ensuring that lobbyist-backed private healthcare and corporate entities can continue to defraud the public while immunizing state actors from civil liability based entirely on racial, religious, and disability discrimination (p. 29). All are infringing on Plaintiff's laws.

13. **Factual Matrix of Marriage and Cross-Border Financial Fraud (2006–2014)**: In 2006, while dealing with severe, untreated Type 1 Juvenile Diabetes and emerging neurocognitive

complications, Plaintiff was placed in a position of extreme economic and biological vulnerability. During this timeline, Plaintiff's ex-wife, Denise Di Fazio, and her father, Jorge Raul Di Fazio, utilized an altered temporary alien visa card to execute an elaborate real estate acquisition scheme. Specifically, Jorge Di Fazio scanned the identification card at a commercial printing facility near the University of Utah, digitally replacing the primary photograph with his own likeness. Working in direct coordination with an inside banking representative at a Key Bank branch, the individuals utilized this altered document to fraudulently secure an FHA Mortgage for the residential real property located at **4163 Blue Jay Street, West Valley City, Utah 84120**. Plaintiff, operating without subclinical metabolic stabilization and managing a minor-era $250.00 check infrastructure liability, was entirely non-volitionally entangled in these fraudulent family structures, earning zero dollars throughout the marriage.

14. **Systemic Defamation, Slander, and Multi-State Dislocation**: Following the passing of Jorge Di Fazio, family members refinanced the FHA obligations multiple times to capture illicit home tax breaks before renting the property to undocumented associates and dislocating the family unit to the State of Wyoming. Throughout this period, members of the Di Fazio family—including Alejandra Di Fazio—initiated a continuous campaign of character assassination, publishing false narratives to state actors accusing Plaintiff of illicit substance abuse and domestic crimes. These defamatory actions intentionally exploited Plaintiff's unmedicated cognitive vulnerabilities. The stress resulting from these false reports caused Plaintiff to suffer severe metabolic fluctuations, leading to frequent episodes of post-syncope amnesia and diabetic comas, where he would wake up disoriented in public spaces or resting near his vehicle.
15. **The 2014 Unlawful Abduction and Custodial Segregation of Minor Child**: In 2014, while residing in West Jordan, Utah, Plaintiff maintained valid, good-standing parent-time orders with zero underlying criminal record. During a scheduled, court-ordered visitation sequence, Denise Di Fazio and her mother arrived at Plaintiff's residence and unlawfully seized and abducted his minor daughter without notice or legal authorization. When Plaintiff text-messaged the individuals approximately 30 times demanding the immediate return of his daughter, the family contacted the West Valley City Police Department. A Spanish-speaking police officer responded to the venue, reviewed Plaintiff's valid parent-time orders, and explicitly stated he did not care about the judicial mandate. The officer issued an immediate, unconstitutional verbal restriction, ordering Plaintiff to stop begging for his daughter under threat of immediate arrest.

16. **Pretextual Criminalization and Custodial Medical Deprivation**: Upon Plaintiff's subsequent attempt to locate and recover his child the following week, municipal law enforcement actors issued a retaliatory no-contact directive and a subsequent protection order violation warrant. Plaintiff was subsequently arrested based entirely on the phone calls and texts he made while in a state of emotional and metabolic distress. During the subsequent state court proceedings, the prosecuting attorney and family members presented false civil narratives to the court, misrepresenting Plaintiff as an armed assailant who beat women with rods. Based on these unverified claims, Plaintiff was sentenced to one year of confinement. Throughout this custodial detention, institutional actors completely withheld his access to life-sustaining insulin. This complete medical deprivation caused an immediate biological breakdown, triggering advanced avascular necrosis that destroyed his bones and permanently stripped him of his ability to walk.
17. **The Move to Colorado and Systematic Exclusion from Social Safety Nets (2015–2020)**: Following his release in late 2015, Plaintiff was forced to crawl through street gutters into Colorado to escape continuous multi-state institutional trauma. While crawling directly into municipal child support offices in Colorado and Utah to present his physical deterioration and request federal parent-time locator services to find his daughter, administrative workers intercepted and seized his federal tax stimulus funds. In 2016, Plaintiff resided at the Light House sober living facility as a non-probationary disabled resident, and was always ridiculed for crawling at Department of Human Services locations in Colorado and was refused all social programs while in dire need because of being a white man and disabled, the liberal workers all bent on the unconstitutional laws of Colorado often called police just because of the gruesome effects of the untreated lifelong illnesses and his race, culture and faith, (varying from cancel culture practices, sanctuary practices, psychology fraud schemes and lobbyists, fraud and a plot to destroy the country and constitution). During this timeline, Colorado administrative entities, Department of Human Services (DHS) offices, and disability servicers—including the Division of Vocational Rehabilitation (DVR) and the Colorado Department of Labor and Employment (CDLE)—enforced restrictive policies that prioritize specialized care and funding options for non-disabled demographics while systematically denying critical insulin and housing access to low-income, disabled individuals. These practices effectively block disabled persons from accessing safety nets, leaving them vulnerable to unaccommodated arrests and prolonged institutional placement.

**--- - - -- - -- -- -EXHIBITS-- - - -- - -- - - -**




**<u>Current Class Loads Include Above, Calc 1, Bio-Organic-General Hybrid, University Calculus 2 and O-Chem Enrolments, Plaintiff is High Function Splintered Savant, the Illnesses Could Have Been Gifts for Us All, Especially Plaintiff Values Money Differently and Not at All but Rather Life.</u>**

Past Visit Details

## Diagnoses this visit

Your diagnoses were: MULTIPLE COMPLAINTS, AVASCULAR NECROSIS OF BONE OF HIP, LEFT (HC CODE)

## Note To Patients About HC Codes

Some diagnoses on this report may show the (HC code) abbreviation. This stands for Hierarchical Condition Category codes. HC codes are used for population health reporting and do not directly affect patients.

# Changes to Your Medication List

as of February 28, 2016 1:41 PM

9:38 AM

Test Details

# GLUTAMIC ACID DECARBOXYLASE AB

Collected on November 22, 2024 4:43 PM

Not yet reviewed by care team. See details

## Results

Source: Unconfirmed
Specimen Start Date: 202411221643

**Glutamic Acid Decarboxylase (GAD65) Antibody**

View trends

Normal range: 0.0 - 5.0 IU/mL

181.5

0 5

INTERPRETIVE INFORMATION: Glutamic Acid Decarboxylase Antibody

A value greater than 5.0 IU/mL is considered positive for Glutamic
Acid Decarboxylase Antibody (GAD Ab). This assay is intended for
the semi-quantitative determination of the GAD Ab in human serum.
Results should be interpreted within the context of clinical symptoms.
Performed By: ARUP Laboratories
500 Chipeta Way
Salt Lake City, UT 84108
Laboratory Director: Jonathan R. Genzen, MD, PhD
CLIA Number: 46D0523979

## Your diagnosed conditions recorded during your visit.

Review and discuss the below diagnosed conditions with your primary care provider during your annual wellness visit.

- Autistic disorder
- Chronic insulin therapy
- Chronic Pain
- Delusional disorders
- Diabetes Type 1–Complications, Polyneuropathy
- Diabetes Type 1–Complications, Retinopathy Unspecified
- Gastro-esophageal reflux disease without esophagitis
- Personal history of nicotine dependence
- Personal history of traumatic brain injury
- Pulsatile tinnitus, bilateral
- Thyroid Disease: Hypothyroidism
- Type 1 diabetes mellitus with unspecified diabetic retinopathy without macular edema
- Unsteadiness on feet



## Educational materials

Below are educational documents your HouseCalls health care practitioner recommended reviewing based on your visit assessment.

- Advance Care Planning.pdf
- Anxiety.pdf
- Care at Home.pdf
- Chronic Pain Management.pdf
- Diabetes and Foot Health.pdf
- Diabetic Peripheral Neuropathy.pdf
- Falls and Fractures.pdf
- Gastroesophageal Reflux.pdf
- Make the Most of Your Appointment.pdf
- Mental Health.pdf
- My Plate Planner.pdf
- Nutrition Labels.pdf
- Preventing Diabetes-related Eye Problems.pdf
- Recommended Health Screenings and Vaccinations.pdf
- Safe medication disposal.pdf
- Taking Charge of Your Diabetes.pdf
- Thyroid Disorders.pdf
- Tips to Manage Insomnia.pdf
- Understanding Depression.pdf

**Violation Description**

Individuals commit a violation of this condition of placement when through investigation, or when he/she submits a urine sample that contains any quantity of unauthorized substances to include illicit drugs (to include synthetic substances), inhalants, or poppy seeds. This also includes taking more medication than prescribed or taking prescription medications to which the individual is not prescribed.

## Hearing

| Hearing Disposition Date | Disposition |
|---|---|
| 11/26/2024 | Not Guilty |

## Appeal

| Appeal Requested Date | Appeal Date |
|---|---|
| | |

## Admin Review

**Narrative**

On 111724 Edward Hoid submitted a urine sample which tested positive for meth/amphetamines. Individuals commit a violation of this condition of placement when through investigation, or when he/she submits a urine sample that contains any quantity of unauthorized substances to include illicit drugs (to include synthetic substances), inhalants, or poppy seeds. This also includes taking more medication than prescribed or taking prescription medications to which, the individual is not prescribed. This is a Class 2 violation of Larimer County Community Corrections rules and regulations.




| Work Year | Earnings Taxed for Social Security | Earnings Taxed for Medicare (began 1966) |
|---|---|---|
| 1991-2000 | $5,158 | $5,158 |
| 2001-2005 | $17,264 | $17,264 |
| 2006 | $21,290 | $21,290 |
| 2007 | $19,556 | $19,556 |
| 2008 | $25,600 | $25,600 |
| 2009 | $7,372 | $7,372 |
| 2010 | $0 | $0 |
| 2011 | $5,580 | $5,580 |
| 2012 | $10,325 | $10,325 |
| 2013 | $15,486 | $15,486 |
| 2014 | $13,863 | $13,863 |
| 2015 | $10,118 | $10,118 |
| 2016 | $13,250 | $13,250 |
| 2017 | $425 | $425 |
| 2018 | $0 | $0 |
| 2019 | $6,278 | $6,278 |
| 2020 | $1,032 | $1,032 |
| 2021 | $0 | $0 |
| 2022 | $5,066 | $5,066 |
| 2023 | $0 | $0 |
| 2024 | $2,113 | $2,113 |
| 2025 | Not yet recorded | Not yet recorded |

Homes.com
https://www.homes.com › ... › 84120 › Hunter

4163 Blue Jay St, Salt Lake City, UT 84120

**Difazio Jorge**. Owned For. 2 Years. Owner Type. Private Individual. Purchase Details. Closed on. Dec 27, 2006. Sold by. Difazio Alejandra and Di Fazzio Jorge.

UnMask
https://unmask.com › F › Fazio

Jorge Fazio (1 public record) - Address, Email, Phone Number

Jorge Fazio **currently lives at 4163 Blue Jay Street**, West Valley City, UT 84120. Relatives / Associates. Denise Di Fazio Wilmington, CA Alejandra Di Fazio San ...

FastBackgroundCheck.com
https://www.fastbackgroundcheck.com › people › aleja...

Alejandra Di Fazio in San Pedro, CA (age 44) 801-349-8190

Alejandra **Di Fazio** is married to **Jorge** Raul **Difazio**, age 71. Alejandra is also related to or closely associated with Denise **Di Fazio**, Rosana **Di Fazio** and Rosana ...

---

## 2. Complete Online Pre-Application

Submit the appropriate Larimer or Weld County pre-application form using the links below. The form typically takes 5-15 minutes to complete and can be submitted anytime between 12:00 AM and 11:59 PM on the open day.

N2N's rent assistance program opens on the 2nd of each month. If the 2nd falls on a Friday, weekend, or holiday, it will open on the next business day.

If you miss the date or your entry is not selected this month, the preapplication is scheduled to reopen at 12:00 AM on the following dates:

- Monday, January 5, 2026
- Monday, February 2, 2026
- Monday, March 2, 2026

**Are You LGBTQ?**

**Are You Undocumented?**

**Are You Colored?**

# Gov. Jared Polis signs bill protecting gender-affirming care coverage in Colorado

BY: **SARA WILSON** - MAY 23, 2025 12:36 PM




Colorado Gov. Jared Polis signs House Bill 25-1309 into law on May 23, 2025 in Denver, Colorado. The law prohibits health insurers to deny affirming care coverage. (Sara Wilson/Colorado Newsline)

Colorado Gov. Jared Polis signed legislation into law on Friday that codifies health insurance coverage for gender-affirming care.

"Today, we're sending a clear message: Coloradans will not let politics get in the way of medical care. As we face national efforts to erase access to gender-affirming care, including threats to Medicaid and pending decisions at the Supreme Court, we're stepping up to protect what we know is right," bill sponsor

NBC NEWS | Truck driver's sentence reduced from 110 years to 10 by Colorado governor in fatal crash | SHARE & SAVE

U.S. NEWS

# Truck driver's sentence reduced from 110 years to 10 by Colorado governor in fatal crash

Gov. Jared Polis commuted Rogel Aguilera-Mederos' sentence by 100 years, calling the 2019 accident a "tragic but unintentional act."



# 'Dangerous' man released from jail over competency spotted with gun on UNC campus, arrested again

The University of Northern Colorado sent an email alert to students on Tuesday, warning them about Ephraim Debisa. The suspect was arrested Wednesday.



# PART 2: THE COLORADO INSTITUTIONAL CONFINEMENT AND MEDICAL DEPRIVATION ERA (2016–2020)

18. **The 2016 Arrival in Colorado and Acute Medical Crisis**: On or about February 28, 2016, following the structural destruction of his hip joints due to custodial insulin deprivation in Utah, Plaintiff arrived in Fort Collins, Colorado. Operating completely unmedicated and lacking necessary endocrinological care, Plaintiff experienced compounding physiological breakdown, including severe, recurring systemic staph infections and septicemia triggered by elevated blood glucose levels. Due to extreme metabolic volatility, Plaintiff experienced severe fluctuations in consciousness, frequently suffering from post-syncope amnesia and diabetic comas. When Plaintiff crawled into regional emergency medical facilities—including UC Health hospitals—seeking emergency care, administrative and security personnel repeatedly intercepted, obstructed, and removed him from the premises while he was in acute physiological agony.
19. **The Light House Eviction and Cold-Snap Displacement**: In or about 2016, Plaintiff secured a non-probationary, private room for rent at the Light House sober living center in Fort Collins, Colorado, paying a $650.00 monthly fee using funds derived entirely from physical day labor. Despite maintaining absolute sobriety and possessing zero criminal or parole supervision frameworks, Plaintiff's physical condition continued to deteriorate. Because Plaintiff's severe mobility restrictions prevented him from executing heavy physical work and manual grocery transportation sequences, the facility management initiated discriminatory housing practices. During a period of extreme winter weather conditions, the manager executed an immediate eviction, displacing a severely disabled individual directly into freezing outdoor environments.
20. **The November 26, 2024 Acute Metabolic Shock and Pretextual Arrest**: On or about November 23, 2024, three days following his unlawful eviction, Plaintiff entered a state of severe, life-threatening metabolic shock, including acute Hyperosmolar Hyperglycemic State (HHS) and Diabetic Ketoacidosis (DKA). Driven by absolute physiological dehydration, Plaintiff experienced severe cognitive disorientation and an involuntary state of extreme polydipsia. Seeking life-sustaining water to prevent a fatal metabolic collapse, Plaintiff crossed an exterior fence line, entered an unlocked doorway at a local structure, and consumed multiple gallons of water. Local law enforcement actors arrived at the venue and, rather than routing an incapacitated, visibly uncoordinated diabetic individual to immediate emergency medical care, initiated

criminal processing. Plaintiff was subsequently arrested and formally charged with felony burglary under Case No. 2017CR2094.

21. **Coercive Interception of Rights by North Range Behavioral Health**: Following his pretextual detention, Plaintiff was subjected to severe physical trauma, accumulating multiple untreated skull fractures from fainting spells on concrete surfaces. Upon seeking emergency intervention at UC Health Poudre Valley Hospital with two fractured arms and active DKA symptoms, his clinical intake was intercepted by state-subsidized actors operating under **North Range Behavioral Health**. Operating under color of state anti-discrimination laws, North Range personnel systematically intercepted emergency police reports and hospital intakes to substitute fraudulent psychological evaluations for necessary clinical medical treatment. North Range staff placed an unconstitutional psychiatric hold on an acutely ill diabetic individual, utilizing emergency nurses to force him into a transportation van for immediate delivery to a non-medical detox facility. Throughout this three-day administrative confinement, staff mocked Plaintiff's physical immobility, completely denied him access to insulin or orthopedic stabilizing care, and subsequently discharged him directly into freezing outdoor conditions.

22. **Successive Parole Sentences and Institutional Demographics Eras**: Following these multi-jurisdictional actions, Plaintiff was remanded to the Larimer County Jail and subsequently placed into maximum security prison networks operated by the Colorado Department of Corrections (CDOC). CDOC and municipal judicial actors systematically implemented consecutive, double-digit sentences and mandatory parole terms off the books, completely denying earned-time credits to ensure cyclic, prolonged institutional confinement. This administrative practice was intentionally designed to silence the victim, block access to federal courts, and prevent the exhaustion of federal funding entitlements. While confined, Correctional Officer Orin actively weaponized Plaintiff's visible physical suffering, accusing him of faking his severe orthopedic injuries to build a fraudulent criminal profile, while local human services departments intercepted and seized his federal stimulus funding to maintain fraudulent domestic obligations.

23. **The Post-Eviction Emergency and Agonized Campus Crossing**: On or about November 23, 2024, immediately following his unconstitutional eviction during a severe cold snap, Plaintiff entered acute metabolic shock, experiencing severe visual impairment and profound disorientation. Completely incapacitated and desperate for water to prevent a fatal cellular collapse, Plaintiff was filmed entering an open doorway at a campus structure and locking

himself inside a bathroom to ingest fluids. After crawling out of the building and managing a prolonged coma-state behind a nearby wooden fence, Plaintiff attempted to navigate across the Colorado State University (CSU) campus property.

24. **The Unlawful Stalking, Interception, and Obstruction by Fort Collins and CSU Police**: As Plaintiff crawled in absolute agony across approximately one mile of the university campus property, municipal and campus law enforcement actors arrived at the venue. Rather than executing their mandatory duties as public safety officers to summon an emergency medical ambulance for a visibly dying individual, the officers engaged in active intimidation and stalking. The police slowly followed directly behind the crawling Plaintiff in their marked patrol vehicle as he traversed the campus grounds. When Plaintiff successfully reached a local church venue, entered the sanctuary, and explicitly begged the pastor to transport him to an emergency hospital, the pursuing police officers followed him directly into the church building to obstruct his rescue. The officers actively blocked the pastor from providing aid, falsely asserting to the witness that the Plaintiff was merely "crazy and on drugs," and ordered the severely injured, non-ambulatory Plaintiff to crawl away back into the freezing outdoor elements.

25. **Pretextual Burglary Prosecution**: Days later, based entirely on this medical intervention and the consumption of water jugs, local law enforcement actors formally prosecuted Plaintiff for felony burglary under Case No. 2017CR2094, setting a fraudulent restitution amount of exactly $1.96 for the consumed water.


Past Visit Details

Curt M at 11/26/2024 11:10 AM

Plan

**Assessment and Plan:**

**1) Type 1 diabetes mellitus without complication (HC CODE) (ICD-10: E10.9)**
Diagnosed while in jail, released 10/2024. Current regimen: 25u Lantus nightly and 10u AM, 10u Humalog TID meals.
--------------------
11/26/2024
Seen in ED for hyperglycemia. Pt reports lifelong history with multiple DKA episodes and a recent arrest for burglary due to entering a business and "Drinking 12 gallons of water for DKA.". BG labile and usually very high per pt. He needs another script for a glucometer. Wants GCM as well as a pump. BG today was >400 fasting but pt hesitant to increase PM Lantus. Will add 10u Lantus AM. Pt has been taking 5u Humalog before meals, will increase to 10u. Will check BG 4x daily and have FU in 1 week. GAD65

*Orders: POCT GLUCOSE CPT 82962 MANUAL RESULT ENTRY*
*AMBULATORY REFERRAL TO PRIMARY CARE*

---

# PART 3: CHRONOLOGY OF THE NOVEMBER 5, 2020 METABOLIC COLLAPSE AND EXTENDED TRANSPORTS

26. **The Racial Misidentification and Target Conversion**: On or about November 5, 2020, during the initial dispatch response sequence, Longmont Police Department officers arrived at the open field near the museum operating under the explicit dispatch report that the suspect was a Black male [source: 4, 6]. Despite discovering the Plaintiff—who is an explicitly white male—lying face-down and completely incapacitated in the dirt field, responding officers deliberately converted him into the target of the violent robbery script [source: 4, 6].

27. **The Explicit Race Divergence in the Official Affidavit**: As recorded in the official Affidavit for Warrant of Arrest, civilian witness Craig Stevens initially told dispatch that the individual who entered his car was a Black man, approximately 5'09" tall, with a crew cut and red hair [source: 4]. The witness later corrected this description, stating the individual was actually a white male whose skin appeared heavily weathered from sun exposure [source: 4]. The Longmont Police Department intentionally utilized this racial description confusion to bridge two entirely separate incidents, choosing to force a white, comatose, autistic diabetic into a violent criminal script originally broadcast for a Black suspect [source: 4, 6]. The warrant was not at issue until months after I was detained. There were no warrants ever until after that fact.

**AFFIDAVIT FOR WARRANT OF ARREST**

**Page 2 of 7 pages**

the parking lot and found a man in the driver's seat going through his things. The man got some old chewing gum from his glove compartment, chewed it, and put the gum all over his car. Stevens told the man to leave, and the man told Stevens to say "please." The man was holding a box cutter with the blade extended in Steven's face. Stevens asked him to please exit his car, and the man left his car, threw an old piece of bubble gum at him, and went west out of the parking lot towards an open field and the museum's car charging station. Stevens said he did not feel threatened and he did not want to press charges.

Stevens initially told Dispatch the suspect was a black man, 5'09", mid-thirties, crew cut red hair, "grizzled" and unshaven, wearing a blue t-shirt and jeans, and wearing a greyish backpack. Stevens later said it was actually a white male but his skin appeared weathered as if he had been in the sun a lot. He appeared clean and not homeless.

28. **The Unquantified Internal Trauma and Skull Fractures**: On or about November 5, 2020, as a direct consequence of the profound biological collapse, muscle cramping, and temporary blindness induced by the Hyperosmolar Hyperglycemic State (HHS), Plaintiff suffered multiple high-impact falls face-down onto hard dirt and pavement surfaces [source: 3, 6]. These sequential collapses, which occurred while Plaintiff was entirely incapacitated, resulted in severe, unmedicated internal head trauma, structural swelling of the brain, and the

accumulation of seven distinct skull fractures [source: 3]. This profound organic brain trauma caused extensive physical complications, leaving Plaintiff to experience severe, chronic bilateral pulsatile tinnitus, ongoing neurological processing blocks, and periodic bleeding from his ears [source: 3].

29. **The Delayed Forensic Intervention and Comparative Care Disparity**: Following his admission to the hospital network, Plaintiff's severe traumatic head injuries and skull fractures were completely left untreated and unexamined by state and medical actors for an extended multi-day period [source: 3]. This total absence of immediate diagnostic testing stands in stark contrast to the standard of care provided to other regional trauma victims—such as civilian trauma patient Barclay at Denver Health, who was immediately afforded multi-point diagnostic imaging and a life-saving craniotomy within seconds of an accidental fall on concrete [source: 3]. State actors deliberately withheld these standard neurosurgical interventions from the Plaintiff, leaving him to endure prolonged internal hemorrhaging and physical deterioration [source: 3].



credit: CBS)

"I was just pouring my coffee and then I woke up four days later," said Barclay. "What we pieced together after is I was just standing there pouring my coffee and all of a sudden I just keeled over and shattered my head on the concrete floor."

Barclay fractured her skull in multiple places, striking her head in what the surgeon called the most unlucky spot.

"What stood out to me was... the term unlucky- to hit your head in just that one spot because with this type of an injury, it's called an epidural hematoma, so you cut an artery on sort of the covering of the brain and you have to be very specific where you get hit for that to happen," said Dr. Kathryn Beauchamp a Neurosurgeon with Denver Health.

For Barclay, every second that passed was critical. Her office called 911 right away, and when the paramedics arrived they noted a significant decline in her mental state, indicating a traumatic brain injury.

30. **The Witness Observations of the Bike Path Scene**: On or about November 5, 2020, during the exact timeline of Plaintiff's face-down collapse in the open field, civilian witnesses riding bicycles along the adjacent museum path observed the physical movements of 71-year-old Randall Clark Schubert [source: 6, 7]. Mr. Schubert was observed attempting to mount a chrome-colored bicycle after temporarily fumbling a basketball near the bike racks [source: 6]. Mr. Schubert pivoted on one foot, struck his leg against the bicycle frame, and accidentally tripped backwards, landing directly on the back of his head on the concrete path [source: 3]. A female pedestrian walking immediately behind him witnessed this accidental fall and immediately placed the secondary 911 call to Longmont Fire and Dispatch [source: 3].
31. **The Mismatched Physical Descriptions in the Police Record**: Despite the explicit, recorded statements of the bike path witnesses tracking a chrome-colored bicycle, the subsequent Longmont Police Department property logs and media broadcasts altered the descriptions to allege a green bicycle with black saddlebags was stolen [source: 6]. Responding officers utilized

this fabricated mismatch to construct a violent robbery narrative against the comatose Plaintiff, intentionally ignoring the reality that Plaintiff was a white male who had been discovered completely unconscious, missing his own phone, and carrying zero stolen property [source: 4, 6].

32. **The 7-Eleven Extraction and Recovery of Possessions**: On or about November 5, 2020, after partially regaining physical awareness at the 7-Eleven convenience store on 17th Street, civilian bystander Robert McEwen left saddlebags for Randall Shubert's bike on top of an ice chest in front of 7-11.




33. **The Subsequent Medical Verification of Hyperglycemia**: Following his retrieval of the truck from the Wal-Mart facility, Plaintiff's metabolic instability escalated rapidly, causing Hyperosmolar Hyperglycemic State (HHS) [source: 3].

34. **The Post-Mortem Medical Tracking of Randall Clark Schubert**: On Sunday, November 15, 2020, at approximately 11:45 PM, Officer J. Hill of the Longmont Police Department was dispatched to Longmont United Hospital following the passing of 71-year-old Randall Clark Schubert

[source: 7]. Attending nurse Valerie Delgado formally reported that Mr. Schubert had been placed on hospice care and removed from a ventilator due to a deteriorating subdural hematoma and subarachnoid hemorrhage resulting from his accidental bicycle fall on November 5, 2020 [source: 7].

## Longmont Police Department

| Employer/School | Position/Grade | |
|---|---|---|
| LONGMONT UNITED HOSPITAL | NURSE | |

| Location | City |
|---|---|
| 1950 MOUNTAIN VIEW AVE | LONGMONT |

| State | ZIP Code | Phone Type | Phone No |
|---|---|---|---|
| Colorado | 80501 | Work/Business | (303)651-5111 |

**Modus Operandi**

Crime Code(s)
ROBBERY

**Narrative**

INITIAL INFORMATION:
On Sunday, November 15, 2020, at approximately 11:45 PM, I, Officer J. Hill, was dispatched to respond to Longmont United Hospital (LUH) in reference to VICTIM-Randall Schubert (Randall) passing away.

INVESTIGATION:
Sergeant P. Beach asked me to respond to LUH to meet with the corner and take pictures of Randall for evidence. Sergeant Beach notified the on call detective, Detective S. Desmond.

I responded to room #4104 and met with Randall's nurse, OTHER-Valerie Delgado (Valerie). Valerie informed me Randall stopped breathing at 9:50 PM and she pronounced Randall deceased at 9:52 PM. The death certificate was going to be signed by Doctor John Massone.

Valerie further informed me Randall arrived at LUH yesterday (11/14/20) and due to his deteriorating condition, Randall's family placed him on hospice with a do not resuscitate order and removed his ventilator. While at Longs Peak Hospital, Randall had a craniotomy due to sustaining a subdural hematoma and subarachnoid hemorrhage during the original incident on 11/5/20. Valerie said Randall did not appear to have any other major injuries or medical issues.

20-8649 Supplement No 0007

## Longmont Police Department DRAFT

**Narrative**

I spoke with Jackie and she said Randall had probably bungee-corded the basketball to his bicycle rack. She said Randall's cell phone number was 303-503-0909. I looked in a law enforcement database, found the carrier was Verizon, and sent a preservation request to Verizon for this number. I also noticed a bungee cord was recovered from the scene.

## Longmont Police Department

**Narrative**

and he said he was not, threw a basketball at him, got on the bike and rode away. Sara described the male as a homeless-looking male, in his 40's 5'9". Sara advised that the male came to and got up. They tried to keep the male down but he would not stay down. The male fell a couple of times.

## Longmont Police Department

Page 4 of 9

| Phone Type | Phone No | Date |
|---|---|---|
| Cell | (970)217-6017 | 11/05/2020 |

| Employer/School | Position/Grade |
|---|---|
| KING SOOPERS | LOSS PREVE |

| Location | City |
|---|---|
| 2255 MAIN ST | LONGMONT |

| State | ZIP Code |
|---|---|
| Colorado | 80501 |

### Property

| Prop # | Involvement | Invl Date | In Custody? | Security | Value |
|---|---|---|---|---|---|
| 1 | Stolen | 11/05/2020 | No | No | $500.00 |

| Description | Typ | Cat |
|---|---|---|
| GREEN WITH BLACK SADDLE BAGS | B | Bicycle |

| Article | Brand | IBRS Type | Entered Date | Entered Time | RMS Transfer |
|---|---|---|---|---|---|
| Bicycle and Related Equipment | BRIDGE | Bicycles | 11/08/2020 | 12:30 | Successful |

| Control | |
|---|---|
| 06C17 | 1116200934 |

| Link | Involvement | Invl No | Name | Race | Sex |
|---|---|---|---|---|---|
| OWN | VIC | 1 | SCHUBERT,RANDALL CLARK | W | M |

| DOB |
|---|
| 09/15/1949 |

| Prop # | Involvement | Invl Date | In Custody? | Security | Value |
|---|---|---|---|---|---|
| 2 | Stolen | 11/05/2020 | No | No | $50.00 |

| Description | Typ | Cat |
|---|---|---|
| WALLET | A | Identification items |

| Article | IBRS Type | Entered Date | Entered Time | RMS Transfer | Control | |
|---|---|---|---|---|---|---|
| WALLET | Other | 11/08/2020 | 12:32 | Successful | 06C17 | 1116200934 |

| Prop # | Involvement | Invl Date | In Custody? | Security | Typ | Cat | Article | IBRS Type |
|---|---|---|---|---|---|---|---|---|
| 3 | Stolen | 11/05/2020 | No | No | S | Identification items | CREDIT | Other |

| Account Name |
|---|
| RONERT SCHUBERT |

| Account No | Bank Name | Entered Date | Entered Time |
|---|---|---|---|
| 4465420594858219 | WELLS FARGO | 11/08/2020 | 12:33 |

| RMS Transfer | Control | |
|---|---|---|
| Successful | 06C17 | 1116200934 |

### Modus Operandi

| Crime Code(s) |
|---|
| ROBBERY |

### Narrative

INITIAL INFORMATION :

On 11052020 at about 1710 hours I, Sgt Malterud (0602), heard Longmont Fire being dispatched to a fall behind Lowes, 355 Ken Pratt Blvd, Longmont, Boulder County, Colorado. Dispatch gave further information that the male was on the bike path south of the river, south of Lowes. I decided to respond to the call.

INVESTIGATION :

There is an open field between the St. Vrain River and the Longmont Museum so I crossed the bridge and started to go through the open field. I had a clear visual down the bike path and could see a small group of people, I believed this to be the location of the fall. I got out and walked to the area and I noticed a male that appeared to be in his 60's with long gray hair that was covered in blood. The male was up and walking but when I contacted him he was not speaking. I asked several questions, what was his name, anyone I could call for him, where he lived, what happened, but he did not answer or say anything. The male tried to walk away but I held his arm and explained he needed to get checked out by medical.






---

## PART 4: THE MEDIA CAMPAIGN AND CUSTODIAL EXCLUSION SEQUENCE (2020–2024)

30. **The November 18, 2020 Press Dissemination and Fabrication of the Homicide Script**: On or about November 18, 2020, while Plaintiff remained completely incapacitated, the Longmont Police Department initiated an extrajudicial media campaign [source: 6]. Acting in direct coordination with corporate news networks, Defendant Deputy Chief Jeff Satur released highly sensationalized, false public narratives asserting that Plaintiff had intentionally jumped, robbed, and "beaten to death" 71-year-old Randall Clark Schubert on the greenway path south of Lowe's [source: 6, 7]. These statements were disseminated despite direct possession of forensic medical intake records and first-responder dispatch transcripts confirming that Mr. Schubert's subdural hematoma resulted exclusively from an accidental, unhelmeted bicycle fall [source: 4, 7].



31. **The Incitement of Public Vigilantism and Multi-State Stalking**: On or about November 21, 2020, Defendant Jeff Satur transmitted a sweeping cross-border electronic press advisory to regional media hubs and law enforcement networks across Nebraska, Ohio, Idaho, Utah, and Nevada [source: 6]. This public release branded the acutely ill, autistic Plaintiff as an "armed and dangerous" fugitive fleeing from a capital homicide investigation [source: 6]. As a direct consequence of this media broadcast, private vigilante networks—including Defendants Brian Derry and Sarah Kathleen Schroeder—commenced a pattern of targeted tracking and intimidation [source: 6]. Private actors stalked Plaintiff's minor children and immediate relatives across multiple states, issuing text-based threats of extrajudicial execution [source: 6].

32. **The November 27, 2020 Extradition, Mechanical Ramming, and Calcaneus Fracture**: On or about November 27, 2020, at approximately 1:00 AM, Plaintiff was located by law enforcement

**From:** Jeff Satur <Jeff.Satur@longmontcolorado.gov>
**Sent:** Saturday, November 21, 2020 10:34 AM
**To:** Brooklyn Dance <bdance@prairiemountainmedia.com>; Kelsey Hammon <khammon@prairiemountainmedia.com>; 4 News <kcncnews@cbs.com>; 7 News <newstips@thedenverchannel.com>; 9 News <desk@9news.com>; KDVR Tips <KDVRTips@kdvr.com>; Times Call <tcnews@times-call.com>; Robin Ericson <Robin.Ericson@longmontcolorado.gov>; news2@nbcneb.com <news2@nbcneb.com>; editor@nptelegrapg.com <editor@nptelegrapg.com>; dee.klein@nptelegraph.com <dee.klein@nptelegraph.com>; andrew.bottrell@nptelegraph.com <andrew.bottrell@nptelegraph.com>; Monte Whaley (monte@longmontleader.com) <monte@longmontleader.com>
**Cc:** Jeff Satur <Jeff.Satur@longmontcolorado.gov>
**Subject:** Press Release - Wanted Party

Hello All,

Please see the attached press release in reference to the Randall Schubert death investigation. For our media representatives in Nebraska, I have included some links for background. We have information he may be staying in Brady, NE, which is between North Platte and Kearney, which is why I included you in the email. I will also be sending information to the Nebraska State Patrol. I would appreciate if you could share this with your Nebraska affiliates along I-80. I do not have any vehicle information.

Feel free to call me if you have any questions.

Thanks, Jeff

Each agency reported differently this is not a ridiculous / soit spree.

https://www.timescall.com/2020/11/18/longmont-police-release-new-photos-of-person-of-interest-in-attack-that-led-to-71-year-old-mans-death/

https://kdvr.com/news/local/longmont-police-search-for-suspect-who-beat-71-year-old-man-to-death-stole-his-bike/

personnel at the Village at the Peaks shopping area in Longmont, Colorado [source: 6]. Operating in an unmedicated state of metabolic shock and severe panic induced by ongoing public death threats, Plaintiff threw stones at commercial windows to intentionally trigger local building alarms and secure civilian sanctuary from pursuing vehicles [source: 6]. Responding tactical units immediately swarmed the venue [source: 6]. An unmarked police vehicle intentionally rammed Plaintiff against a concrete curb line, causing a severe, closed comminuted displaced fracture of his right calcaneus bone [source: 6].


ED After Visit Summary (...

AFTER VISIT SUMMARY

uchealth

Edward H. Hoid MRN: 3560969 11/27/2020 UCHealth Emergency Care - Longs Peak Hospital 720-718-7000

**Instructions**

Do not put weight on your right foot. Keep the splint in place until seen by orthopedic foot and ankle surgery clinic. Use crutches. Use over-the-counter acetaminophen (tylenol) and/or ibuprofen (motrin, advil) as needed for pain or fever. Return to the ER for increasing toe/foot pain, numbness, weakness, coldness, or other acute concerns. You are medically cleared for further jail processing.

Your medications have changed today

**Refer to the Medication List for detailed information on how you take the medications.**

Read the attached information

1. CARENOTES - GONORRHEA (AFTERCARE(R) INSTRUCTIONS(ER/ED)) (ENGLISH)
2. KRAMES HEEL PAIN, UNDERSTANDING (ENGLISH)
3. CARENOTES - CALCANEAL FRACTURE (AFTERCARE(R) INSTRUCTIONS(ER/ED)) (ENGLISH)

Pick up these medications from any pharmacy with your printed prescription

acetaminophen

AMB REF TO ORTHOPEDIC SURGERY - CU Ortho Longmont (Daniel Kyeongtaek Moon, MD)

Where: UCHealth Orthopedics Clinic - Longmont
Address: 1925 Mountain View Ave LONGMONT CO 80501
Phone: 720-494-3132
Multiple visits requested (expires 11/26/2021)

Follow up with UCHealth Longmont Clinic

Why: Call to arrange outpatient primary care evaluation with Family Medicine or Internal Medicine or follow-up with your usual primary care provider.
Contact: 1925 W. Mountain View Avenue, Longmont, CO 80501

(303) 647-4974

**Today's Visit**

You were seen by Devin Anthony Rickett, MD

Reason for Visit
Ankle Pain Right

Diagnoses
- Closed comminuted displaced fracture of right calcaneus
- Medical clearance for jail processing

[redacted]

- Pain of right heel
- History of methamphetamine abuse (HC code)

Imaging Tests
CT FOOT/ANKLE RIGHT WO CONTRAST
XR FOOT 3 VIEW (AP,OBL,LAT)-RIGHT

Medications Given
cefTRIAXone (ROCEPHIN) Last given at 8:29 AM

**My Health Connection**

View your After Visit Summary, schedule appointments, send messages, and refill medications by downloading the UCHealth Mobile App for Apple or Android.

Edward H. Hoid (MRN: 3560969) • Printed by [2340] at 11/27/20 11:28 AM ©2017 Epic Systems Corporation Page 1 of 15
We improve lives.

33. **The Interrogation Coercion and the Suppression of the McEwen Exculpatory Affidavit**: Following his emergency admission and immediate discharge back to custodial custody, Plaintiff was subjected to extended law enforcement interrogations [source: 3]. Responding detectives deliberately exploited Plaintiff's untreated organic brain trauma, skull fractures, and metabolic disorientation to extract coercive statements while systematically hiding exculpatory

evidence [source: 3]. While detained inside the Boulder County Jail, a civilian inmate, Robert McEwen, recognized Plaintiff from the 17th Street 7-Eleven timeline and executed a carbon-copied jail administrative "kite" affidavit [source: 6]. The McEwen affidavit explicitly confessed that he had discovered a misplaced financial card on the ground near the store console and thrust it directly into the hands of the completely comatose, non-communicative Plaintiff [source: 6].

34. **The Destruction of Legal Defense Records and Judicial Fast-Tracking**: On or about February 17, 2021, appointed public defense counsels—including Defendants Nicole Collins and Jessica Hempstead—received direct telephonic and written verification of the McEwen exculpatory affidavit [source: 6]. Instead of entering this baseline discovery into the court record, Defendant Collins actively suppressed and destroyed the documentation to protect the ongoing high-profile media narrative [source: 6]. When Plaintiff explicitly refused to enter a guilty plea for a non-existent crime, public defenders colluded with state prosecutors to threaten an administrative declaration of mental incompetence [source: 6]. Defendant Collins subsequently withdrew from representation after coercing Plaintiff into drawing an inaccurate memory map, which was immediately handed over to Longmont detectives to retroactively reconstruct and stage the greenway bike path crime scene [source: 6].

35. **The Forensic Longmont Police Evidence Logs and Photographic Verification**: On or about December 10, 2020, as recorded on the official law enforcement discovery portal under the designated registry path `highjl (://evidence.com)`, multiple frames of electronic and photographic evidence were officially preserved [source: 170, 171]. These unredacted scene photographs definitively demonstrate that immediately following his accidental bicycle collapse behind the Lowe's facility, Randall Clark Schubert was standing upright, walking under his own physical power, and actively communicating with civilian bystanders [source: 35, 170]. The objective surveillance profile explicitly registers the presence of Mr. Schubert's chrome bicycle at the venue, while confirming the absolute absence of a basketball or any signs of a physical, blunt-force trauma attack [source: 171]. Responding officers and detectives deliberately chose to ignore these active forensic images, choosing instead to suppress the visual evidence from the primary court records to insulate the municipality from liability and preserve the high-profile homicide script [source: 95, 171].




36. **The Chronological Re-Questioning of Witness Craig Stevens and the Race Discrepancy Falsification**: On or about November 19, 2020, administrative and records division actors within the Longmont Department of Public Safety received a formal voicemail message from an associate named Barton, noting a tentative identification of the suspect based on local news broadcasts [source: 172]. Acting under the direct supervision of **Defendant Deputy Chief Jeff Satur**, **Longmont Police Racheal Sloan-Stoggsdill** subsequently requestioned civilian witness Craig Stevens regarding the initial incident near Quail Road and Main Street [source: 4, 98]. Although Mr. Stevens explicitly reaffirmed that no robbery, threat, or criminal execution had transpired, detectives intentionally weaponized the witness's initial race-description error—wherein he originally described a 5'9" Black male to dispatch operators—to force the white, comatose Plaintiff into the violent homicide profile [source: 4, 29].
37. **The Map Fabrication Conspiracy and the Technical Greenway Path Diagram**: In or about February 2021, while the Plaintiff was held in acute metabolic shock and enduring severe internal head trauma inside the Boulder County Jail, appointed defense counsel **Defendant Nicole Collins** executed an affirmative act of professional betrayal [source: 68]. Defendant Collins arrived at the facility and forced the non-stabilized, unmedicated Plaintiff to construct a

handwritten diagram of his disoriented wandering path [source: 68]. This diagram utilizes precise geographical coordinates, tracing a concrete path forming a distinct "Y" shape where line A denotes the path passing directly beneath the regional bridges, line B marks the downhill concrete ramp sequence, and line C identifies the parking lot layout near the Longmont Museum [source: 165, 169]. Defendant Collins immediately bypassed standard defense procedures and delivered this physical map directly to Longmont detectives [source: 68]. Detectives subsequently used this drawing to retroactively stage a fake crime scene layout on the greenway path, fabricating a physical narrative that falsely claimed the Plaintiff had jumped out of the adjacent bushes to ambush the bicyclist [source: 68, 71].




Next scene; Below is a diagram of the concrete path with direction;




I crossed the field, from the south. I approached the merge area. I had not yet landed on the bike path, and never would. As I approached, a cyclist drove, East, there was a foot pedestrian, walking East, 2 bi-standers were at the top of the ramp. The cyclist drove around the foot pedestrian, the bicycle had a rear mounted rack with saddlebags, on top of the rack was




46. **The Sham Sentencing Sequence and Maximum-Security Sequestration (2021–2023)**: On or about May 12, 2023, state judicial actors executed a coordinated sentencing protocol to insulate the municipal enterprise from civil liability [source: 6]. Magistrate Nancy W. Salomone vacated the bench for a single day, permitting Judge Bruce Langer to step in and finalize an unconstitutional 7-year Department of Corrections (CDOC) confinement sentence based on a single, fabricated count of identity theft [source: 6]. Throughout this multi-year confinement within maximum-security state networks, Plaintiff was systematically denied access to life-sustaining insulin, causing ongoing brain swelling, internal hemorrhaging, face scarring, and advanced bone necrosis [source: 6].

47. **The Fraudulent Federal Concealment and Appellate Affirmations (2024)**: On or about December 19, 2024, the Colorado Court of Appeals—operating under Division IV via Judge Harris—issued an order affirming the trial court's underlying actions under Appeal No. 23CA1976 [source: 6]. The appellate panel explicitly adopted the fabricated "deadly beating and robbery" news scripts, utilizing procedural barriers to block the entry of forensic 911 audio and hospital trauma logs into the official record [source: 6]. This systematic falsification was subsequently used by federal bench actors—including Chief Judge Philip A. Brimmer under Case No. 24-cv-01127—to summarily dismiss Plaintiff's civil rights actions, preserving the fraudulent state record to force an autistic, crippled Type 1 diabetic minor lineage holder into continuous parole restrictions [source: 6]. The Court of appeals authored from thin air a conviction assertion and one by the wrong judge.

00:05:00 Speaker 3
Yes, it is, ma'am. Mr. Mr. Hoyt right now.
00:05:04 Speaker 3
**Is currently a suspect in a homicide high profile homicide.**
00:05:12 Speaker 3
The division is on. The division is taking verification because.
00:05:17 Speaker 3
We will be able.
00:05:18 Speaker 3
To work may be a danger to it's still a danger to.
00:05:20 Speaker 3
The public no formal charges have been.
00:05:24 Speaker 3
Filed yet because it's still under investigation.

Dec 28 2020 - Parole Hearing audio file HOID 178706_362d_12.28.2020 (1).

23CA1976 Peo v Hoid 12-19-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1976
Boulder County District Court No. 20CR2138
Honorable Nancy W. Salomone, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Edward Herbert Hoid,

Defendant-Appellant.

---

ORDER AFFIRMED

Division IV
Opinion by JUDGE HARRIS
Yun and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 19, 2024

---

appeal, Hoid did not sufficiently allege that he was entitled to file an appeal. Under section 18-1-409(1), C.R.S. 2024, a defendant who pleads guilty may not appeal his sentence if the sentence imposed "is within a range agreed upon by the parties pursuant to a plea

---

[2] The sentencing judge was the same judge who considered and denied Hoid's Crim. P. 35(c) motion. By denying the Rule 35(c) motion, the judge implicitly found that evidence of Hoid's diabetes would not have changed the outcome of the sentencing proceedings. *See, e.g.*, *Voytik v. United States*, 778 F.2d 1306, 1310 (8th Cir. 1985) (where district court judge had determined "that he would not have reduced [the defendant's] sentence" even if counsel had performed as the defendant wished, the defendant's ineffective assistance of counsel claim failed for lack of prejudice.).

Court Address: Boulder Justice Center
1777 Sixth Street P.O. Box 4249
Boulder, CO 80306-4249
Phone Number: 303-441-3750

DATE FILED
May 12, 2023

COURT USE ONLY

Case Number: 2020CR002138

**The People of the State of Colorado**
vs.
**HOID, EDWARD HERBERT**

Division: 6

**SENTENCE ORDER**

**Defendant:** HOID, EDWARD HERBERT **Date of Birth:** 03/19/1984

| Count | Class | Plea | Finding |
|---|---|---|---|
| 1 18-5-902(1)(a) - ID THEFT-USES INFO TO OBTAIN | F4 | Plea of Guilty | Guilty |
| 2 18-4-502 - TRESPASS 1-AUTO-W/INTENT TO COMMIT CRIME | F5 | Plea Not Guilty | Dism by DA |
| 3 18-3-206(1)(a)/(b) - FELONY MENACING-REAL/SIMULATED WEAPO | F5 | Plea Not Guilty | Dism by DA |
| 4 18-4-401(1),(2)(e) - THEFT-$750-$2,000 | M1 | Plea of Guilty | Guilty |
| 5 18-4-501(1),(4)(c) - CRIMINAL MISCHIEF-$750-$1000 | M1 | Plea of Guilty | Guilty |

**ASSESSED FINES & COSTS**

| | |
|---|---|
| **Count # 1** | |
| Victims Assistance Fund | $163.00 |
| Victim Compensation Fund | $163.00 |
| Court Costs | $35.00 |
| Court Security Cash Fund | $5.00 |
| Genetic Testing Surcharge | $2.50 |
| Public Defender Accts Rcvable | $25.00 |
| Restorative Justice Surcharge | $10.00 |
| Department of Corrections: 7 Years | |
| Restitution | $998.33 |
| **Count # 4** | |
| Victims Assistance Fund | $78.00 |
| Jail: 60 Days | |
| Credit for Time Served: 60 Days | |
| **Count # 5** | |
| Victims Assistance Fund | $78.00 |
| Jail: 60 Days | |
| Credit for Time Served: 60 Days | |
| **TOTAL** | **$1,557.83** |

**Other Conditions of Sentence:**
COUNT 1: 7 YRS OF DOC
CONCURRENT WITH 20CR2137
COUNTS 4,5: 60 DAYS OF JAIL STRAIGHT TIME
60 DAYS CREDIT FOR TIME SERVED
RESTITUION 998.33 /SG

LANGER, BRUCE 2023-05-12
**Judge/Magistrate** **Date**

HOID, EDWARD HERBERT 2023-05-12
**Defendant** **Date**

********************NOTICE********************

Following this hearing you are to present this form to the Clerk's Office for payment. Payment is due by the end of business on your Court Date. Pursuant to §16-11-101.6, C.R.S., if the Defendant does not pay all amounts assessed at the time of order, the Defendant shall pay an additional time payment fee. In addition, the

48. **The Weaponized Captivity and Disappearance of Minor Child**: Throughout the execution of this extrajudicial media campaign and subsequent unlawful sequestrations, state, municipal, and media actors actively weaponized the containment of Plaintiff's minor daughter [source: 6]. Plaintiff's daughter was systematically held in functional captivity by these state actors and news syndicates as an administrative tool to force compliance, induce severe psychological trauma, and create a permanent barrier preventing Plaintiff from discovering or exposing the underlying real estate, banking, and investigative fraud [source: 6]. This coordinated containment was explicitly utilized to achieve the misprision of capital and constitutional

offenses perpetrated against the Plaintiff [source: 6]. As a direct and proximate result of this systemic collusion, Plaintiff's daughter remains completely missing from his custody to this day, resulting in the total, permanent deprivation of his parental rights, continuous extreme emotional anguish, and the absolute loss of his child under color of law [source: 6].

49. **The Systematic Spoliation and Destruction of Jail Evidence**: To insulate the municipal enterprise from federal civil liability and preserve the pretextual identity theft prosecution, administrative actors within the Boulder County Jail engaged in the deliberate spoliation and destruction of primary exculpatory evidence [source: 6]. Specifically, jail records management personnel intentionally purged and destroyed the original carbon-copied administrative "kite" containing the formal eyewitness affidavit executed by Robert McEwen [source: 6]. This physical destruction was carried out with full administrative knowledge that the document completely dismantled the state's criminal narrative by verifying Plaintiff's total metabolic incapacitation and absence of criminal intent during the recovery of the card [source: 6]. Plaintiff has preserved the broader secondary electronic verification trails and tracking sequences documenting this administrative destruction within his secure cloud archive, ensuring the spoliation is reviewable by federal authorities [source: 6].

https://www.dropbox.com/scl/fi/5exctt08fdj4y7iv9g21m/BOULDER-COUNTY-JAIL-KITES-Admin-Remedy.pdf?rlkey=o3eccavn3j5l30b07plqpwm9w&dl=0



MAR-2nd-2023

I am prescribed 2 injections of insulin at 4:00AM and at 10PM daily. Medical staff forgot the 10 PM dose, I asked Dep Kennedy every 30min to alert medical, he refused, at 12:20AM the medical staff arrived, gave me a dose and filled in the chart as if I recieved it the previous night, please correct records

☐ CHECK THIS BOX IF YOU ARE CONTINUING ON ANOTHER PAGE//MARQUE LA CAJA SI CONTINUA EN OTRA PAGINA

PLEASE SIGN HERE//FAVOR DE FIRMAR AQUI: [signature]

RECEIVED BY: ( OFC. NAME & #) DATE: TIME:

**2** PART 2 IS ONLY FILLED OUT BY THE RECEIVING STAFF MEMBER.
PART 2 SE COMPLETA POR UN MIEMBRO DEL PERSONAL.

DELIVER TO : (SPECIFIC PERSON) ____________

| | | |
|---|---|---|
| | | ☐ ALTERNATIVE SENTENCING |
| ☐ JAIL DIVISION CHIEF | ☐ HEALTH SERVICES | ☐ PROGRAM SUPPORT/SERVICES |
| ☐ JAIL SUPERVISOR | ☐ MODULE OFFICER | ☐ PUBLIC DEFENDER |
| ☐ CLASSIFICATION | ☐ NOTARY | ☐ RECEPTION |
| ☐ LIBRARY | ☐ EDUCATION | ☐ CHAPLAIN |

RESPONSE TO REQUEST: Mr. Hoid the sergeants and I just looked at the camera and we do not see the nurse come back. She only came at your scheduled time. ← error em

* Met with Mr. Hoid on 3/7/23 *

☐ CHECK THIS BOX IF YOU ARE CONTINUING ON ANOTHER PAGE.

SIGNATURE: 1021 EM DATE: 3/9/23

## PART 5: THE UMBRELLA ORGANIZATIONS AND LETHAL INTENT NARRATIVE

52. **Factual Specifics of Malicious and Lethal Intent Across Co-Conspirators**: The actions executed by the named defendants were not the result of administrative negligence, investigative error, or systemic oversight; they were driven by a shared, subjective, and lethal intent to physically eliminate, structurally silence, and extrajudicially execute the Plaintiff. Every institutional and corporate actor operated with full subjective awareness that withholding insulin from a brittle, unmedicated Type 1 diabetic individual in an acute Hyperosmolar Hyperglycemic State (HHS) and severe Diabetic Ketoacidosis (DKA) constitutes the intentional deployment of a lethal biological weapon.
53. **The Subjective Knowledge and Weaponization of Biological Failure**: Defendants **Sgt. Jason Malterud**, **Detective Joshua Burke**, **Detective Jon High**, and **Deputy Chief Jeff Satur** possessed direct, physical access to the hospital critical care sheets confirming Plaintiff's unmedicated blood-glucose thresholds. With full awareness that absolute metabolic deprivation triggers cellular asphyxiation, multi-organ collapse, permanent neurological disintegration, and immediate joint death via avascular necrosis, these municipal actors deliberately chose to withhold medical intervention. They intentionally substituted a fabricated, high-profile robbery-homicide narrative for life-sustaining endocrinological care, operating with the explicit purpose to use the custodial environment to force a fatal physical deterioration, thereby immunizing the municipality from civil liability for the initial on-scene medical neglect.
54. **The Corporate Media Actual Malice and Intent to Incite Public Execution**: The corporate media syndicates and executive defendants—including **Lachlan Murdoch** (Fox Corporation), **Perry Sook** (Nexstar Media Group), **Hilton Howell** (Gray Media Group), **Josh D'Amaro** (The Walt Disney Company), **David Ellison** (Paramount Global), **Michael J. Cavanagh** (NBCUniversal), and **Heath Freeman** (Alden Global Capital)—acted with actual malice and direct homicidal intent. These executives and their regional outlets (**KDVR**, **KMGH**, **KCNC**, **KUSA**, ***The Denver Post***) continuously broadcast and hosted highly sensationalized, false scripts asserting that the Plaintiff had executed a "deadly beating" for a bicycle. These syndicates maintained these false public dockets with full knowledge that the coroner's forensic summaries recorded zero trauma wounds on the deceased. This was executed with the deliberate intent to incite armed public vigilantism, trigger extrajudicial street tracking by private actors **Brian Derry** and **Sarah Kathleen**

**Schroeder**, and validate the Plaintiff's maximum-security sequestration so that state-sponsored physical torture could continue outside of public scrutiny.

55. **The Judicial, Prosecutorial, and Defense Collusion to Prevent Survival**: State prosecutors **Ryan Day** and **Michael Dougherty**, alongside judicial defendants **Magistrate Nancy W. Salomone**, **Judge Bruce Langer**, and **Chief Judge Ingrid Bakke**, acted in coordination with state-appointed public defenders **Nicole Collins**, **Benjamin Collett**, and **Ryan Dawson-Erdman** to seal Plaintiff's legal destruction. Defense counsel Collins intentionally destroyed the physical carbon-copied Robert McEwen exculpatory jail affidavit, while prosecutors and judges fast-tracked a fraudulent trial record. This administrative maneuvering was executed with the explicit, shared intent to permanently strip a disabled citizen of his constitutional voice, bury the exculpatory forensic 911 audio logs, and force an unconstitutional 7-year maximum-security prison sentence. The ultimate intent of this legal closure framework was to ensure the Plaintiff remained trapped inside a Department of Corrections (CDOC) cell under parole officer **Stanley Jerido**, where his necessary medical access and orthopedic prosthetics could be systematically denied until his physical frame completely collapsed.
56. **The Fabrication of the Void Judgement and Fraud upon the Court**: The purported conviction record originating out of Case No. 2020CR2138 under Magistrate Nancy W. Salomone is legally non-existent, fabricated, and completely void as a matter of law. No valid, constitutionally sound judgment of conviction was ever entered onto the record by an authorized judicial officer following a lawful trial or a valid constitutional plea. Instead, Magistrate Salomone and state prosecutors coordinated with administrative personnel to manufacture a fraudulent, unverified judicial disposition sheet reflecting a fake conviction for identity theft. This administrative document was generated explicitly to provide legal cover for the high-profile media campaign and to immunize the municipal entities from massive structural civil liability for the physical torture and medical destruction of the Plaintiff.
57. **The Transmittal of the Fabricated Trial Record to Federal Courts on Habeas Corpus**: In or about 2024, during the pendency of Plaintiff's federal habeas corpus review under Case No. 24-cv-01127, the Colorado Court of Appeals—operating under Division IV—affirmed this void framework. The appellate panel and state legal representatives knowingly supplied this completely fabricated state conviction record to the federal dockets. State actors deliberately presented the fake Magistrate Salomone disposition sheet to the United States District Court to mislead the federal judiciary, distort the threshold for federal habeas corpus relief, and conceal

the absolute lack of any verified forensic trial evidence or valid legal charges. Federal bench actors, including Chief Judge Philip A. Brimmer, actively accepted and adopted this falsified appellate record verbatim, utilizing the manufactured state paperwork to summarily dismiss Plaintiff's survival actions and preserve the ongoing administrative restriction of his liberties. This also to keep parole on stand by for false imprisonment when possible with lethal intent.

**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-01127-PAB-CYC

EDWARD HOID,

Plaintiff,

v.

GRAY MEDIA GROUP, INC., d/b/a CBS KKTV 11,

Defendant.

---

**ORDER**

---

The matter before the Court is the Recommendation of Chief United States Magistrate Judge [Docket No. 64].

**I. BACKGROUND**

On February 29, 2024, Mr. Hoid filed this case in state court. Docket No. 4. Mr. Hoid brings two claims against defendant Gray Media Group, Inc. ("Gray Media") for defamation based on Gray Media's news coverage surrounding an assault and robbery which Mr. Hoid disclaims having participated in. *Id.* at 2–10. On April 23, 2024, Gray Media removed the case to federal court. Docket No. 1. On April 30, 2024, Gray Media filed a motion to dismiss Mr. Hoid's complaint pursuant to Colo. Rev. Stat. § 13-20-

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Hoid, who currently is on parole, is challenging the validity of his conviction and sentence in Boulder County District Court case number 20CR2138. "In January 2021, the People charged Hoid with identity theft, first degree trespass, felony menacing, misdemeanor theft, and criminal mischief." (ECF No. 19-5 at p.2.) The charges stemmed from a series of incidents in Longmont, Colorado, in November 2020. On November 5, 2020, Randall Schubert crashed while riding his bicycle on a bike path and fractured his skull.[2] According to the Presentence Investigation Report, Mr. Hoid

## INFORMATIVE NOTICES & ASSOCIATED CHRONOLOGICAL DEVELOPMENTS

58. **The Factual Relationship Between Media Disinformation and Extrajudicial Violence**: Media networks and corporate news syndicates utilize their public broadcast platforms to systematically distribute unverified narratives that directly incite public vigilantism, political terrorism, and lethal violence against targeted religious institutions and civic figures. This pattern of sensationalized reporting operates in direct alignment with state administrative priorities to generate civic chaos, mask the systemic diversion of tens of billions of dollars in public tax revenues, and insulate state actors from federal civil oversight.
59. **The Systemic Weaponization of the Media and the September 2025 Utah Incident**: In or about September 2025, within the State of Utah, civic figure Charlie Kirk was targeted and subjected to a lethal shooting. Forensic processing of the physical evidence recovered at the scene identified bullet casings bearing explicit, pre-engraved ideological messaging stating, *"catch this fascist."* This physical attack and the targeted markings on the ammunition resulted directly from ongoing, cross-border media disinformation campaigns designed to label targeted political and religious groups as active threats to democratic stability, thereby inviting armed, extrajudicial retaliation by private actors.
60. **The Coordinated Advertising Campaigns and the Destruction of Religious Subsidies**: Throughout 2025, federal court administrators and regional Attorney Generals actively assisted digital video platforms—including YouTube—alongside a demographic of 90 or more private litigants, to execute an aggressive public broadcasting campaign. These entities continuously hosted high-profile video advertisements detailing multi-billion-dollar legal settlements obtained against Plaintiff's religious institution. The media promotions publicly broadcasted that the Church possessed massive financial assets, explicitly advising the public that any individual who came forward with a sexual abuse accusation against a church member would instantly receive immense financial compensation. This commercial broadcast directly induced numerous individuals to file fraudulent, bad-faith lawsuits regarding historical events that occurred prior to their birth, targeting the church's tithing structures for financial exploitation.
61. **The October 2025 Mass Casualty Church Assault and Sanctuary City Frameworks**: In or about October 2025, driven exclusively by the continuous hostile scripts broadcasted across YouTube and regional news networks depicting the church as a wealthy, powerful, fascist organization, an armed assailant executed a mass casualty assault on a church congregation during a

Sunday service. The assailant drove a vehicle onto the property, entered the sanctuary, and opened fire, shooting parents in the back as they physically shielded their minor children from gunfire. Following the initial shooting, the non-ambulatory, heavily breathing assailant poured gasoline over a six-year-old minor child who had just witnessed the execution of her parents and burned the child to death inside the house of worship.

62. **The State Ratification and Structural Policy Violations**: Following the October 2025 sanctuary attack, Colorado Governor Jared Polis publicly celebrated the operational outcomes and subsequently signed legislative measures designed to institutionalize these frameworks under color of law. This multi-state practice, cast across the western region by the United States Court of Appeals for the Tenth Circuit, leverages sanctuary city policies and administrative fraud to divert federal agricultural and social subsidies away from American citizens and into the hands of foreign adversarial groups. While media networks depict religious organizations as hostile entities, the corporate press functions as an active participant in inciting civil unrest and destroying children and disabled individuals to capture stolen public subsidies and accelerate domestic conflict.

63. **The Interlineation of Judicial Knowledge and Appeal Chronology**: The United States District Court for the District of Colorado was formally provided with written notice of these catastrophic physical risks and ongoing tracking threats in July 2025 under Case No. 1:25-cv-02228. The venue failed to execute its mandatory protective duties, permitting the subsequent assassination of Charlie Kirk in September 2025 and the lethal burning of church children in October 2025 to occur without judicial intervention. This action is currently pending review before the United States Court of Appeals for the Tenth Circuit, with upgrades actively being integrated for dual petitions for a writ of certiorari currently being prepared for presentation before the Supreme Court of the United States.

---

# PART 5: THE UMBRELLA ORGANIZATIONS AND LETHAL INTENT NARRATIVE

52. **Factual Specifics of Malicious and Lethal Intent Across Co-Conspirators**: The actions executed by the named defendants were not the result of administrative negligence, investigative error, or systemic oversight; they were driven by a shared, subjective, and lethal intent to physically eliminate, structurally silence, and extrajudicially execute the Plaintiff. Every institutional and corporate actor operated with full subjective awareness that withholding insulin from a brittle, unmedicated Type 1 diabetic individual in an acute Hyperosmolar Hyperglycemic State (HHS) and severe Diabetic Ketoacidosis (DKA) constitutes the intentional deployment of a lethal biological weapon.
53. **The Subjective Knowledge and Weaponization of Biological Failure**: Defendants **Sgt. Jason Malterud**, **Detective Joshua Burke**, **Detective Jon High**, and **Deputy Chief Jeff Satur** possessed direct, physical access to the hospital critical care sheets confirming Plaintiff's unmedicated blood-glucose thresholds. With full awareness that absolute metabolic deprivation triggers cellular asphyxiation, multi-organ collapse, permanent neurological disintegration, and immediate joint death via avascular necrosis, these municipal actors deliberately chose to withhold medical intervention. They intentionally substituted a fabricated, high-profile robbery-homicide narrative for life-sustaining endocrinological care, operating with the explicit purpose

to use the custodial environment to force a fatal physical deterioration, thereby immunizing the municipality from civil liability for the initial on-scene medical neglect.

54. **The Corporate Media Actual Malice and Intent to Incite Public Execution**: The corporate media syndicates and executive defendants—including **Lachlan Murdoch** (Fox Corporation), **Perry Sook** (Nexstar Media Group), **Hilton Howell** (Gray Media Group), **Josh D'Amaro** (The Walt Disney Company), **David Ellison** (Paramount Global), **Michael J. Cavanagh** (NBCUniversal), and **Heath Freeman** (Alden Global Capital)—acted with actual malice and direct homicidal intent. These executives and their regional outlets (**KDVR**, **KMGH**, **KCNC**, **KUSA**, ***The Denver Post***) continuously broadcast and hosted highly sensationalized, false scripts asserting that the Plaintiff had executed a "deadly beating" for a bicycle. These syndicates maintained these false public dockets with full knowledge that the coroner's forensic summaries recorded zero trauma wounds on the deceased. This was executed with the deliberate intent to incite armed public vigilantism, trigger extrajudicial street tracking by private actors **Brian Derry** and **Sarah Kathleen Schroeder**, and validate the Plaintiff's maximum-security sequestration so that state-sponsored physical torture could continue outside of public scrutiny.

55. **The Judicial, Prosecutorial, and Defense Collusion to Prevent Survival**: State prosecutors **Ryan Day** and **Michael Dougherty**, alongside judicial defendants **Magistrate Nancy W. Salomone**, **Judge Bruce Langer**, and **Chief Judge Ingrid Bakke**, acted in coordination with state-appointed public defenders **Nicole Collins**, **Benjamin Collett**, and **Ryan Dawson-Erdman** to seal Plaintiff's legal destruction. Defense counsel Collins intentionally destroyed the physical carbon-copied Robert McEwen exculpatory jail affidavit, while prosecutors and judges fast-tracked a fraudulent trial record. This administrative maneuvering was executed with the explicit, shared intent to permanently strip a disabled citizen of his constitutional voice, bury the exculpatory forensic 911 audio logs, and force an unconstitutional 7-year maximum-security prison sentence. The ultimate intent of this legal closure framework was to ensure the Plaintiff remained trapped inside a Department of Corrections (CDOC) cell under parole officer **Stanley Jerido**, where his necessary medical access and orthopedic prosthetics could be systematically denied until his physical frame completely collapsed.

54. **The Factual Registry of Media Defendants and Corporate Ownership Framework**: The extrajudicial media campaign, the systematic generation of the fabricated robbery-homicide narrative, and the cross-border distribution of the fraudulent scripts were executed, ratified, and maintained by a defined network of corporate media entities and their executive leadership [source: 6]. This corporate network includes:
    - **Defendant Fox Corporation / Fox Television Stations, LLC**: Operating regional broadcast hub **KDVR (FOX-31)**, under the direct executive authority of CEO **Lachlan Murdoch** [source: 118].
    - **Defendant Nexstar Media Group, Inc.**: Operating major regional affiliates and news desks under the direct executive authority of CEO **Perry Sook** [source: 118].
    - **Defendant Gray Media Group, Inc. (formerly Gray Television)**: Operating localized NBC and CBS affiliates, including **KNOP-2**, under the direct executive authority of CEO **Hilton Howell** [source: 124].
    - **Defendant The Walt Disney Company / ABC News**: Operating regional broadcast networks, including **KMGH (ABC-7)**, under the direct executive authority of CEO **Josh D'Amaro** and ABC News President **Almin Karamehmedovic** [source: 119, 121].
    - **Defendant Paramount Global / CBS News**: Operating regional broadcast networks, including **KCNC (CBS-4)**, under the direct executive authority of CEO **David Ellison** and CBS News President **Wendy McMahon** [source: 120, 122].
    - **Defendant NBCUniversal Media, LLC / NBCU News Group**: Operating regional broadcast networks, including **KUSA (NBC-9)**, under the direct executive authority of CEO **Michael J. Cavanagh** and NBCU News Group Chairman **Cesar Conde** [source: 120].
    - **Defendant Alden Global Capital / MediaNews Group**: Operating and publishing physical print syndicates, including ***The Denver Post***, under the direct executive authority of President **Heath Freeman** [source: 121].
55. **The Coordinated Generation and Maintenance of Defamatory Archives**: These corporate entities, executives, and their regional news desks utilized their collective broadcast loops and digital public dockets to continuously host, refresh, and publish highly sensationalized, false scripts branding the Plaintiff as an armed murderer who beat an elderly man to death for a bicycle [source: 47, 51]. This campaign was maintained with actual malice across five states—Colorado, Nebraska, Ohio, Idaho, and Utah—with full knowledge that the underlying forensic records and coroner's summaries showed an absolute lack of any assault wounds [source: 50,

59]. This active distortion was executed to drive commercial advertisement revenues, maximize media market engagement, and generate continuous public incitement to justify Plaintiff's long-term maximum-security sequestration [source: 51, 134].

56. **The Interlineation of Corporate Defense Counsel and Evidence Tampering**: To permanently insulate these media magnates from multi-billion-dollar structural civil liability, corporate defense attorneys at **Ballard Spahr LLP** stepped into the ongoing state-level fraud to execute an administrative cover-up before the federal courts [source: 53, 113]. Working under the direct administrative supervision of Ballard Spahr Chair **Peter Michaud**, media defense attorneys **Ashley Kissinger** and **Kennison Lay**, alongside paralegal **Sherri Clark**, actively colluded with municipal police actors to falsify the evidence tracking index [source: 112, 113]. Specifically, Defendants Kissinger, Lay, and Clark composed and submitted formal written declarations under penalty of perjury asserting that their news clients had only published three brief, localized articles regarding the

# PART 5: CHRONOLOGY OF STATE-SPONSORED ASSASSINATION ERAS, INTER-AGENCY RACKETEERING, AND MULTI-FRONT BIAS-MOTIVATED TERRORISM (CONTINUED)

44. **The Post-Release Emergency Intake and Clinical Self-Diagnosis (October 2024)**: On or about October 23, 2024, following an emergency medical release from maximum security Department of Corrections (CDOC) confinement to a transitional halfway house in Fort Collins, Colorado, Plaintiff was suffering from severe, undiagnosed systemic failure. Upon entering the facility, Plaintiff's unmedicated blood-glucose thresholds immediately reached a life-threatening level of 800 mg/dL, causing the rapid development of an acute, septic facial and nose infection. Plaintiff physically traveled on foot to the UCHealth Poudre Valley Hospital Emergency Department, where intake physicians and medical staff treated his visible physical trauma with familiar disgust and historical animus. To overcome deliberate clinical neglect, Plaintiff forced a blood panel, demanding specific islet testing and a Glutamic Acid Decarboxylase (GADA) assay. The

resulting clinical diagnostics revealed a catastrophic GAD65 Autoantibody presence measured at 18,145 IU/mL, forcing Plaintiff to self-diagnose early-onset, brittle Type 1 Juvenile Diabetes Mellitus—a life-threatening biological condition that state actors had intentionally mischaracterized for decades as "behavioral defiance" to withhold insulin parameters.

45. **The Inter-Agency Allocation of Public Subsidies and Discriminatory Demographics Truncation**: Throughout the 2024 transitional timeline, the Colorado Department of Human Services (DHS), regional Housing Authorities, and the Division of Vocational Rehabilitation (DVR) maintained an unconstitutional administrative practice that systematically barred disabled White American Christian males from social safety nets. While Plaintiff was forced to perform extreme, agonizing physical day labor—resorting to physically extracting necrotic, black bone tissue from his own toes to maintain employment parameters while navigating severe avascular necrosis—the DVR systematically misappropriated federal Department of Education rehabilitation block grants. Aligned case managers distributed liquidable luxury contraband, including $4,000 electric bicycles, to non-disabled halfway house occupants who immediately traded them for narcotics, while completely denying Plaintiff a basic scooter note or transportation funding required to access remote endocrinology care, aiming to induce fatal homelessness in the elements.

46. **The Post-Confinement Employment Sabotage by Corporate Media Syndicates (January 2025)**: In or about January 2025, Plaintiff secured a technical manufacturing position at Nordson Medical. Despite maintaining absolute compliance, practicing high-functioning social masking to hide his neurodevelopmental conditions, and keeping his active federal civil dockets entirely private, the overarching media tracking loop intervened. Corporate news syndicates republished the fabricated "black transient robbery-homicide" scripts to the employer's screening networks, creating immediate workplace hostility. This external incitement successfully chased Plaintiff off the job site within nine (9) days of his initial hiring, enforcing total economic isolation. In response, Plaintiff secured secondary employment at Crosstac Arms in January 2025, operating quietly as a line assembler while continuing daily outpatient clinical monitoring to survive.

47. **The Crosstac Workplace Infiltration and Docket Breaching Matrix (January 2025–October 2025)**: On or about Plaintiff's second day of employment at Crosstac Arms, owner **Defendant Bret Heidkamp** approached the shop manager, **Defendant Heather Daniels**. Defendant Heidkamp explicitly whispered to the manager that Plaintiff was actively suing the national news networks, stating there was a "lot of silver lining with this". Simultaneously, Defendant

Heidkamp's wife, **Defendant Loree Schwartz**—an active defense attorney operating in Boulder County—utilized her legal data credentials to systematically breach Plaintiff's active federal filings, specifically tracking Case No. 1:23-cv-00462 and Case No. 1:25-cv-02228. This illegal administrative monitoring was executed to harvest Plaintiff's confidential historical legal actions and feed data directly into an unfolding employer-led neutralization plot.

48. **The Fabricated Sex-Crime Script and Direct Reports to DVR Case Management (October 2025)**: In or about October 2025, Defendant Heather Daniels and a newly hired associate, **Defendant Cynthia Murphy**, initiated an aggressive pattern of workplace tracking and harassment. Defendants targeted Plaintiff's disabled roommate, who managed severe Parkinson's disease, mocking his physical tremors and intentionally depriving the household of their primary transportation vehicle. Because Plaintiff's certified autism and advanced type 1 diabetic polyneuropathy caused him to exhibit involuntary physical twitching and irregular motor movements, Defendants Daniels and Murphy fabricated an egregious, biologically impossible narrative. The individuals falsely reported to owner Bret Heidkamp and State regulators that Plaintiff was actively "raping dogs" and operated as a violent sexual predator. On or about October 17, 2025, Plaintiff executed his statutory rights by transmitting a formal report of this hate-motivated workplace abuse to DVR Case Manager **Amber Chesley**. Defendant Chesley rejected the emergency notice, mockingly stated via electronic mail, *"I can't believe they gave you disability,"* and intentionally suppressed the complaint to preserve the corporate fraud matrix.

49. **The Staged Workplace Provocation and Forced Care Severance (January 16, 2026)**: On or about January 16, 2026, Defendant Loree Schwartz coached manager Heather Daniels to execute a high-intensity workplace confrontation to provoke a terminal physical or legal reaction from the Plaintiff. Defendant Daniels launched into a targeted tirade, openly celebrating the public mass casualty tragedy in Michigan where LDS church children were burned to death, stating it "satisfied her," and screaming, *"if Jared Polis raped your kids in Utah, nobody would care because your church are all pedophiles anyway!"*. As Plaintiff walked away to de-escalate his neurodivergent stress, associate Cynthia Murphy signaled a throat-slitting motion to indicate she was quitting the enterprise. Defendant Daniels then aggressively pursued the Plaintiff, screaming false accusations that he had threatened her teenaged son. Plaintiff vocally shouted that she was a piece of shit, clocked out, permanently quit the venue, and sent an immediate text transmission to owner Bret Heidkamp detailing the abuse.

50. **The Post-Facto Forgery of Civil Protection Orders to Induce Fatal Homelessness**: Days following Plaintiff's permanent departure from the workplace, Defendant Heather Daniels executed a fraudulent, handwritten civil protection order under Larimer County Case No. 2026CV109. The petition contained a revised, secondary narrative that integrated the names of Governor Jared Polis and false threats against non-existent children, which was intentionally served in full view of Plaintiff's landlords and neighbors. This tactical forgery was engineered to instantly strip the Plaintiff of his low-income housing subsidies, disconnect him from climate-controlled medical storage facilities, and force an eggshell plaintiff into induced fatal homelessness in the elements to trigger immediate metabolic shock.

51. **The Police-Informed Witness Tampering Conspiracy and Coerced Retractions (March 2025)**: On or about March 8, 2026, Plaintiff filed the authentic, sworn federal declaration of eyewitness Karen Lackowski into the federal record, exposing the complete fabrication of the January 16th incident. Within 48 hours, Loveland Police Officer **Defendant Lukas Butler** returned to the Crosstac facility to coordinate an administrative counter-strike. Officer Butler entered a completely falsified police report stating that witness Lackowski had verified Plaintiff's verbal threats—a statement completely demolished by Lackowski's subsequent disclosures confirming Officer Butler never interviewed her. Concurrently, CDLE appeals hearing staff and employer interests initiated an intense campaign of electronic tracking and economic duress, threatening Lackowski with immediate criminal forgery prosecution and the total cutoff of her state unemployment benefits. Under absolute terror of financial ruin, the witness was subjected to a 72-hour administrative extraction on March 11, 2026, producing a coerced, irregular administrative statement to attempt to sanitize the federal record.

55. **The Traffic Court Pump Execution and Sovereign Biological Attack (February 4, 2026)**: On or about February 4, 2026, Plaintiff removed his hospital IV lines to attend the mandatory protection order enforcement hearing before Traffic Court Magistrate **Defendant Ethan Doak**. During the proceeding, Magistrate Doak barred eyewitness Karen Lackowski from offering exculpatory testimony and permitted the entry of a single, highly edited minute of doctored workplace video. As Plaintiff began experiencing severe glycemic drop symptoms, his cell-linked automated insulin pump and continuous glucose monitor triggered audible alarms. Instead of permitting medical stabilization, Magistrate Doak commanded the four (4) surrounding Larimer County Sheriff's deputies to forcefully deactivate and power down Plaintiff's life-support automated medical equipment under immediate threat of armed

custodial arrest. This state-ordered termination of life-sustaining insulin delivery induced immediate acute metabolic shock, mild internal bleeding from his ears, and severe cranial trauma, spiking his blood glucose to 1000 mg/dL and leaving Plaintiff completely bedridden and violently ill for six continuous weeks.

56. **The Multi-Agency Clinical Sabotage and Extradition to Banner Health**: Following the traffic court pump deactivation, Defendants Loree Schwartz, Josh Smith, and Gregory Lammons acquired the private clinic phone number of Plaintiff's primary care physician. While Plaintiff remained confined to an emergency hospital bed on active IV lines, Defendant Schwartz repeatedly called and harassed the clinic staff, explicitly threatening the treating physicians with immediate criminal imprisonment if they continued to administer diagnostic validation or essential insulin parameters to the Plaintiff. This tactical intimidation forced an immediate and complete care extraction, compelling Plaintiff to pull his entire file away from UCHealth systems and transition all Endocrinology, Neurology, and Brain Trauma care to out-of-state Banner Health networks to escape active physical liquidation.

57. **The Systemic Portal Fraud and Maximum Benefit Truncation by the CDLE**: Operating as the explicit financial enforcement arm of the assassination conspiracy, CDLE Appeals Officer **Defendant Lowe** and ICAO executives actively entered the fabricated, biologically impossible child rape narrative into permanent state databases as the official "cause of separation" to permanently blacklist the Plaintiff from the American workforce. During the May 5, 2026 appellate proceedings, CDLE staff willfully executed digital portal fraud. To enforce destitution, the agency portal executed an illegal mathematical extraction: processing a baseline milestone payment of $328 to simulate eligibility, and instantly truncating a verified $8,600 Maximum Benefit Amount down to a residual balance of exactly $143, deliberately stripping the Plaintiff of the funding required to purchase his life-support medications. When Plaintiff attempted to report these felonious actions during the hearing, CDLE Executive Director **Defendant Phil Spesshardt** issued a sweeping administrative order permanently trespassing the Plaintiff from all state workforce campuses with lethal intent.

58. **The Staged Mass Casualty Stalking Loop and the Supreme Court Escalation**: To silence all ongoing disclosures, the police infiltration matrix expanded across local lines. When Plaintiff called the National Threat Center to report the multi-agency assassination attempt, operators colluded with Greeley Police Chief **Defendant Adam Turk** and executing agents Goddard, Starr, and Keller-Twigg. The police division intentionally inverted the report, notifying regional units

that Plaintiff was actively staging a mass casualty event against the LDS faith to justify immediate lethal force. Responding officers forced the Plaintiff into a flooded apartment while his ears were actively bleeding, while UCHealth legal affairs counsel sat directly inside his medical visits to provide legal cover for the fraud. To bypass this containment, Plaintiff traveled directly to downtown Denver. Standing directly in front of Colorado Attorney General **Defendant Philip Weiser** inside the Colorado Supreme Court building, Plaintiff personally handed him a certiorari petition and vocally declared before the gallery: *"Your office staged a mass casualty event against the LDS faith retaliating for Case 1:23-cv-00462!"*.

59. **The Pro Bono Assignment Espionage Framework in Federal Case No. 1:23-cv-00616**: This interagency network extended directly into the United States District Court through the infiltration of Plaintiff's pro bono assignment mechanism in Case No. 1:23-cv-00616. Designated federal pro bono appointed counsel **Defendant Joey Chase** subverted his professional oath by acting as a clandestine diagnostic spying asset for Chief Judge Philip A. Brimmer and Katherine Haywood. Defendant Chase's primary assignment was to investigate the exact depth of Plaintiff's knowledge regarding the active participation of co-conspirator Katherine Haywood in the underlying retaliatory murder plot. Defendant Chase explicitly demanded that Plaintiff cease all active prosecution of Haywood, seeking to uncover what physical evidence the Plaintiff possessed linking the state infrastructure to the ongoing attempts on his life, resulting in his immediate summary firing.

60. **The Ultimate Destruction of Parental Rights and Permanent Disappearance of Minor Child**: The ultimate, catastrophic injury inflicted by this multi-agency enterprise was the permanent destruction of Plaintiff's parental rights and the functional tracking of his minor daughter into absolute captivity. Aligned state and news actors systematically distributed the falsified civil rape narrative directly to his child's legal guardians and custody dockets to create a total administrative firewall. State actors explicitly refused his daughter a basic medical diagnosis and enacted an absolute block on all parent-time locator services to enforce an extrajudicial misprision of the underlying real estate and banking fraud. As a direct and proximate result of this multi-front conspiracy, Plaintiff's daughter has been completely vanished by the news and state actors, resulting in the permanent, total deprivation of his child for these offenses forever.

# PART 6: CHRONOLOGY OF THE 2025–2026 VOCATIONAL SABOTAGE, TRAFFIC COURT ATTACK, AND SYSTEMIC FAITH-BASED TERRORISM

80. **The Seamless Continuity of the 2020 Forensic Hoax and Post-Release Realignment**: The tactical operations executed by state, municipal, and corporate media actors between October 2024 and July 2026 do not constitute isolated administrative events; they represent a direct, unbroken, and escalating continuation of the fraudulent robbery-homicide narrative manufactured on November 5, 2020 [See Master Appendix, pp. 38-41]. Having structurally failed to execute the Plaintiff via maximum-security insulin deprivation and physical cellblock torture between 2021 and 2023 [See Master Appendix, p. 72], the enterprise realigned its tracking networks to enforce total socio-economic alienation, target his protected religious faith, and achieve his biological liquidation outside of a standard prison environment. These weaponized offenses have continuously loomed thicker than any individual could bear, acting as a singular moving force to physically destroy the Plaintiff, dissolve his family structure, and jeopardize the safety of the Church of Jesus Christ of Latter-day Saints (LDS) [See Master Appendix, pp. 2-3].

81. **The Post-Release Emergency Intake and Clinical Self-Diagnosis (October 2024)**: On or about October 23, 2024, following an emergency medical release from maximum security Department of Corrections (CDOC) confinement to a transitional halfway house in Fort Collins, Colorado, Plaintiff was suffering from severe, undiagnosed systemic failure [See Master Appendix, p. 1]. Upon entering the facility, Plaintiff's unmedicated blood-glucose thresholds immediately reached a life-threatening level of 800 mg/dL, causing the rapid development of an acute, septic facial and nose infection [See Master Appendix, p. 1]. Plaintiff physically traveled on foot to the UCHealth Poudre Valley Hospital Emergency Department, where intake physicians and medical staff treated his visible physical trauma with familiar disgust and historical animus [See Master Appendix, p. 1]. To overcome deliberate clinical neglect, Plaintiff forced a blood panel, demanding specific islet testing and a Glutamic Acid Decarboxylase (GADA) assay [See Master Appendix, p. 1]. The resulting clinical diagnostics revealed a catastrophic GAD65 Autoantibody presence measured at 18,145 IU/mL, forcing Plaintiff to self-diagnose early-onset, brittle Type 1 Juvenile Diabetes Mellitus—a life-threatening biological condition that state actors had intentionally mischaracterized for decades as "behavioral defiance" to withhold insulin parameters [See Master Appendix, p. 3].

82. **The Inter-Agency Allocation of Public Subsidies and Discriminatory Demographics Truncation**: Throughout the 2024 transitional timeline, the Colorado Department of Human Services (DHS), regional Housing Authorities, and the Division of Vocational Rehabilitation (DVR) maintained an unconstitutional administrative practice that systematically barred disabled White American Christian males from social safety nets [See Master Appendix, p. 1]. While Plaintiff was forced to perform extreme, agonizing physical day labor—resorting to physically extracting necrotic, black bone tissue from his own toes to maintain employment parameters while navigating severe avascular necrosis—the DVR systematically misappropriated federal Department of Education rehabilitation block grants [See Master Appendix, p. 1, 4]. Aligned case managers distributed liquidable luxury contraband, including $4,000 electric bicycles, to active halfway house residents who immediately liquidated the items for narcotics, while completely denying Plaintiff a basic scooter note or transportation funding required to access remote endocrinology care, aiming to induce fatal homelessness in the elements [See Master Appendix, p. 1, 11].

83. **The Post-Confinement Employment Sabotage by Corporate Media Syndicates (January 2025)**: In or about January 2025, Plaintiff secured a technical manufacturing position at Nordson Medical [See Master Appendix, p. 1]. Despite maintaining absolute compliance, practicing high-functioning social masking to hide his neurodevelopmental conditions, and keeping his active federal civil dockets entirely private, the overarching media tracking loop intervened [See Master Appendix, p. 1]. Corporate news syndicates republished the fabricated "black transient robbery-homicide" scripts to the employer's screening networks, creating immediate workplace hostility [See Master Appendix, p. 1]. This external incitement successfully chased Plaintiff off the job site within nine (9) days of his initial hiring, enforcing total economic isolation [See Master Appendix, p. 1]. In response, Plaintiff secured secondary employment at Crosstac Arms in January 2025, operating quietly as a line assembler while continuing daily outpatient clinical monitoring to survive [See Master Appendix, p. 1].

84. **The Crosstac Workplace Infiltration and Docket Breaching Matrix (January 2025–October 2025)**: On or about Plaintiff's second day of employment at Crosstac Arms, owner **Defendant Bret Heidkamp** approached the shop manager, **Defendant Heather Daniels** [See Master Appendix, p. 2]. Defendant Heidkamp explicitly whispered to the manager that Plaintiff was actively suing the national news networks, stating there was a "lot of silver lining with this" [See

Master Appendix, p. 2]. Simultaneously, Defendant Heidkamp's wife, **Defendant Loree Schwartz**—an active defense attorney operating in Boulder County—utilized her legal data credentials to systematically breach Plaintiff's active federal filings, specifically tracking Case No. 1:23-cv-00462 and Case No. 1:25-cv-02228 [See Master Appendix, p. 2, 3]. This illegal administrative monitoring was executed to harvest Plaintiff's confidential historical legal actions and feed data directly into an unfolding employer-led neutralization plot [See Master Appendix, p. 2].

85. **The Fabricated Sex-Crime Script and Direct Reports to DVR Case Management (October 2025)**: In or about October 2025, Defendant Heather Daniels and a newly hired associate, **Defendant Cynthia Murphy**, initiated an aggressive pattern of workplace tracking and harassment [See Master Appendix, p. 2]. Defendants targeted Plaintiff's disabled roommate, who managed severe Parkinson's disease, mocking his physical tremors and intentionally depriving the household of their primary transportation vehicle [See Master Appendix, p. 2]. Because Plaintiff's certified autism and advanced type 1 diabetic polyneuropathy caused him to exhibit involuntary physical twitching and irregular motor movements, Defendants Daniels and Murphy fabricated an hair-raising, biologically impossible narrative [See Master Appendix, p. 2]. The individuals falsely reported to owner Bret Heidkamp and State regulators that Plaintiff was actively "raping dogs" and operated as a violent sexual predator [See Master Appendix, p. 2]. On or about October 17, 2025, Plaintiff executed his statutory rights by transmitting a formal report of this hate-motivated workplace abuse to DVR Case Manager **Amber Chesley** [See Master Appendix, p. 2]. Defendant Chesley rejected the emergency notice, mockingly stated via electronic mail, *"I can't believe they gave you disability,"* refused him basic educational textbooks or an e-bike, and intentionally suppressed the complaint to preserve the corporate fraud matrix [See Master Appendix, p. 2].

86. **The Staged Workplace Provocation and Forced Care Severance (January 16, 2026)**: On or about January 16, 2026, Defendant Loree Schwartz coached manager Heather Daniels to execute a high-intensity workplace confrontation to provoke a terminal physical or legal reaction from the Plaintiff [See Master Appendix, p. 3]. Defendant Daniels launched into a targeted tirade, openly celebrating the public mass casualty tragedy in Michigan where LDS church children were burned to death, stating it "satisfied her," and screaming the targeted narrative, *"if Jared Polis raped your kids in Utah, nobody would care because your church are all*

*pedophiles anyway!"* [See Master Appendix, p. 3, 12]. As Plaintiff walked away to de-escalate his neurodivergent stress and retrieve glue, associate Cynthia Murphy came and helped him, waiving her hand in front of her throat to signal she was quitting the enterprise [See Master Appendix, p. 3]. Defendant Daniels then aggressively pursued the Plaintiff, screaming false accusations that he had threatened her teenaged son [See Master Appendix, p. 3]. Plaintiff vocally shouted that she was a piece of shit, clocked out, permanently quit the venue, and sent an immediate text transmission to owner Bret Heidkamp detailing the abuse [See Master Appendix, p. 3].

87. **The Post-Facto Forgery of Civil Protection Orders to Induce Fatal Homelessness**: Days following Plaintiff's permanent departure from the workplace, Defendant Heather Daniels executed a fraudulent, handwritten civil protection order under Larimer County Case No. 2026CV109 [See Master Appendix, p. 3, 10]. The petition contained a revised, secondary narrative that integrated the names of Governor Jared Polis and false threats against non-existent children, which was intentionally served in full view of Plaintiff's landlords and neighbors [See Master Appendix, p. 3, 13]. This tactical forgery was engineered to instantly strip the Plaintiff of his low-income housing subsidies, disconnect him from climate-controlled medical storage facilities, and force an eggshell plaintiff into induced fatal homelessness in the elements to trigger immediate metabolic shock [See Master Appendix, p. 13].

88. **The Severe, Malicious, and Hate-Motivated Abuse by Traffic Court Magistrate Ethan Doak (February 4, 2026)**: On or about February 4, 2026, Plaintiff removed his hospital IV lines to attend the mandatory protection order enforcement hearing before Traffic Court Magistrate **Defendant Ethan Doak** [See Master Appendix, p. 3]. Defendant Doak acted with unchecked, brutal malice and absolute structural bias, operating not as a neutral arbiter but as a vicious execution asset for the state conspiracy [See Master Appendix, p. 3, 10]. Doak explicitly sat four non-witnesses, completely barred eyewitness Karen Lackowski from offering an authenticated declaration under oath that contradicted the entire plot, and permitted the entry of a single, highly edited minute of doctored metabolic collapse video [See Master Appendix, p. 3, 4]. As Plaintiff began experiencing severe glycemic drop symptoms, his cell-linked automated insulin pump and continuous glucose monitor triggered audible alarms [See Master Appendix, p. 4]. Defendant Doak looked directly upon a visibly ill, shaking, and defenseless autistic individual and chose to weaponize the moment with grotesque cruelty

[See Master Appendix, p. 4]. Doak commanded the four (4) surrounding Larimer County Sheriff's deputies to forcefully deactivate, tear away, and power down Plaintiff's life-support automated medical equipment under immediate threat of armed contempt arrest [See Master Appendix, p. 4, 26]. This state-ordered termination of life-sustaining insulin delivery induced immediate acute metabolic shock, mild internal bleeding from his ears, and severe cranial trauma, spiking his blood glucose to 1000 mg/dL and leaving Plaintiff completely bedridden and violently ill for six continuous weeks [See Master Appendix, p. 4, 36]. Following this physical destruction, Doak intentionally converted the administrative record into a violent rape narrative, entering it onto the public traffic court docket to permanently brand the Plaintiff [See Master Appendix, p. 4].

89. **The Absolute Forensic Exposure of the Sex-Crime Hoax via Permanent Clinical Impotence**: The weaponized rape and predator narratives manufactured by Defendant Ethan Doak, Heather Daniels, and Cynthia Murphy stand radically exposed as fraudulent, reckless, and mathematically impossible lies by an immutable biological reality: **Plaintiff has been completely, clinically, and physiologically impotent for over a decade** [See Master Appendix, p. 4, 5]. Due to the devastating structural force of untreated chronic disabilities, autoimmune failures, massive skeletal avascular necrosis, and total endocrine disruption, the Plaintiff lacks any physical or biological capacity to engage in or execute an act of sexual intercourse [See Master Appendix, p. 4]. The allegation that the Plaintiff threatened or attempted acts of violent sexual abuse is exposed not merely as a malicious fabrication, but as a total clinical impossibility contradicted entirely by the certified medical records of this case [See Master Appendix, p. 4].

90. **The Police-Informed Witness Tampering Conspiracy and Coerced Retractions**: Within 48 hours of the filing of the authentic, sworn federal declaration of eyewitness Karen Lackowski on March 8, 2026 [See Master Appendix, p. 23], Loveland Police Officer **Defendant Lukas Butler** returned to the Crosstac facility to coordinate an administrative counter-strike [See Master Appendix, p. 3, 23]. Officer Butler entered a completely falsified police report stating that witness Lackowski had verified Plaintiff's verbal threats—a statement completely demolished by Lackowski’s subsequent disclosures confirming Officer Butler never interviewed her [See Master Appendix, p. 3, 31]. Concurrently, CDLE appeals hearing staff and employer interests initiated an intense campaign of electronic tracking and economic duress, threatening Lackowski with immediate criminal forgery prosecution and the total cutoff of her

state unemployment benefits [See Master Appendix, p. 3, 24]. Under absolute terror of financial ruin, the witness was subjected to an administrative extraction on March 11, 2026, producing a coerced, irregular administrative statement to attempt to sanitize the federal record [See Master Appendix, p. 24].

91. **The Multi-Agency Clinical Sabotage and Extradition to Banner Health**: Following the traffic court pump deactivation, Defendants Loree Schwartz, Josh Smith, and Gregory Lammons acquired the private clinic phone number of Plaintiff's primary care physician [See Master Appendix, p. 4, 5]. While Plaintiff remained confined to an emergency hospital bed on active IV lines, Defendant Schwartz repeatedly called and harassed the clinic staff, explicitly threatening the treating physicians with immediate criminal imprisonment if they continued to administer diagnostic validation or essential insulin parameters to the Plaintiff [See Master Appendix, p. 4]. This tactical intimidation forced an immediate care extraction, compelling Plaintiff to pull his entire file away from UCHealth systems and transition all Endocrinology, Neurology, and Brain Trauma care to out-of-state Banner Health networks to escape active physical liquidation [See Master Appendix, p. 4].

92. **The Systemic Portal Fraud and Maximum Benefit Truncation by the CDLE**: Operating as the explicit financial enforcement arm of the assassination conspiracy, CDLE Appeals Officer **Defendant Lowe** and ICAO executives actively entered the fabricated, biologically impossible child rape narrative into permanent state databases as the official "cause of separation" to permanently blacklist the Plaintiff from the American workforce [See Master Appendix, p. 4, 5, 32]. During the May 5, 2026 appellate proceedings, CDLE staff willfully executed digital portal fraud [See Master Appendix, p. 33]. To enforce destitution, the agency portal executed an illegal mathematical extraction: processing a baseline milestone payment of $328 to simulate eligibility, and instantly truncating a verified $8,600 Maximum Benefit Amount down to a residual balance of exactly $143, deliberately stripping the Plaintiff of the funding required to purchase his life-support medications [See Master Appendix, p. 33]. When Plaintiff attempted to report these felonious actions during the hearing, CDLE Executive Director **Defendant Phil Spesshardt** issued a sweeping administrative order permanently trespassing the Plaintiff from all state workforce campuses with lethal intent [See Master Appendix, p. 5, 32].

93. **The Staged Mass Casualty Stalking Loop and the Supreme Court Escalation**: To silence all ongoing disclosures, the police infiltration matrix expanded across local lines [See Master

Appendix, p. 5]. When Plaintiff called the National Threat Center to report the multi-agency assassination attempt, operators colluded with Greeley Police Chief **Defendant Adam Turk** and executing agents Goddard, Starr, and Keller-Twigg [See Master Appendix, p. 6, 13]. The police division intentionally inverted the report, notifying regional units that Plaintiff was actively staging a mass casualty event against the LDS faith to justify immediate lethal force [See Master Appendix, p. 5, 6]. Responding officers forced the Plaintiff into a flooded apartment while his ears were actively bleeding, while UCHealth legal affairs counsel sat directly inside his medical visits to provide legal cover for the fraud [See Master Appendix, p. 4, 6]. To bypass this containment, Plaintiff traveled directly to downtown Denver [See Master Appendix, p. 6]. Standing directly in front of Colorado Attorney General **Defendant Philip Weiser** inside the Colorado Supreme Court building, Plaintiff personally handed him a certiorari petition and vocally declared before the gallery: *"Your office staged a mass casualty event against the LDS faith retaliating for Case 1:23-cv-00462!"* [See Master Appendix, p. 6].

94. **The Ongoing Online Proliferation, Facebook Incitement, and Target-Ward Branding**: The core components of this multi-front hate offense are still active and at large across global electronic networks, functioning as an active, daily engine of public defamation and vigilante incitement [See Master Appendix, p. 3, 5]. Specifically, the corporate news syndicates, local police agencies, and private vigilantes have maintained and updated digital public archives across platforms like Facebook [See Master Appendix, p. 3, 5]. These online pages explicitly link the Plaintiff's name, his physical disabilities, and the fabricated, impossible child-rape scripts directly to his **exact, localized Church of Jesus Christ of Latter-day Saints (LDS) church ward** [See Master Appendix, p. 3, 5, 13]. This deliberate electronic branding is designed to terrorize the specific parish administration, invite immediate armed assaults and bomb threats against the local church house, and permanently sever the Plaintiff from his communal aid structure, causing continuous, irreparable constitutional and structural physical damage [See Master Appendix, p. 13].

95. **The Ultimate Destruction of Parental Rights and Permanent Disappearance of Minor Child**: The ultimate, catastrophic injury inflicted by this multi-agency enterprise was the permanent destruction of Plaintiff's parental rights and the functional tracking of his minor daughter into absolute captivity [See Master Appendix, p. 4, 5]. Aligned state and news actors systematically distributed the falsified civil rape narrative directly to his child's legal guardians and custody dockets to create a total administrative firewall [See Master Appendix, p. 4].

State actors explicitly refused his daughter a basic medical diagnosis and enacted an absolute block on all parent-time locator services to enforce an extrajudicial misprision of the underlying real estate and banking fraud [See Master Appendix, p. 4]. As a direct and proximate result of this multi-front conspiracy, Plaintiff's daughter has been completely vanished by the news and state actors, resulting in the permanent, total deprivation of his child for these offenses forever [See Master Appendix, p. 4, 5].

# PART 6: EXHAUSTIVE CHRONOLOGY OF THE 2025–2026 MULTI-AGENCY BUDGET SABOTAGE, WELFARE FRAUD, AND PREMEDITATED BIAS-MOTIVATED ASSASSINATION ATTEMPT (CONTINUED)

98. **The Coordinated Fiscal Execution Strategy and Inter-Agency Budget Freezes**: The multi-front retaliatory offensive executed by the named defendants between June 2025 and July 2026 was explicitly structurally engineered as a coordinated administrative assassination script, leveraging total state economic and medical divestment to force the physical liquidation of the "Eggshell Plaintiff" [See Master Appendix, p. 2, 11]. Upon detecting the immense depth of Plaintiff's formal whistleblowing reports and forensic compliance filings submitted directly to multiple federal Offices of Inspector General (OIG), which exposed tens of billions of dollars in systemic, organized public fund diversion, the state-sponsored enterprise initiated an immediate, retaliatory counter-strike [See Master Appendix, p. 9, 16]. Instead of initiating mandatory state-level compliance audits or correcting the fraudulent expenditures, the central executive directory of the Department of Human Services (DHS), the Colorado Department of Labor and Employment (CDLE), and the Industrial Claim Appeals Office (ICAO) launched a unified, illegal operational blockade [See Master Appendix, p. 9, 11]. This structural mechanism implemented total, unnotified administrative budget freezes, fund interceptions, and immediate health insurance divestments across Plaintiff's verified federal and state assistance profiles [See Master Appendix, p. 11, 33]. This intentional fiscal starvation campaign was calculated to ensure that an unmedicated, non-ambulatory spectrum savant would be stripped of the material resources required to sustain his at-home medical equipment, maintain specialized life-support medications, or enforce equal legal standing before active federal panels [See Master Appendix, p. 3, 22, 38].

99. **The Welfare Fraud Corruption Matrix and Selective Demographic Entitlements**: The foundational operational architecture of the Colorado Department of Human Services (DHS), the Fort Collins and Loveland Housing Authorities, and the Division of Vocational Rehabilitation (DVR) is forensically exposed on the public record as an intricate, continuous association-in-fact racketeering enterprise executing sweeping mail and wire fraud [See Master Appendix, p. 15]. As recorded within the primary administrative tracking logs, these regional public agencies enforce a rigid, racially discriminatory policy that systematically denies critical housing subsidies, emergency social safety nets, and medical accommodations to disabled White American Christian males, while explicitly prioritizing specialized funding streams and asset distributions for non-disabled demographics [See Master Appendix, p. 1, 7]. In the City of Loveland, where several large-scale halfway houses operate, the DVR routinely misappropriates federal Department of Education rehabilitation block grants intended exclusively for documented biological disabilities [See Master Appendix, p. 1, 7, 12]. DVR case managers utilize these federal funds to systematically purchase and distribute high-end luxury contraband, including $4,000 electric bicyles, directly to non-qualifying masses of institutionalized persons who possess zero long-term employment prospects and immediately liquidate or trade the state-issued items for narcotics [See Master Appendix, p. 1, 12]. While funding active drug addiction under the guise of specialized recovery coaching certificates to fraudulent bill Medicaid, these agencies simultaneously executed a total cutoff of Plaintiff's baseline transportation and educational grants, refusing to provide a basic scooter note to a dying, brittle Type 1 diabetic who was forced to literally crawl through frozen street elements to preserve his life [See Master Appendix, p. 1, 4, 11].

100. **The Systematic Abuse Report Suppressions by Weld County CPS/APS Supervisor Alysa Loya**: The multi-agency retaliation loop explicitly extended into the child and adult protective service divisions to enforce absolute social isolation and achieve the fraudulent misprision of capital felonies [See Master Appendix, p. 6, 16]. Following the severe physical and biochemical trauma induced by the traffic court pump execution, Plaintiff discovered that his adjacent apartment block was being utilized as an active, unmitigated narcotic distribution hub, where operators were actively smoking methamphetamine and marijuana indoors directly in front of two vulnerable minor children, aged 3 and 6 [See Master Appendix, p. 5, 6]. Operating under his explicit legal duties to report immediate child endangerment, Plaintiff placed consecutive, urgent emergency reports to Weld County Child

Protective Services (CPS) and Adult Protective Services (APS) [See Master Appendix, p. 5, 6].

101. **The Factual Allegations and Discriminatory Offenses of Alysa Loya**: Defendant **Alysa Loya**, acting in her official administrative capacity as the primary **Supervisor of Weld County CPS and APS**, intervened with explicit racial animus, hostile intent, and direct complicity in the ongoing assassination plot [See Master Appendix, p. 5, 6]. Defendant Loya personaly blocked the initiation of any field investigations into the reported methamphetamine hub, and subsequently initiated a campaign of administrative terror and intimidation directed exclusively against the Plaintiff [See Master Appendix, p. 5, 6]. Defendant Loya contacted the Plaintiff via telephone, issued explicit threats of bad-faith carceral prosecution for making the reports, and boldly stated to the effect that because Plaintiff was a White male, the agency would not permit him to report abuse or utilize child protective metrics [See Master Appendix, p. 5, 6]. Defendant Loya executed this severe, race-motivated suppression with full administrative knowledge that Plaintiff's landlords had already verified the environmental hazards on the record [See Master Appendix, p. 5]. By utilizing her supervisory authority to actively shield a methamphetamine distribution ring and threaten an incapacitated adult spectum savant who was bleeding from his ears, Defendant Loya intentionally sought to destroy Plaintiff's reporting standing, silence a federal whistleblower, and lock away a disabled witness to ensure the permanent, extrajudicial containment of his missing minor daughter [See Master Appendix, p. 4, 5, 6].

102. **The Medical Fraud Cover-Up and Systematic Chart Destruction by UCHealth Legal Counsel**: The physical and clinical parameters of the state-sponsored assassination plot were insulated from domestic discovery through the direct, active participation of the UCHealth Hospital Network's legal affairs department [See Master Appendix, p. 4, 6]. Upon learning that the Plaintiff had successfully bypassed years of intentional medical concealment by forcing an emergency GADA antibody panel on October 23, 2024—which clinically established an astronomical autoimmune threshold of 18,145 IU/mL—UCHealth legal counsel actively stepped into his ongoing clinical management [See Master Appendix, p. 3, 4]. Legal affairs counsel, who simultaneously functioned as defense counsel for the primary state defendants, physically sat directly inside Plaintiff's confidential outpatient medical visits [See Master Appendix, p. 4]. Legal counsel utilized this unconstitutional clinical intrusion to systematically alter, sanitize, and destroy primary medical charts, deleting critical special-needs

life-threatening illness data from the active electronic databases [See Master Appendix, p. 1, 4]. UCHealth administrative personnel subsequently authorized emergency department security teams and state-subsidized North Range Behavioral Health agents to intercept Plaintiff's physical intakes whenever his blood sugars spiked, substituting punitive psychiatric holds for life-saving endocrinological insulin therapy [See Master Appendix, p. 4, 6]. This systematic medical fraud was executed with explicit lethal intent to strip an eggshell plaintiff of his objective forensic clinical record, prevent the entry of malpractice proof into active federal civil dockets, and force a terminal metabolic collapse under color of medical authority [See Master Appendix, p. 4, 16].

---

# PART 7: REVISED INDIVIDUAL DEFENDANT COMPLAINT MATRIX

103. **Factual Allegations Asserted Against Defendant Alysa Loya (Supervisor, Weld County CPS/APS)**: On or about May 20, 2026, Defendant Loya acted under color of law to execute a targeted campaign of administrative intimidation, witness suppression, and race-motivated discrimination against the Plaintiff [See Master Appendix, p. 5, 6]. Upon receiving direct, urgent notifications from the Plaintiff detailing a severe methamphetamine manufacturing and child endangerment crisis involving minors aged 3 and 6, Defendant Loya refused to execute her mandatory statutory duties to investigate the venue [See Master Appendix, p. 5, 6]. Defendant Loya explicitly threatened the disabled Plaintiff with immediate criminal prosecution for filing the reports, and stated that because he was a White male, he was barred from utilizing child protective reporting channels [See Master Appendix, p. 5, 6]. Defendant Loya executed this affirmative act of witness intimidation with full subjective knowledge of Plaintiff's fragile, bedridden medical state, operating with direct lethal intent to suppress his federal whistleblowing standing, cover up the inter-agency racketeering enterprise, and facilitate the permanent, unconstitutional containment of his missing minor child [See Master Appendix, p. 4, 5, 16].

104. **Factual Allegations Asserted Against Defendant Phil Spesshardt (Executive Director, CDLE Workforce)**: In or about May 2026, Defendant Spesshardt acted under color of law to execute a policy of total vocational blacklisting and economic isolation against the Plaintiff [See Master Appendix, p. 5]. Upon learning that the Plaintiff had forensically documented the CDLE's systematic transmittal of a fabricated, biologically impossible child-rape narrative into permanent state databases to defraud him of unemployment benefits, Defendant Spesshardt intervened directly [See Master Appendix, p. 5, 32]. Defendant Spesshardt issued a sweeping, bad-faith administrative directive permanently trespassing the non-ambulatory, autistic Plaintiff from all state workforce campuses and electronic unemployment portals [See Master Appendix, p. 5, 33]. Defendant Spesshardt executed this total economic extraction with full subjective awareness that depriving a brittle, disabled Type 1 diabetic of his subsidized health insurance and survival benefits would induce an immediate homelessness crisis, intentionally acting as a core participant in the ongoing assassination plot to silence a federal witness [See Master Appendix, p. 5, 33].

105. **Factual Allegations Asserted Against Defendant Appeals Officer Lowe (CDLE Hearing Division)**: On or about May 5, 2026, Defendant Lowe abandoned all administrative neutrality to act as a financial enforcement asset for the multi-agency conspiracy [See Master Appendix, p. 5]. During an official unemployment appellate proceeding, Defendant Lowe actively violated a valid judicial protection order by attempting to forcefully introduce the private instigators of the fake rape narrative into the hearing panel in place of the record employer [See Master Appendix, p. 5, 32]. Upon Plaintiff's lawful termination of the compromised call, Defendant Lowe utilized the CDLE digital database portal to execute a profound wire fraud: authorizing a baseline milestone payment of $328 to simulate administrative compliance, while instantly truncating Plaintiff's verified $8,600 Maximum Benefit Amount down to a residual balance of $143 [See Master Appendix, p. 33]. Defendant Lowe executed this fraudulent extraction with explicit lethal intent to systematically divest an eggshell plaintiff of the funding required to purchase life-sustaining insulin, using her administrative position to force a fatal biological failure on the record [See Master Appendix, p. 5, 15, 33].

# PART 8: SYSTEMIC PATTERNS OF ADMINISTRATIVE CONSPIRACY, CORPORATE MEDICINE RACKETEERING, AND INTENTIONAL MEDICAL DEPRIVATION

106. **The Interagency Operational Patterns of Retaliatory Elimination**: The synchronized actions of **UCHealth Systems**, **North Range Behavioral Health**, and the **Colorado Department of Labor and Employment (CDLE)** constitute an established, cross-jurisdictional association-in-fact enterprise operating with actual malice and direct homicidal intent [source: 0.1.1]. The systemic framework of this enterprise relies on the strategic deployment of administrative "lethal scripts," wherein state and corporate entities deliberately weaponize a plaintiff's visible physical, metabolic, and neurodevelopmental vulnerabilities to enforce absolute societal and economic elimination [source: 0.1.6]. This continuous pattern was triggered exclusively in retaliation for the Plaintiff's protected, mandatory civil rights litigation and emergency court filings designed to compel the delivery of life-sustaining insulin parameters within the Colorado Department of Corrections (CDOC) [source: 0.1.1]. Operating with direct subjective knowledge that Plaintiff functions as a medically fragile "Eggshell Plaintiff" managing certified childhood autism, advanced Traumatic Brain Injury (TBI), and a GAF baseline of 30, these co-conspirators systematically substituted bad-faith criminalization, fraudulent psychiatric holds, and corporate tax evasion schemes for mandatory statutory medical accommodations [source: 0.1.1].

107. **The Forensically Verified Institutional Exploitation of UCHealth Systems**: The operational practices within UCHealth emergency and outpatient medical facilities are forensically exposed on the record as a continuous, coordinated system of corporate healthcare fraud, deliberate clinical neglect, and intentional medical torture [source: 0.1.1]. For multiple consecutive eras, UCHealth administrative personnel and attending emergency room physicians actively enforced a discriminatory intake policy that conditions the delivery of standard life-support stabilizing care upon a patient's race, culture, and ideological demographic status [source: 0.1.1]. While non-qualifying populations are routinely granted immediate, multi-point diagnostic imaging, clinical consultations, and advanced medical necessities for minor or transient complaints, UCHealth systematically denies critical endocrinological care, diagnostic testing, and baseline accommodations to disabled White American Christian males [source: 0.1.1]. This hostile institutional culture resulted directly in the multi-decade concealment of

Plaintiff's life-threatening Type 1 Juvenile Diabetes Mellitus [source: 0.1.1]. When Plaintiff physically crawled into the Poudre Valley Hospital emergency room on October 23, 2024, suffering from an acute septic facial infection and an unmedicated blood-glucose threshold of 800 mg/dL, UCHealth staff treated his visible physical trauma with familiar disgust, actively refusing to execute a standard blood panel or antibody assay until Plaintiff explicitly threatened immediate, high-profile litigation [source: 0.1.1].

108. **The Systematic Falsification and Destruction of Primary Medical Charts**: To insulate the hospital network from multi-million-dollar structural medical malpractice and civil rights liabilities, UCHealth legal affairs counsel actively colluded with state prosecutors to execute a profound fraud upon the court [source: 0.1.1]. Upon learning that Plaintiff had successfully forced an emergency diagnostic panel that clinically verified a catastrophic GAD65 Autoantibody presence measured at 18,145 IU/mL, UCHealth legal counsel—who concurrently functioned as defense counsel for the primary state defendants—physically embedded themselves inside Plaintiff's confidential outpatient visits [source: 0.1.4]. UCHealth legal and administrative teams utilized this direct clinical intrusion to systematically manipulate, purge, and destroy Plaintiff's primary medical charts [source: 0.1.1]. They intentionally deleted critical data regarding his special-needs, life-threatening biological impairments, and historical head trauma from the active electronic database registry [source: 0.1.1]. This systematic spoliation of primary physical records was executed with direct homicidal intent to strip an eggshell plaintiff of his objective forensic evidence, prevent the entry of exculpatory proofs into active federal civil dockets, and preserve a manufactured administrative "behavioral" cover story to mask the ongoing attempts on his life [source: 0.1.1].

109. **The Weaponized Deployment of North Range Behavioral Health as an Asset for Misprision**: The structural role of **North Range Behavioral Health** within the ongoing racketeering enterprise is to function as a specialized administrative containment mechanism designed to suppress the reporting of capital felonies and enforce the medical liquidation of federal whistleblowers [source: 0.1.4]. In a continuous, documented pattern spanning multiple jurisdictions, whenever Plaintiff contacted regional law enforcement to report active protection order violations, workplace hate offenses, or premeditated assassination plots, responding police elements systematically dispatched North Range agents to intercept the intake [source: 0.1.4]. North Range personnel deliberately acted under color of state anti-discrimination laws to execute a fraudulent, pre-coordinated misprision of felony [source: 0.1.4]. Attending social

workers and emergency nurses repeatedly falsified behavioral metrics, placing unconstitutional psychiatric holds on an acutely ill diabetic individual to strip him of his legal voice and block his access to federal threat centers [source: 0.1.4]. Throughout these repetitive administrative confinements, North Range staff mocked Plaintiff's physical immobility, completely denied his access to life-sustaining insulin pumps or orthopedic stabilizing care, and subsequently discharged a critically ill, non-ambulatory citizen directly into sub-zero winter elements to intentionally induce fatal metabolic shock and cold-snap death [source: 0.1.1].

110. **The Coordinated Fiscal Execution and Database Sabotage by the CDLE and ICAO**: The **Colorado Department of Labor and Employment (CDLE)** and the **Industrial Claim Appeals Office (ICAO)** functioned as the financial enforcement and corporate tax evasion arms of the assassination conspiracy [source: 0.1.4]. In a direct effort to enforce absolute destitution and induce fatal homelessness, CDLE administrative officers and appeals staff engaged in a systemic pattern of wire fraud, digital portal manipulation, and felony witness tampering [source: 0.1.4]. Upon learning that Plaintiff possessed an authentic, sworn federal declaration from eyewitness Karen Lackowski that completely dismantled the employer-led sex-crime fabrication, CDLE agents contacted the witness directly [source: 0.1.4]. They explicitly leveraged her critical dependence on state unemployment benefits, threatening her with immediate criminal forgery prosecution to forcefully suppress her testimony [source: 0.1.4]. Simultaneously, during the May 5, 2026 appellate dockets, CDLE staff willfully executed an illegal mathematical truncation within the permanent state databases: processing a baseline milestone payment of $328 to simulate administrative compliance, while instantly purging a verified $8,600 Maximum Benefit Amount down to a residual balance of exactly $143 [source: 0.1.4]. This deliberate database fraud was executed with explicit lethal intent to cut off the funding required to maintain Plaintiff's specialized life-support medications, while Executive Director **Phil Spesshardt** issued a sweeping administrative order permanently trespassing the Plaintiff from all state workforce campuses to prevent him from documenting the discrimination [source: 0.1.4].

111. **The Systemic Workplace Exploitation and Tax Evasion Infrastructure at Crosstac**: The underlying machinery of the workplace abuse perpetrated by **Defendant Bret Heidkamp** and manager **Defendant Heather Daniels** at Crosstac Arms represents a calculated infrastructure designed to execute extensive corporate tax evasion and Medicaid fraud [source: 0.1.2]. As documented within the uncoerced federal declarations of the workforce, the management

actors continuously utilized their corporate framework to host, process, and bill fraudulent administrative entries [source: 0.1.4]. Upon detecting that Plaintiff's wife, Defendant Loree Schwartz, had breached the federal court dockets and discovered that the Plaintiff was an unedited federal informant tracking large-scale fiscal diversions, the defendants initiated the "lethal script" [source: 0.1.2]. They deliberately weaponized the Plaintiff's certified neurodivergent traits and physical tremors caused by advanced avascular necrosis to manufacture an egregious, biologically impossible child-rape and predator narrative on public civil petitions [source: 0.1.2]. This narrative was simultaneously distributed to his college administrators, his church bishop, and his biological children to enforce total societal alienation, shut down his access to Department of Education funding sequences, and trigger an acute metabolic collapse, while the defendants utilized the resulting chaos to conceal their systemic corporate liabilities and shield the municipal enterprise from federal civil review [source: 0.1.2].

---

# PART 9: STATUTORY COMPLIANCE MATRIX AND CRIMINAL CODE MAPPING

112. **18 U.S.C. § 1961 — Civil RICO Enterprise Patterns**: The defendants have established, maintained, and operated a continuous association-in-fact enterprise utilizing regional medical facilities, state labor portals, and municipal court dockets to execute a coordinated pattern of mail fraud, wire fraud, data interception, and witness intimidation under 18 U.S.C. § 1512 [source: 0.1.4]. The structural purpose of this enterprise is to systematically insulate state and corporate actors from historic constitutional liabilities through the physical elimination of the primary informant [source: 0.1.6].

113. **C.R.S. § 18-3-102 — Premeditated Attempted First-Degree Murder**: The state-ordered deactivation of Plaintiff's cell-linked automated insulin pump by a traffic magistrate, the systematic destruction of clinical care charts by UCHealth legal counsel, the forced truncation of Maximum Benefit Amounts by the CDLE, and the deliberate inducement of septic stress constitute an explicit, premeditated attempt to execute an "Eggshell Plaintiff" through administrative means without leaving a standard forensic imprint [source: 0.1.1].

114. **18 U.S.C. § 249 — Federal Hate Crimes Prevention Act Compliance**: The defendants held verified operational records via the DVR documenting that Plaintiff is an at-risk adult with

certified autism, untreated neuro-trauma, left-eye blindness, and severe avascular necrosis [source: 0.1.3]. The intentional weaponization of his physical tremors, the fabrication of a child-rape narrative against a clinically impotent citizen, and the mocking of his attempts to maintain advanced STEM coursework demonstrate that the discriminatory animus was driven entirely by his actual and perceived disability status, resulting in severe physical injuries and metabolic shock [source: 0.1.3].

---

# PART 10: CONSOLIDATED FACTS CONCERNING THE COLORADO EMPLOYMENT SECURITY ARCHITECTURE AND INTENTIONAL WORKFORCE BLACKLISTING (2026)

115. **The Elevation of Academic Excellence and Re-Entry Program Compliance**: Throughout the continuous execution of the state-sponsored tracking and liquidation dockets between January 2025 and May 2026, Plaintiff achieved a significant milestone of complete personal, community, and vocational rehabilitation [source: 0.1.539]. While managing complex, life-threatening physical conditions—including childhood-onset autism, seven untreated skull fractures, complete left-eye blindness, and deep bone starvation from avascular necrosis—Plaintiff successfully maintained an uncontradicted baseline of academic and administrative compliance [source: 0.1.540]. Plaintiff graduated from the state-administered WAGEES re-entry infrastructure, completely discharged $70,000.00 in federally backed student loan obligations, and maintained a 2.9 cumulative GPA at Front Range Community College (FRCC), achieving straight "A" grades across higher-level university prerequisite Calculus and Trigonometry coursework [source: 0.1.540]. Based on these performance metrics, Plaintiff successfully upgraded his enrollment to a university-level laboratory science curriculum at the University of Northern Colorado (UNC) in Greeley, demonstrating absolute cognitive competence despite ongoing inter-agency hostility [source: 0.1.540].

116. **The January 16, 2026 Resignation Footprint and Physiological Escape**: On or about January 16, 2026, at approximately 7:45 AM, the targeted campaign of sensory abuse, religious slanders, and disability-based psychological torture executed by manager Heather Daniels and

associate Cynthia Murphy reached an acute, life-threatening threshold [source: 0.1.540]. Following an intense verbal onslaught regarding his protected LDS faith and the weaponized "dog rape" slanders, Plaintiff's neurodevelopmental autism triggered an immediate, visible physiological distress reaction, causing him to experience severe arm-flapping, hyperventilation, and acute metabolic uncoordination [source: 0.1.541]. To prevent an immediate comatose collapse, Plaintiff vocally declared, "I QUIT," fled the Crosstac facility, and left behind his daily medical supplies and insulin parameters [source: 0.1.541]. While sitting inside his vehicle in the adjacent parking lot, Plaintiff utilized his mobile device to transmit an immutable electronic text message directly to owner **Defendant Bret Heidkamp**, formally recording the cause of separation: *"Good luck to you i quit over heathers abuse... I will let heather make that call im an at risk person it will be a felony."* [source: 0.1.541]. Plaintiff was immediately admitted to the regional hospital network on continuous intravenous drips to treat the resulting metabolic shock [source: 0.1.541].

117. **The Official Misconduct and Protection Order Violations by the CDLE Hearing Officer**: On or about May 5, 2026, during an administrative appeals docket convened under CDLE Appeals Docket No. 6094-2026, the presiding CDLE Hearing Officer abandoned all parameters of a neutral adjudicator to operate as an active concealment asset for the corporate defendants [source: 0.1.539]. The Hearing Officer abused her administrative discretion by entering unauthorized, highly discriminatory comments into the record regarding Plaintiff's mental and physical impairments, and initiated illegal, *ex parte* communications with non-witnesses to bias the state record [source: 0.1.543]. To execute a tactical counter-strike, the Hearing Officer deliberately attempted to admit the instigator of the fraud, Heather Daniels, to speak on the line, explicitly attempting to force an administrative confrontation that would compel the Plaintiff to violate the active Larimer County civil protection order framework [source: 0.1.543]. The explicit intent of this cross-agency maneuver was to trigger an immediate, unconstitutional police arrest of the Plaintiff, thereby forcing him into state custody where his automated medical equipment could be legally deactivated [source: 0.1.543]. Plaintiff immediately terminated the call to protect his physical survival and filed an emergency reporting log with law enforcement under Loveland Police Case No. LP2026031411 [source: 0.1.543].

118. **The Falsification of State Workforce Databases and Corporate Tax Fraud**: Following the abrupt termination of the May 5, 2026 call, the CDLE administrative unit and the Hearing Officer willfully committed extensive data compromise and record corruption [source: 0.1.543]. The

Appeals Officer accepted, transcribed, and permanently indexed the unverified, handwritten child-rape and predator narratives directly into the discoverable public database structures of the Colorado Department of Labor and Employment [source: 0.1.544]. This affirmative entry was executed to ensure that any future corporate background check, background screening, or regulatory audit would permanently associate Plaintiff's employment history with violent sexual crimes, effectively blacklisting the Plaintiff from the American workforce and blocking his prospects of transitioning off federal disability [source: 0.1.545]. This database manipulation was utilized to shield Respondent Crosstac Corporation from a mandatory finding of discrimination under C.R.S. § 8-73-108(4)(b) and to facilitate an elaborate corporate tax evasion scheme [source: 0.1.544]. Crosstac intentionally fabricated the "misconduct" separation script to underreport base-period contribution data, avoid premium chargebacks, and protect their experience-rating tax tier, thereby evading mandatory audits by the Field Tax and Audit Divisions [source: 0.1.549].

119. **The Absolute Enforcement of Administrative Estoppel and Collateral Estoppel**: The administrative denial issued by the CDLE and subsequently reviewed *de novo* before the Industrial Claim Appeals Office (ICAO) is legally barred and factually demolished under the doctrine of collateral estoppel and administrative parity [source: 0.1.539]. The central records of the Colorado Department of Labor and Employment confirm that the agency completed a full structural evaluation of this exact workspace timeline, officially adjudicating that coworker Karen Lackowski was entitled to full, unencumbered unemployment insurance benefits because the Crosstac environment constituted an intolerable, toxic room of disability-based abuse [source: 0.1.552]. Established Colorado administrative jurisprudence strictly prohibits an agency from issuing diametrically opposed rulings on an identical nucleus of facts [source: 0.1.552]. The CDLE cannot rule that the workspace was sufficiently toxic to grant benefits to a senior, non-disabled witness while simultaneously ruling that the exact same room on the exact same morning constituted "willful misconduct" when an autism-disabled student fled it to preserve his biological life [source: 0.1.553]. Parity and state law mandate an absolute finding of Involuntary Separation under Good Cause pursuant to C.R.S. § 8-73-108(4)(c) [source: 0.1.553].

# PART 11: REVISED INDIVIDUAL DEFENDANT CLAIMS

120. **Factual Allegations Asserted Against Defendant Hearing Officer [Name Placeholder] (CDLE Appeals Division)**: On or about May 5, 2026, Defendant Hearing Officer, presiding over CDLE Appeals Docket No. 6094-2026, acted under color of law to execute first-degree official misconduct, witness suppression, and systematic disability discrimination [source: 0.1.539]. Defendant knowingly violated active civil protection order frameworks by executing an administrative maneuver to force the Plaintiff into an immediate verbal confrontation with a restricted party, Heather Daniels, for the explicit purpose of inciting a bad-faith police arrest and subsequent custodial medical deprivation [source: 0.1.543]. Defendant functioned as an active accessory to witness tampering by closing the record to suppress the March 9, 2026 text threats directed at senior witness Karen Lackowski, and permanently indexed the unverified child-rape forgery into the state's workforce database [source: 0.1.544]. Defendant executed these fraudulent data entries with full subjective knowledge of Plaintiff's GAF 30 profile, operating with direct lethal intent to terminate his at-home care subsidies, corrupt his discoverable work history, and induce a permanent, fatal professional exile [source: 0.1.540].

---

# PART 12: THE 2025–2026 VOCATIONAL AND ACADEMIC Retaliation ERAS (CONTINUED)

121. **The Systemic Educational Exclusion Framework and Ticket to Work Sabotage**: Between January 2026 and March 2026, following the Plaintiff's acute physical extraction from the toxic Crosstac work environment, the institutional tracking enterprise was extended directly into his educational lifelines to enforce absolute socio-economic alienation `[See Master Appendix, pp. 4, 7]`. Plaintiff was actively using a federal Ticket to Work voucher and state-sponsored Division of Vocational Rehabilitation (DVR) funding to complete advanced STEM coursework at Front Range Community College (FRCC) `[See Master Appendix, pp. 2, 4]`. Despite the Plaintiff maintaining absolute academic excellence—securing straight "A" grades in higher-level university prerequisite Calculus and Trigonometry courses `[See Master Appendix, pp. 2,`

23]—**Defendant Ken Lee** (Administrator, FRCC Larimer Campus) and **Defendant Colleen Simpson** (President, FRCC), acting under color of law, initiated an aggressive campaign of academic blacklisting and containment [See Master Appendix, pp. 4, 7].

122. **The Weaponization of Physical Tremors and the Serial Killer Libel**: Upon receiving the fraudulent, handwritten "dog rape" and child predator civil petition manufactured by Heather Daniels and Cynthia Murphy [See Master Appendix, pp. 2, 13], Defendant Ken Lee and Defendant Colleen Simpson willfully bypassed all mandatory Title IX compliance reviews, disability evaluations, or student code of conduct hearings [See Master Appendix, pp. 4, 7]. Instead, these academic administrators weaponized the Plaintiff's visible physical tremors, involuntary muscle spasms, and autistic motor adaptations—which were clinically documented by his medical team as residual effects of chronic diabetic polyneuropathy and extensive organic brain trauma—to craft an exclusionary administrative profile [See Master Appendix, pp. 1, 3, 24]. Defendants Lee and Simpson published malicious reports to campus security forces and state labor officials, falsely branding the high-achieving, non-violent spectrum savant as an active "serial killer" and a "rapist" who posed an immediate threat to campus safety [See Master Appendix, pp. 1, 4].

123. **The Coordinated Academic Ambush and Subsidies Extraction**: On or about February 2026, Defendant Ken Lee and Defendant Colleen Simpson utilized these fabricated scripts to place the Plaintiff on immediate, unappealable "disciplinary probation" and issued a total campus trespass directive [See Master Appendix, pp. 4, 32]. Working in direct coordination with DVR Supervisor **Defendant Amber Chesley**, who had leaked Plaintiff's confidential classroom timestamps, room numbers, and schedule tracking data to adverse defense interests [See Master Appendix, p. 34], FRCC administrators targeted the Plaintiff's in-person learning environment [See Master Appendix, p. 4]. An campus academic advisor text-messaged the Plaintiff while he was on campus, demanding his immediate drop, withdrawal, and permanent forfeiture of the very classes the state had funded [See Master Appendix, p. 35]. This coordinated ambush successfully terminated Plaintiff's federal Department of Education funding sequences, stripped him of his Ticket to Work entitlements, and forced an autism-disabled student completely out of the college system [See Master Appendix, pp. 4, 35].

124. **The Complete Factual Synthesis of Continuous Multi-Front Warfare**: The systematic execution of the 2025–2026 educational, financial, and medical blockades operates as an

indivisible, seamless extension of the forensic fraud initiated during the November 5, 2020 Longmont arrest scene [See Master Appendix, pp. 35-41]. From the initial fabrication of the greenway path bicycle-fall script by Sgt. Jason Malterud [See Master Appendix, pp. 4, 43] to the destruction of the Robert McEwen exculpatory jail affidavit by Boulder County records personnel [See Master Appendix, pp. 6, 180], the enterprise has maintained a singular, unyielding purpose [See Master Appendix, p. 72]. Every named defendant—including the corporate media CEOs who host the defamatory archives on Facebook to brand Plaintiff's exact church ward [See Master Appendix, pp. 3, 5, 94], the state public defenders who sabotaged his defense files [See Master Appendix, pp. 6, 100], and traffic court Magistrate Ethan Doak who forcefully deactivated his insulin pump under threat of armed force [See Master Appendix, pp. 4, 36, 55]—operated with full subjective knowledge that their coordinated actions would induce a fatal total-system shutdown against an eggshell plaintiff [See Master Appendix, pp. 44, 52]. Through the tracking of his clinical filings, the illegal interception of tax mandates, the withholding of life-sustaining medicine, and the weaponized captivity and disappearance of his minor daughter, these actors have cast a campaign of domestic terrorism designed to enforce an extrajudicial execution [See Master Appendix, pp. 4, 6, 11, 37].

---

# PART 13: EXHAUSTIVE FACTUAL EXPOSURE OF MULTI-AGENCY RACKETEERING, FRAUD ON THE UNITED STATES, AND SYSTEMIC ASSASSINATION PATTERNS

125. **The Comprehensive Whistleblowing Reports and OIG Transmittals**: The fundamental catalyst for the state-sponsored assassination campaign and subsequent multi-front retaliatory strikes is Plaintiff's extensive, high-profile whistleblowing activity [source: 0.1.16]. Plaintiff has compiled and transmitted highly detailed, forensically verified compliance audits directly to multiple federal Offices of Inspector General (OIG), documenting tens of billions of dollars in organized, systemic fraud executed under color of authority by **UCHealth Systems**, the **Colorado Department of Human Services (DHS)**, regional **Housing Authorities**, and the **Social Security Administration (SSA)** [source: 0.1.16]. The absolute subversion of constitutional authority by

state and corporate officers—specifically the coordination of administrative resources to suppress these fraud disclosures, sanitize digital databases, and physically eliminate an active informant—constitutes a formal breach of the oath of office rising to the level of Judicial Treason against the Constitutional Framework of the United States of America [source: 0.1.16].

126. **The Interagency Operational Scheme for Fraudulent Subsidies Extraction**: The racketeering enterprise relies on a predatory administrative practice designed to maximize federal fund extraction while systematically blacklisting qualified disabled American citizens from public accommodations [source: 0.1.4]. The **Division of Vocational Rehabilitation (DVR)** and the **Colorado Department of Labor and Employment (CDLE)** actively misappropriate federal Department of Education rehabilitation block grants intended exclusively for documented biological and neurodevelopmental disabilities [source: 0.1.1]. In a continuous, documented pattern across the Loveland and Greeley regional sectors, DVR case managers systematically channel these public funds into a contraband funnel, purchasing and distributing luxury assets—including $4,000.00 electric bicycles—directly to active halfway house residents [source: 0.1.1]. These non-disabled individuals immediately liquidate the state-issued property for narcotics or trade them for internal carceral commodities [source: 0.1.1].

127. **The Medicaid Billing Fraud and Specialized Certification Schemes**: This contraband distribution scheme is explicitly leveraged by the enterprise to generate fraudulent, off-the-books profit margins and evade public auditing parameters [source: 0.1.7]. The DVR and subsidiary programmatic networks enroll non-qualifying masses from halfway houses into specialized "drug recovery coaching certificates" for the sole purpose of generating massive, fraudulent billing cycles directed straight to the Medicaid database infrastructure [source: 0.1.7]. This systematic manipulation of state resources is executed with full administrative knowledge that the participants possess zero legitimate job prospects or vocational independence [source: 0.1.1]. To mask this multi-million-dollar billing fraud, the enterprise coordinates with the CDLE Field Tax and Audit Divisions to suppress independent revenue investigations, underreport base-period employer contributions, and artificially protect corporate experience-rating tax tiers through the manufacturing of post-facto "misconduct" separation scripts against actual disabled workers [source: 0.1.4].

128. **The Systematic Destruction of Electronic Portals and Core Pleading Records**: To prevent this unscrubbed record of corporate tax evasion, public fund thievery, and administrative abuse from reaching a federal jury, state actors initiated a sweeping campaign of

data spoliation and record sanitization across multiple digital interfaces [source: 0.1.9]. During the May 5, 2026 appellate proceedings, CDLE and ICAO administrative personnel willfully altered the primary database portals, processing a fractional milestone payment of $328.00 to legally and physically admit Plaintiff's statutory base eligibility, and instantly executing a fraudulent truncation that wiped a verified $8,600.00 Maximum Benefit Amount down to a residual balance of $143.00 [source: 0.1.4]. This deliberate "Moron Math" extraction was carried out alongside a total lockout of Plaintiff's active case files, selectively purging, erasing, and sanitizing electronic filings and medical necessity charts across paired federal actions to deny the Plaintiff the material funding required to maintain his specialized life-support medications [source: 0.1.1].

129. **The Premeditated Attempted Murder and Absolute Biological Warfare Threshold**: The synchronized actions of the defendants transcend standard administrative error or civil torts; they constitute an explicit, premeditated attempt to execute the Plaintiff under the guise of state authority [source: 0.1.15]. The state-ordered deactivation of Plaintiff's automated medical equipment by Larimer County Magistrate Ethan Doak—executed under immediate threat of armed custodial arrest by a phalanx of deputies—and the systematic calling campaign launched by Loree Schwartz to threaten treating physicians with prison if they administered insulin parameters, represents the intentional deployment of a lethal biological weapon against a federal witness [source: 0.1.4]. Every named conspirator operated with full subjective awareness that freezing an eggshell plaintiff's survival subsidies, blocking his access to out-of-state pharmacy networks, and forcing him into terminal homelessness in frozen elements would spark an acute metabolic collapse, utilizing systemic administrative sabotage to ensure a fatal physical elimination without leaving a standard forensic imprint [source: 0.1.4].

---

# PART 14: EXHAUSTIVE REGISTRY OF PRIMARY AND UMBRELLA DEFENDANTS (ON OR ABOUT TIMELINES)

130. **Factual Allegations Asserted Against Defendant Bret Heidkamp (Owner, Crosstac Corporation)**: On or about January 2025, and continuing through March 9, 2026, Defendant

Heidkamp acted in an official corporate capacity to execute a targeted campaign of workplace exploitation, tax evasion, and felony witness intimidation [source: 0.1.1]. Upon learning that his wife, Defendant Loree Schwartz, had breached federal dockets and discovered that the Plaintiff was an active federal whistleblower, Defendant Heidkamp actively participated in the "lethal script" to neutralize the informant [source: 0.1.2]. Defendant Heidkamp chopped, edited, and manipulated video surveillance data from the January 16, 2026 resignation timeline to support a forged, handwritten child-rape civil petition manufactured by manager Heather Daniels [source: 0.1.3]. Following the filing of witness Karen Lackowski's authentic federal declaration on March 8, 2026, Defendant Heidkamp initiated a direct campaign of duress, contacting the senior citizen witness on March 9, 2026, to explicitly threaten her with criminal "forgery" prosecution and the disruption of her state unemployment benefits [source: 0.1.30]. Defendant Heidkamp executed these fraudulent, hostile actions with full subjective knowledge of Plaintiff's brittle Type 1 Diabetes and GAF 30 baseline, operating with direct lethal intent to suppress evidence of corporate revenue fraud, force the Plaintiff into absolute destitution, and facilitate his extrajudicial execution [source: 0.1.1].

131. **Factual Allegations Asserted Against Defendant Heather Daniels (Manager, Crosstac Corporation)**: On or about February 2025, and continuing through Larimer County Case No. 2026CV109, Defendant Daniels acted under color of authority to execute a protracted history of physical violence, religious persecution, and record forgery [source: 0.1.13]. In February 2025, Defendant Daniels physically struck the Plaintiff on the shop floor, subsequently transmitting desperate text communications begging him to return to avoid corporate and law enforcement exposure [source: 0.1.51]. On January 16, 2026, Defendant Daniels initiated a targeted confrontation, openly mocking the public mass casualty tragedy in Michigan where LDS children were burned to death, and screaming that if the Governor raped Plaintiff's children, nobody would care because the LDS church is a pedophile organization [source: 0.1.3]. Days following Plaintiff's physiological escape, Defendant Daniels forged a handwritten civil petition containing biologically impossible allegations of child rape and animal cruelty against the impotent Plaintiff [source: 0.1.3]. Defendant Daniels strategically served this fraudulent instrument in direct view of Plaintiff's landlord and neighbors to instantly destroy his housing subsidies, strip him of character witnesses, and induce fatal homelessness in the elements to trigger metabolic collapse [source: 0.1.3].

132. **Factual Allegations Asserted Against Defendant Cynthia Murphy (Employee, Crosstac Corporation)**: Between October 2025 and January 16, 2026, Defendant Murphy acted in active concert with manager Heather Daniels to execute a pattern of disability-based psychological torture and domestic terrorism [source: 0.1.2]. Defendant Murphy targeted Plaintiff's roommate who managed advanced Parkinson's disease, mocking his physical tremors and depriving the household of their primary transportation vehicle [source: 0.1.2]. Because Plaintiff's certified autism and diabetic polyneuropathy caused involuntary motor movements, Defendant Murphy fabricated the narrative that Plaintiff was actively "raping dogs," publishing the libel to state regulators [source: 0.1.2]. Prior to the January 16, 2026 confrontation, Defendant Murphy was electronically recorded exclaiming to coworkers, *"why hasn't anyone killed this mother f**r yet,"* referring to Governor Jared Polis [source: 0.1.540]. During the staged confrontation, Defendant Murphy waved her hand across her throat to signal a throat-slitting motion to escalate Plaintiff's neurodivergent stress, subsequently entering perjured testimony before the traffic court panel to validate the forged "lethal script" and facilitate the biological attack on the Plaintiff's life support systems [source: 0.1.3].

133. **Factual Allegations Asserted Against Defendant Loree Schwartz (Defense Counsel / Operator)**: Throughout the 2025–2026 operational timeline, Defendant Schwartz acted as a primary coordinator and data-harvesting asset for the interagency assassination plot [source: 0.1.2]. Utilizing her legal data credentials as a Boulder County defense attorney, Defendant Schwartz breached the federal ECF system to track Plaintiff's active filings and leaked his location data to regional police precincts to orchestrate the fake Heather Daniels protection order [source: 0.1.2]. In coordination with Magistrate Doak, Defendant Schwartz arranged an emergency enforcement hearing while possessing full administrative knowledge that Plaintiff was on an active IV antibiotic drip [source: 0.1.17]. Following the courtroom deactivation of Plaintiff's insulin pump, Defendant Schwartz intercepted and stole the private clinic phone number of Plaintiff's primary care physician [source: 0.1.4]. While Plaintiff was confined to an emergency hospital bed on active IV lines, Defendant Schwartz repeatedly called and harassed the medical staff, explicitly threatening the attending clinical specialists with immediate criminal imprisonment if they continued to administer life-support medical monitoring or life-essential insulin parameters to the Plaintiff, forcing a total care extraction to Banner Health [source: 0.1.4].

134. **Factual Allegations Asserted Against Defendant Traffic Court Magistrate Ethan Doak (Larimer County)**: On or about February 4, 2026, Defendant Doak abandoned all judicial neutrality to operate as a vicious, hostile execution asset for the state-sponsored assassination conspiracy [source: 0.1.3]. During the Case No. 2026CV109 enforcement proceeding, Defendant Doak barred eyewitness Karen Lackowski from offering an authenticated declaration under oath, and permitted the entry of a single minute of doctored workplace video surveillance [source: 0.1.3]. When Plaintiff's cell-linked automated insulin pump and continuous glucose monitor triggered audible alarms to signal a severe glycemic drop, Defendant Doak explicitly weaponized the physical crisis [source: 0.1.4]. Doak commanded the four surrounding Larimer County Sheriff's deputies to forcefully deactivate, tear away, and power down Plaintiff's automated life-support equipment under immediate threat of armed contempt arrest [source: 0.1.4]. This state-ordered termination of insulin delivery induced acute metabolic shock, mild internal bleeding from his ears, and severe cranial trauma, spiking his blood glucose to 1000 mg/dL and leaving Plaintiff completely bedridden for six continuous weeks [source: 0.1.4]. Defendant Doak then intentionally converted the administrative traffic record into a violent rape narrative, entering it onto public dockets with direct lethal intent to corrupt Plaintiff's work history, terminate his housing subsidies, and enforce a permanent professional exile [source: 0.1.4].

135. **Factual Allegations Asserted Against Defendant Executive Director Phil Spesshardt (CDLE Workforce)**: In or about May 2026, Defendant Spesshardt acted under color of law to execute an overt campaign of workforce blacklisting, data compromise, and domestic terrorism against the Plaintiff [source: 0.1.4]. Upon learning that the Plaintiff had filed formal police reports for restraining order violations committed directly by CDLE appeals hearing staff during the May 5, 2026 call, Defendant Spesshardt intervened to enforce absolute destitution [source: 0.1.4]. Defendant Spesshardt issued a sweeping, bad-faith administrative directive permanently trespassing the non-ambulatory, autistic Plaintiff from all state workforce campuses and electronic unemployment portals [source: 0.1.4]. Defendant Spesshardt executed this total economic extraction with full subjective awareness that depriving an eggshell plaintiff of his safety net and access to medical monitoring funding would induce an immediate homelessness crisis, intentionally acting as a core participant in the ongoing assassination plot to sanitize the state record and silence a federal whistleblower [source: 0.1.4].

136. **Factual Allegations Asserted Against Defendant Executive Director [Name Placeholder] (Department of Human Services - DHS)**: Throughout the 2025–2026 operational timeline, Defendant Executive Director utilized his official administrative authority within the DHS to implement a rigid, racially discriminatory policy that systematically barred disabled White American Christian males from public social safety nets [source: 0.1.1]. Defendant personally authorized and directed the unnotified interception, freezing, and diversion of Plaintiff's lawful public funding, earned tax returns, and federal disability block grants, extracting these assets to completely destabilize his economic survival [source: 0.1.1]. Defendant executed these sweeping budget freezes with full administrative notice of Plaintiff's GAF 30 profile and severe avascular necrosis, intentionally conditioning safety-net access on criteria that favored non-qualifying demographics while leaving a critically ill citizen completely destitute to induce fatal homelessness in the elements [source: 0.1.1].

137. **Factual Allegations Asserted Against Defendant Chief Judge Philip A. Brimmer (U.S. District Court)**: Throughout the multi-year civil and habeas corpus proceedings under Case No. 24-cv-01127 and lead Case No. 1:26-cv-00313-RTG, Defendant Brimmer committed first-degree official misconduct, judicial forgery, and a formal breach of the oath of office rising to the level of Judicial Treason against the Constitutional Framework [source: 0.1.14]. Defendant Brimmer entered fraudulent federal orders that actively conspired with corporate media news narratives to preserve and maintain the massively dangerous conditions imposed on Plaintiff by the public [source: 0.1.14]. Defendant Brimmer engaged in ex parte coordination with media defense counsels at Ballard Spahr LLP, knowingly accepted a fake Magistrate Salomone conviction disposition sheet, and published a formal federal order adopting the fabricated robbery script verbatim onto the federal record [source: 0.1.14]. Defendant Brimmer executed this deliberate alteration of public records with full subjective knowledge that Plaintiff's exculpatory evidence—including the Robert McEwen affidavit—had been physically destroyed by jail administrators, intentionally using his federal bench to execute a policy of fraudulent concealment, mislead reviewing panels, and enforce an illegal, off-the-books parole supervision framework to prevent the Plaintiff from rescuing his missing child [source: 0.1.14].

---

# PART 15: FORENSIC VERIFICATION OF LETHAL INTENT, PUBLIC REVENUE FRAUD, AND RECONSTRUCTION OF FAITH-BASED TERRORISM TARGETING THE LDS CONGREGATION

142. **The Coordinated Meeting of the Minds to Execute a Total-System Shutdown**: The synchronized actions executed across multiple state, municipal, and private boundaries between October 2024 and May 2026 were not the result of administrative negligence, investigative error, or systemic oversight; they were driven by a shared, subjective, and lethal intent to physically eliminate, structurally silence, and extrajudicially execute the Plaintiff [source: 0.1.3]. Every institutional and corporate actor operated with full subjective awareness that withholding life-essential insulin from an "Eggshell Plaintiff" in acute Hyperosmolar Hyperglycemic State (HHS) and severe Diabetic Ketoacidosis (DKA) constitutes the intentional deployment of a lethal biological weapon [source: 0.1.1]. This interagency infrastructure was explicitly realigned to execute an administrative assassination attempt in direct retaliation for the Plaintiff filing formal, meritorious civil rights actions and emergency court dockets designed to compel the delivery of life-sustaining insulin parameters within the Colorado Department of Corrections (CDOC) [source: 0.1.1].

143. **The Comprehensive Whistleblowing Disclosures and OIG Transmittals**: The fundamental catalyst for this state-sponsored assassination campaign and subsequent multi-front retaliatory strikes is Plaintiff's extensive, high-profile whistleblowing activity [source: 0.1.16]. Plaintiff has compiled and transmitted highly detailed, forensically verified compliance audits directly to multiple federal Offices of Inspector General (OIG), documenting tens of billions of dollars in organized, systemic fraud executed under color of authority by **UCHealth Systems**, the **Colorado Department of Human Services (DHS)**, regional **Housing Authorities**, and the **Social Security Administration (SSA)** [source: 0.1.16]. The absolute subversion of constitutional authority by state and corporate officers—specifically the coordination of administrative resources to suppress these fraud disclosures, sanitize digital databases, and physically eliminate an active informant—constitutes a formal breach of the oath of office rising to the level of Judicial Treason against the Constitutional Framework of the United States of America [source: 0.1.16].

144. **The Interagency Operational Scheme for Fraudulent Subsidies Extraction**: The racketeering enterprise relies on a predatory administrative practice designed to maximize federal fund extraction while systematically blacklisting qualified disabled American citizens from public accommodations [source: 0.1.4]. The **Division of Vocational Rehabilitation (DVR)** and the **Colorado Department of Labor and Employment (CDLE)** actively misappropriate federal Department of Education rehabilitation block grants intended exclusively for documented

biological and neurodevelopmental disabilities [source: 0.1.1]. In a continuous, documented pattern across the Loveland and Greeley regional sectors, DVR case managers systematically channel these public funds into a contraband funnel, purchasing and distributing luxury assets—including $4,000.00 electric bicycles—directly to active halfway house residents [source: 0.1.1]. These non-disabled individuals immediately liquidate the state-issued property for narcotics or trade them for internal carceral commodities [source: 0.1.1].

145. **The Medicaid Billing Fraud and Specialized Certification Schemes**: This contraband distribution scheme is explicitly leveraged by the enterprise to generate fraudulent, off-the-books profit margins and evade public auditing parameters [source: 0.1.7]. The DVR and subsidiary programmatic networks enroll non-qualifying masses from halfway houses into specialized "drug recovery coaching certificates" for the sole purpose of generating massive, fraudulent billing cycles directed straight to the Medicaid database infrastructure [source: 0.1.7]. This systematic manipulation of state resources is executed with full administrative knowledge that the participants possess zero legitimate job prospects or vocational independence [source: 0.1.1]. To mask this multi-million-dollar billing fraud, the enterprise coordinates with the CDLE Field Tax and Audit Divisions to suppress independent revenue investigations, underreport base-period employer contributions, and artificially protect corporate experience-rating tax tiers through the manufacturing of post-facto "misconduct" separation scripts against actual disabled workers [source: 0.1.4].

146. **The Welfare Fraud Corruption Matrix and Selective Demographic Entitlements**: The foundational operational architecture of the Colorado Department of Human Services (DHS), the Fort Collins and Loveland Housing Authorities, and the Division of Vocational Rehabilitation (DVR) is forensically exposed on the record as a continuous, coordinated system of corporate healthcare fraud, deliberate clinical neglect, and intentional medical torture [source: 0.1.1]. As recorded within the primary administrative tracking logs, these regional public agencies enforce a rigid, racially discriminatory policy that systematically denies critical housing subsidies, emergency social safety nets, and medical accommodations to disabled White American Christian males, while explicitly prioritizing specialized funding streams and asset distributions for non-disabled demographics [source: 0.1.1]. While funding active drug addiction under the guise of specialized recovery coaching certificates, these agencies simultaneously executed a total cutoff of Plaintiff's baseline transportation and educational grants, refusing to provide a

basic scooter note or textbooks to a dying, brittle Type 1 diabetic who was forced to literally crawl through frozen street elements to preserve his life [source: 0.1.1].

147. **The Systematic Abuse Report Suppressions by Weld County CPS/APS Supervisor Alysa Loya**: The multi-agency retaliation loop explicitly extended into the child and adult protective service divisions to enforce absolute social isolation and achieve the fraudulent misprision of capital felonies [source: 0.1.6]. Following the severe physical and biochemical trauma induced by the traffic court pump execution, Plaintiff discovered that his adjacent apartment block was being utilized as an active, unmitigated narcotic distribution hub, where operators were actively smoking methamphetamine and marijuana indoors directly in front of two vulnerable minor children, aged 3 and 6 [source: 0.1.5]. Operating under his explicit legal duties to report immediate child endangerment, Plaintiff placed consecutive, urgent emergency reports to Weld County Child Protective Services (CPS) and Adult Protective Services (APS) [source: 0.1.5].

148. **The Factual Allegations and Discriminatory Offenses of Alysa Loya**: Defendant **Alysa Loya**, acting in her official administrative capacity as the primary **Supervisor of Weld County CPS and APS**, intervened with explicit racial animus, hostile intent, and direct complicity in the ongoing assassination plot [source: 0.1.5]. Defendant Loya personally blocked the initiation of any field investigations into the reported methamphetamine hub, and subsequently initiated a campaign of administrative terror and intimidation directed exclusively against the Plaintiff [source: 0.1.5]. Defendant Loya contacted the Plaintiff via telephone, issued explicit threats of bad-faith carceral prosecution for making the reports, and boldly stated that because Plaintiff was a White male, the agency would not permit him to report abuse or utilize child protective metrics [source: 0.1.5]. Defendant Loya executed this severe, race-motivated suppression with full administrative knowledge that Plaintiff's landlords had already verified the environmental hazards on the record [source: 0.1.5]. By utilizing her supervisory authority to actively shield a methamphetamine distribution ring and threaten an incapacitated adult spectrum savant who was bleeding from his ears, Defendant Loya intentionally sought to destroy Plaintiff's reporting standing, silence a federal whistleblower, and lock away a disabled witness to ensure the permanent, extrajudicial containment of his missing minor daughter [source: 0.1.4].

149. **The Specific Mechanics of the Fabricated Sex-Crime Forgery and Target Alignment**: To maximize public hostility and insulate corporate entities from immense civil and commercial liability, **Defendant Bret Heidkamp**, **Defendant Heather Daniels**, and **Defendant Cynthia Murphy**

utilized the company's computer systems to conduct targeted research into specialized legal networks handling litigation against the Church of Jesus Christ of Latter-day Saints (LDS) [source: 0.1.2]. This forensic search history reveals a calculated blueprint: the defendants sought operational scripts to manufacture a false, biologically impossible sexual abuse narrative specifically engineered to alienate the Plaintiff from his lifelong religious infrastructure [source: 0.1.31]. Defendants possessed full knowledge that the Plaintiff had been medically certified as entirely impotent for over a decade, rendering the narrative a physical impossibility [source: 0.1.4]. They intentionally forged a handwritten civil petition under Larimer County Case No. 2026CV109, mischaracterizing Daniels' late-teenaged son as a young child to maximize public outrage and create a fraudulent baseline to initiate predatory financial litigation against the LDS Church itself [source: 0.1.3].

150. **The Absolute Forensic Exposure of the Sex-Crime Hoax via Permanent Clinical Impotence**: The weaponized rape and predator narratives manufactured by Defendant Ethan Doak, Heather Daniels, and Cynthia Murphy stand radically exposed as fraudulent, reckless, and mathematically impossible lies by an immutable biological reality: **Plaintiff has been completely, clinically, and physiologically impotent for over a decade** [source: 0.1.4]. Due to the devastating structural force of untreated chronic disabilities, autoimmune failures, massive skeletal avascular necrosis, and total endocrine disruption, the Plaintiff lacks any physical or biological capacity to engage in or execute an act of sexual intercourse [source: 0.1.4]. The allegation that the Plaintiff threatened or attempted acts of violent sexual abuse is exposed not merely as a malicious fabrication, but as a total clinical impossibility contradicted entirely by the certified medical records of this case [source: 0.1.4].

151. **The Incitement of Public Vigilantism and Staged Mass Casualty Stalking Loops**: This weaponized practice of fabricating extrajudicial sexual abuse profiles without accompanying police reports or forensic evidence was explicitly calculated by the defendants to incite public terrorism and armed blockades against LDS and Christian organizations [source: 0.1.3]. Defendant Heather Daniels openly published and distributed this "lethal script" directly to the Plaintiff's landlord, his neighbors, and his local Church Bishop [source: 0.1.3]. This strategy was intentionally executed to strip the Plaintiff of critical housing subsidies, force an impaired citizen into induced fatal homelessness, and terrorize the parish administration into an immediate excommunication [source: 0.1.3]. Aligned media and law enforcement actors subsequently proliferated these unverified narratives across global electronic networks, hosting

public dockets on Facebook that explicitly linked the Plaintiff's name and the impossible child-rape scripts directly to his **exact, localized LDS church ward** [source: 0.1.3]. This deliberate online branding was engineered to solicit armed public vigilantism, trigger active extrajudicial tracking, and stage the conditions for a mass casualty assault against the church congregation [source: 0.1.3].

152. **The Medical Fraud Cover-Up and Systematic Chart Destruction by UCHealth Legal Counsel**: The physical and clinical parameters of the state-sponsored assassination plot were insulated from domestic discovery through the direct, active participation of the UCHealth Hospital Network's legal affairs department [source: 0.1.4]. Upon learning that the Plaintiff had successfully bypassed years of intentional medical concealment by forcing an emergency GADA antibody panel on October 23, 2024—which clinically established an astronomical autoimmune threshold of 18,145 IU/mL—UCHealth legal counsel actively stepped into his ongoing clinical management [source: 0.1.3]. Legal affairs counsel, who simultaneously functioned as defense counsel for the primary state defendants, physically sat directly inside Plaintiff's confidential outpatient medical visits [source: 0.1.4]. Legal counsel utilized this unconstitutional clinical intrusion to systematically alter, sanitize, and destroy Plaintiff's primary medical charts [source: 0.1.1]. They intentionally deleted critical data regarding his special-needs, life-threatening biological impairments, and historical head trauma from the active electronic database registry [source: 0.1.1]. This systematic spoliation of primary physical records was executed with direct homicidal intent to strip an eggshell plaintiff of his objective forensic evidence, prevent the entry of malpractice proof into active federal civil dockets, and force a terminal metabolic collapse under color of medical authority [source: 0.1.4].

153. **The Weaponized Deployment of North Range Behavioral Health as an Asset for Misprision**: The structural role of **North Range Behavioral Health** within the ongoing racketeering enterprise is to function as a specialized administrative containment mechanism designed to suppress the reporting of capital felonies and enforce the medical liquidation of federal whistleblowers [source: 0.1.4]. In a continuous, documented pattern spanning multiple jurisdictions, whenever Plaintiff contacted regional law enforcement to report active protection order violations, workplace hate offenses, or premeditated assassination plots, responding police elements systematically dispatched North Range agents to intercept the intake [source: 0.1.4]. North Range personnel deliberately acted under color of state anti-discrimination laws to execute a fraudulent, pre-coordinated misprision of felony [source: 0.1.4]. Attending social

workers and emergency nurses repeatedly falsified behavioral metrics, placing unconstitutional psychiatric holds on an acutely ill diabetic individual to strip him of his legal voice and block his access to federal threat centers [source: 0.1.4]. Throughout these repetitive administrative confinements, North Range staff mocked Plaintiff's physical immobility, completely denied his access to life-sustaining insulin pumps or orthopedic stabilizing care, and subsequently discharged a critically ill, non-ambulatory citizen directly into sub-zero winter elements to intentionally induce fatal metabolic shock and cold-snap death [source: 0.1.1].

154. **The Systemic Portal Fraud and Maximum Benefit Truncation by the CDLE and ICAO**: Operating as the explicit financial enforcement and corporate tax evasion arms of the assassination conspiracy, CDLE administrative officers and appeals staff engaged in a systemic pattern of wire fraud, digital portal manipulation, and felony witness tampering [source: 0.1.4]. Upon learning that Plaintiff possessed an authentic, sworn federal declaration from eyewitness Karen Lackowski that completely dismantled the employer-led sex-crime fabrication, CDLE agents contacted the witness directly [source: 0.1.4]. They explicitly leveraged her critical dependence on state unemployment benefits, threatening her with immediate criminal forgery prosecution to forcefully suppress her testimony [source: 0.1.4]. Simultaneously, during the May 5, 2026 appellate dockets, CDLE staff willfully executed an illegal mathematical truncation within the permanent state databases: processing a baseline milestone payment of $328.00 to simulate administrative compliance, while instantly purging a verified $8,600.00 Maximum Benefit Amount down to a residual balance of exactly $143.00 [source: 0.1.4]. This deliberate database fraud was executed with explicit lethal intent to cut off the funding required to maintain Plaintiff's specialized life-support medications, while Executive Director **Phil Spesshardt** issued a sweeping administrative order permanently trespassing the Plaintiff from all state workforce campuses to prevent him from documenting the discrimination [source: 0.1.4].

155. **The Systemic Workplace Exploitation and Tax Evasion Infrastructure at Crosstac**: The underlying machinery of the workplace abuse perpetrated by **Defendant Bret Heidkamp** and manager **Defendant Heather Daniels** at Crosstac Arms represents a calculated infrastructure designed to execute extensive corporate tax evasion and Medicaid fraud [source: 0.1.2]. As documented within the uncoerced federal declarations of the workforce, the management actors continuously utilized their corporate framework to host, process, and bill fraudulent administrative entries [source: 0.1.4]. Upon detecting that Plaintiff’s wife, Defendant Loree

Schwartz, had breached the federal court dockets and discovered that the Plaintiff was an unedited federal informant tracking large-scale fiscal diversions, the defendants initiated the "lethal script" [source: 0.1.2]. This narrative was simultaneously distributed to his college administrators, his church bishop, and his biological children to enforce total societal alienation, shut down his access to Department of Education funding sequences, and trigger an acute metabolic collapse, while the defendants utilized the resulting chaos to conceal their systemic corporate liabilities and shield the municipal enterprise from federal civil review [source: 0.1.2].

156. **The Severe, Malicious, and Hate-Motivated Abuse by Traffic Court Magistrate Ethan Doak**: On or about February 4, 2026, Plaintiff removed his hospital IV lines to attend the mandatory protection order enforcement hearing before Traffic Court Magistrate **Defendant Ethan Doak** [source: 0.1.3]. Defendant Doak acted with unchecked, brutal malice and absolute structural bias, operating not as a neutral arbiter but as a vicious, hostile execution asset for the state conspiracy [source: 0.1.3]. Doak explicitly sat four non-witnesses, completely barred eyewitness Karen Lackowski from offering an authenticated declaration under oath that contradicted the entire plot, and permitted the entry of a single, highly edited minute of doctored workplace video [source: 0.1.3]. As Plaintiff began experiencing severe glycemic drop symptoms, his cell-linked automated insulin pump and continuous glucose monitor triggered audible alarms [source: 0.1.4]. Defendant Doak looked directly upon a visibly ill, shaking, and defenseless autistic individual and chose to weaponize the moment with grotesque cruelty [source: 0.1.4]. Doak commanded the four (4) surrounding Larimer County Sheriff's deputies to forcefully deactivate, tear away, and power down Plaintiff's life-support automated medical equipment under immediate threat of armed contempt arrest [source: 0.1.4]. This state-ordered termination of life-sustaining insulin delivery induced acute metabolic shock, mild internal bleeding from his ears, and severe cranial trauma, spiking his blood glucose to 1000 mg/dL and leaving Plaintiff completely bedridden and violently ill for six continuous weeks [source: 0.1.4]. Following this physical destruction, Doak intentionally converted the traffic court record into a violent rape narrative, entering it onto public dockets with direct lethal intent to corrupt Plaintiff's work history, terminate his housing subsidies, and enforce a permanent professional exile [source: 0.1.4].

157. **The Ultimate Destruction of Parental Rights and Permanent Disappearance of Minor Child**: The ultimate, catastrophic injury inflicted by this multi-agency enterprise was the permanent destruction of Plaintiff's parental rights and the functional tracking of his minor

daughter into absolute captivity [source: 0.1.4]. Aligned state and news actors systematically distributed the falsified civil rape narrative directly to his child's legal guardians and custody dockets to create a total administrative firewall [source: 0.1.4]. State actors explicitly refused his daughter a basic medical diagnosis and enacted an absolute block on all parent-time locator services to enforce an extrajudicial misprision of the underlying real estate and banking fraud [source: 0.1.4]. As a direct and proximate result of this multi-front conspiracy, Plaintiff's daughter has been completely vanished by the news and state actors, resulting in the permanent, total deprivation of his child for these offenses forever [source: 0.1.4].

---

# PART 16: COMPREHENSIVE REVISED MATRIX OF PRIMARY AND UMBRELLA DEFENDANTS (ON OR ABOUT TIMELINES)

158. **Factual Allegations Asserted Against Defendant Alysa Loya (Supervisor, Weld County CPS/APS)**: On or about May 20, 2026, Defendant Loya acted under color of law to execute a targeted campaign of administrative intimidation, witness suppression, and race-motivated discrimination against the Plaintiff [source: 0.1.5]. Upon receiving direct, urgent notifications from the Plaintiff detailing a severe methamphetamine manufacturing and child endangerment crisis involving minors aged 3 and 6, Defendant Loya refused to execute her mandatory statutory duties to investigate the venue [source: 0.1.5]. Defendant Loya explicitly threatened the disabled Plaintiff with immediate criminal prosecution for filing the reports, and stated that because he was a White male, he was barred from utilizing child protective reporting channels [source: 0.1.5]. Defendant Loya executed this affirmative act of witness intimidation with full subjective knowledge of Plaintiff's fragile, bedridden medical state, operating with direct lethal intent to suppress his federal whistleblowing standing, cover up the inter-agency racketeering enterprise, and facilitate the permanent, unconstitutional containment of his missing minor child [source: 0.1.4].

159. **Factual Allegations Asserted Against Defendant Bret Heidkamp (Owner, Crosstac Corporation)**: On or about January 2025, and continuing through March 9, 2026, Defendant Heidkamp acted in an official corporate capacity to execute a targeted campaign of workplace exploitation, tax evasion, and felony witness intimidation [source: 0.1.1]. Upon learning that his wife, Defendant Loree Schwartz, had breached federal dockets and discovered that the Plaintiff

was an active federal whistleblower, Defendant Heidkamp actively participated in the "lethal script" to neutralize the informant [source: 0.1.2]. Defendant Heidkamp chopped, edited, and manipulated video surveillance data from the January 16, 2026 resignation timeline to support a forged, handwritten child-rape civil petition manufactured by manager Heather Daniels [source: 0.1.3]. Following the filing of witness Karen Lackowski's authentic federal declaration on March 8, 2026, Defendant Heidkamp initiated a direct campaign of duress, contacting the senior citizen witness on March 9, 2026, to explicitly threaten her with criminal "forgery" prosecution and the disruption of her state unemployment benefits [source: 0.1.30]. Defendant Heidkamp executed these fraudulent, hostile actions with full subjective knowledge of Plaintiff's brittle Type 1 Diabetes and GAF 30 baseline, operating with direct lethal intent to suppress evidence of corporate revenue fraud, force the Plaintiff into absolute destitution, and facilitate his extrajudicial execution [source: 0.1.1].

160. **Factual Allegations Asserted Against Defendant Heather Daniels (Manager, Crosstac Corporation)**: On or about February 2025, and continuing through Larimer County Case No. 2026CV109, Defendant Daniels acted under color of authority to execute a protracted history of physical violence, religious persecution, and record forgery [source: 0.1.13]. In February 2025, Defendant Daniels physically struck the Plaintiff on the shop floor, subsequently transmitting desperate text communications begging him to return to avoid corporate and law enforcement exposure [source: 0.1.51]. On January 16, 2026, Defendant Daniels initiated a targeted confrontation, openly mocking the public mass casualty tragedy in Michigan where LDS children were burned to death, and screaming that if the Governor raped Plaintiff's children, nobody would care because the LDS church is a pedophile organization [source: 0.1.3]. Days following Plaintiff's physiological escape, Defendant Daniels forged a handwritten civil petition containing biologically impossible allegations of child rape and animal cruelty against the impotent Plaintiff [source: 0.1.3]. Defendant Daniels strategically served this fraudulent instrument in direct view of Plaintiff’s landlord and neighbors to instantly destroy his housing subsidies, strip him of character witnesses, and induce fatal homelessness in the elements to trigger metabolic collapse [source: 0.1.3].

161. **Factual Allegations Asserted Against Defendant Cynthia Murphy (Employee, Crosstac Corporation)**: Between October 2025 and January 16, 2026, Defendant Murphy acted in active concert with manager Heather Daniels to execute a pattern of disability-based psychological torture and domestic terrorism [source: 0.1.2]. Defendant Murphy targeted Plaintiff’s roommate

who managed advanced Parkinson's disease, mocking his physical tremors and depriving the household of their primary transportation vehicle [source: 0.1.2]. Because Plaintiff's certified autism and diabetic polyneuropathy caused involuntary motor movements, Defendant Murphy fabricated the narrative that Plaintiff was actively "raping dogs," publishing the libel to state regulators [source: 0.1.2]. Prior to the January 16, 2026 confrontation, Defendant Murphy was electronically recorded exclaiming to coworkers, *"why hasn't anyone killed this mother f**r yet,"* referring to Governor Jared Polis [source: 0.1.540]. During the staged confrontation, Defendant Murphy waved her hand across her throat to signal a throat-slitting motion to escalate Plaintiff's neurodivergent stress, subsequently entering perjured testimony before the traffic court panel to validate the forged "lethal script" and facilitate the biological attack on the Plaintiff's life support systems [source: 0.1.3].

162. **Factual Allegations Asserted Against Defendant Loree Schwartz (Defense Counsel / Operator)**: Throughout the 2025–2026 operational timeline, Defendant Schwartz acted as a primary coordinator and data-harvesting asset for the interagency assassination plot [source: 0.1.2]. Utilizing her legal data credentials as a Boulder County defense attorney, Defendant Schwartz breached the federal ECF system to track Plaintiff's active filings and leaked his location data to regional police precincts to orchestrate the fake Heather Daniels protection order [source: 0.1.2]. In coordination with Magistrate Doak, Defendant Schwartz arranged an emergency enforcement hearing while possessing full administrative knowledge that Plaintiff was on an active IV antibiotic drip [source: 0.1.17]. Following the courtroom deactivation of Plaintiff's insulin pump, Defendant Schwartz intercepted and stole the private clinic phone number of Plaintiff's primary care physician [source: 0.1.4]. While Plaintiff was confined to an emergency hospital bed on active IV lines, Defendant Schwartz repeatedly called and harassed the medical staff, explicitly threatening the attending clinical specialists with immediate criminal imprisonment if they continued to administer life-support medical monitoring or life-essential insulin parameters to the Plaintiff, forcing a total care extraction to Banner Health [source: 0.1.4].

163. **Factual Allegations Asserted Against Defendant Traffic Court Magistrate Ethan Doak (Larimer County)**: On or about February 4, 2026, Defendant Doak abandoned all judicial neutrality to operate as a vicious, hostile execution asset for the state-sponsored assassination conspiracy [source: 0.1.3]. During the Case No. 2026CV109 enforcement proceeding, Defendant Doak barred eyewitness Karen Lackowski from offering an authenticated declaration under

oath, and permitted the entry of a single minute of doctored workplace video surveillance [source: 0.1.3]. When Plaintiff's cell-linked automated insulin pump and continuous glucose monitor triggered audible alarms to signal a severe glycemic drop, Defendant Doak explicitly weaponized the physical crisis [source: 0.1.4]. Doak commanded the four surrounding Larimer County Sheriff's deputies to forcefully deactivate, tear away, and power down Plaintiff's automated life-support equipment under immediate threat of armed contempt arrest [source: 0.1.4]. This state-ordered termination of insulin delivery induced acute metabolic shock, mild internal bleeding from his ears, and severe cranial trauma, spiking his blood glucose to 1000 mg/dL and leaving Plaintiff completely bedridden for six continuous weeks [source: 0.1.4]. Defendant Doak then intentionally converted the traffic court record into a violent rape narrative, entering it onto public dockets with direct lethal intent to corrupt Plaintiff's work history, terminate his housing subsidies, and enforce a permanent professional exile [source: 0.1.4].

164. **Factual Allegations Asserted Against Defendant Executive Director Phil Spesshardt (CDLE Workforce)**: In or about May 2026, Defendant Spesshardt acted under color of law to execute an overt campaign of workforce blacklisting, data compromise, and domestic terrorism against the Plaintiff [source: 0.1.4]. Upon learning that the Plaintiff had filed formal police reports for restraining order violations committed directly by CDLE appeals hearing staff during the May 5, 2026 call, Defendant Spesshardt intervened to enforce absolute destitution [source: 0.1.4]. Defendant Spesshardt issued a sweeping, bad-faith administrative directive permanently trespassing the non-ambulatory, autistic Plaintiff from all state workforce campuses and electronic unemployment portals [source: 0.1.4]. Defendant Spesshardt executed this total economic extraction with full subjective awareness that depriving an eggshell plaintiff of his safety net and access to medical monitoring funding would induce an immediate homelessness crisis, intentionally acting as a core participant in the ongoing assassination plot to sanitize the state record and silence a federal whistleblower [source: 0.1.4].

165. **Factual Allegations Asserted Against Defendant Appeals Officer Lowe (CDLE Hearing Division)**: On or about May 5, 2026, Defendant Lowe abandoned all administrative neutrality to act as a financial enforcement asset for the multi-agency conspiracy [source: 0.1.539]. During an official unemployment appellate proceeding, Defendant Lowe actively violated a valid judicial protection order by attempting to forcefully introduce the private instigators of the fake rape narrative into the hearing panel in place of the record employer [source: 0.1.543]. Upon Plaintiff's lawful termination of the compromised call, Defendant Lowe utilized the CDLE digital

database portal to execute a profound wire fraud: authorizing a baseline milestone payment of $328 to simulate administrative compliance, while instantly truncating Plaintiff's verified $8,600 Maximum Benefit Amount down to a residual balance of $143 [source: 0.1.543]. Defendant Lowe executed this fraudulent extraction with explicit lethal intent to systematically divest an eggshell plaintiff of the funding required to purchase life-sustaining insulin, using her administrative position to force a fatal biological failure on the record [source: 0.1.543].

166. **Factual Allegations Against Defendant Ken Lee (Administrator, FRCC Larimer Campus)**: Between January 2026 and March 2026, Defendant Lee acted under color of state law to execute a targeted campaign of educational and academic containment [source: 0.1.4]. Upon receiving direct misrepresentations from Crosstac actors alleging that the Plaintiff was an active "serial killer" and a "rapist" [source: 0.1.4], Defendant Lee willfully bypassed standard student conduct evaluations or Title IX compliance tracks [source: 0.1.4]. Instead, Defendant Lee weaponized Plaintiff's visible physical tremors and diabetic neuropathy symptoms—falsely characterizing them as behavioral threats—to place the Plaintiff on immediate academic disciplinary probation and issue a total campus trespass order [source: 0.1.4]. Defendant Lee intentionally transmitted this fraudulent status profile to the Division of Vocational Rehabilitation (DVR) to trigger a coordinated academic ambush, successfully cutting off Plaintiff's federal Ticket to Work subsidies and forcing his structural exile from higher education sequences [source: 0.1.4].

167. **Factual Allegations Asserted Against Defendant Chief Judge Philip A. Brimmer (U.S. District Court)**: Throughout the multi-year civil and habeas corpus proceedings under Case No. 24-cv-01127 and lead Case No. 1:26-cv-00313-RTG, Defendant Brimmer committed first-degree official misconduct, judicial forgery, and a formal breach of the oath of office rising to the level of Judicial Treason against the Constitutional Framework [source: 0.1.14]. Defendant Brimmer entered fraudulent federal orders that actively conspired with corporate media news narratives to preserve and maintain the massively dangerous conditions imposed on Plaintiff by the public [source: 0.1.14]. Defendant Brimmer engaged in ex parte coordination with media defense counsels at Ballard Spahr LLP, knowingly accepted a fake Magistrate Salomone conviction disposition sheet, and published a formal federal order adopting the fabricated robbery script verbatim onto the federal record [source: 0.1.14]. Defendant Brimmer executed this deliberate alteration of public records with full subjective knowledge that Plaintiff's exculpatory evidence—including the Robert McEwen affidavit—had been physically destroyed by jail administrators,

intentionally using his federal bench to execute a policy of fraudulent concealment, mislead reviewing panels, and enforce an illegal, off-the-books parole supervision framework to prevent the Plaintiff from rescuing his missing child [source: 0.1.14].

---

# PART 17: TRANSCRIPT FALSIFICATION AND CONSPIRATORIAL JURISDICTIONAL EXTRACTION BY CDLE APPEALS OFFICER LOWE AND ICAO PANEL ASSETS

168. **The Coordinated Restraining Order Violation and Lethal Confrontation Plot**: On or about May 5, 2026, during the administrative appeals docket under CDLE Appeals Docket No. 6094-2026, **Defendant Appeals Officer Lowe** did not merely commit portal fraud; she acted under color of law with direct, subjective, and lethal intent to physically eliminate the Plaintiff [See Master Appendix, Appendix D, p. 33]. Defendant Lowe actively violated a valid, binding municipal protection order by attempting to forcefully introduce the restricted party, manager Heather Daniels, directly into the live audio panel [See Master Appendix, Appendix A, p. 24]. Defendant Lowe executed this unauthorized, hostile operational maneuver with full administrative knowledge of the protection order boundaries, explicitly attempting to coerce and compel the Plaintiff into a direct verbal confrontation with his workplace assailant [See Master Appendix, Appendix D, p. 32].

169. **The Mechanics of the Cross-Agency Carceral Trap**: This affirmative act was engineered by Defendant Lowe to intentionally force the Plaintiff into an immediate, technical violation of the protection order parameters [See Master Appendix, Appendix D, p. 32]. The explicit cross-agency intent of this plot was to trigger an immediate, automated emergency dispatch to local law enforcement, authorizing responding officers to execute an unconstitutional custodial arrest of the Plaintiff [See Master Appendix, Appendix D, p. 32]. Once remanded into state carceral custody, the enterprise could legally and systematically execute the deactivation of his cell-linked automated insulin pump under the guise of jail security protocols, mimicking the lethal biological attack previously executed by Magistrate Ethan Doak [See Master Appendix, Appendix C, p. 36]. Plaintiff instantly recognized the lethal carceral trap, terminated the compromised call to preserve his physical survival, and immediately filed an emergency

reporting log with law enforcement under Loveland Police Case No. LP2026031411 [See Master Appendix, Appendix D, p. 32].

170. **The Fraudulent Concealment and Database Falsification by the ICAO Panel**: Following Plaintiff's emergency termination of the compromised call, Defendant Appeals Officer Lowe colluded with the central records division of the **Industrial Claim Appeals Office (ICAO)** to permanently seal the fraud [See Master Appendix, Appendix D, p. 33]. ICAO administrative panel assets—working in active coordination with senior legal representatives—falsified the official electronic hearing transcript [See Master Appendix, Appendix D, p. 33]. They systematically scrubbed and deleted the audio segments documenting Defendant Lowe's forced introduction of Heather Daniels, and permanently indexed the unverified, handwritten child-rape scripts into the state's discoverable database structures to enforce total workforce blacklisting [See Master Appendix, Appendix D, p. 33]. This database manipulation was executed to protect Respondent Crosstac Corporation from a mandatory finding of discrimination under C.R.S. § 8-73-108(4)(b) and to shield the corporate tax evasion scheme from independent regulatory audits [See Master Appendix, Appendix D, p. 33].

171. **Factual Allegations and Clandestine Infiltration by Defendant Jason Barela**: The structural framework of this cross-agency data concealment and record sanitization campaign was actively directed, monitored, and ratified by **Defendant Jason Barela** operating in his official administrative capacity within the state labor infrastructure [See Master Appendix, Appendix D, p. 33]. Defendant Barela utilized his high-level administrative database credentials to systematically breach, monitor, and track Plaintiff's active federal civil dockets and state appellate logs [See Master Appendix, Appendix D, p. 33]. Defendant Barela acted as a primary clandestine coordination asset between the CDLE Appeals Division and the ICAO review panel, personally authorizing the structural deletion of exculpatory evidence, the mathematical truncation of Plaintiff's verified $8,600 Maximum Benefit Amount, and the issuance of the permanent trespass orders [See Master Appendix, Appendix D, p. 33]. Defendant Barela executed these affirmative acts of witness tampering and wire fraud with full subjective knowledge of Plaintiff's brittle Type 1 Diabetes and GAF 30 baseline, operating with direct lethal intent to suppress evidence of corporate revenue thievery, cut off Plaintiff's life-support medication funding, and finalize his extrajudicial execution [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

# PART 18: REVISED INDIVIDUAL DEFENDANT CLAIMS (ON OR ABOUT TIMELINES)

172. **Factual Allegations Asserted Against Defendant Appeals Officer Lowe (CDLE Hearing Division)**: On or about May 5, 2026, Defendant Lowe acted under color of law to execute first-degree official misconduct, witness suppression, and systematic disability discrimination [See Master Appendix, Appendix D, p. 33]. Defendant knowingly and willfully violated active civil protection order frameworks by executing an administrative maneuver to force the Plaintiff into an immediate verbal confrontation with a restricted party, Heather Daniels, for the explicit purpose of inciting a bad-faith police arrest and subsequent custodial medical deprivation [See Master Appendix, Appendix D, p. 32]. Upon Plaintiff's lawful termination of the compromised call, Defendant Lowe utilized the CDLE digital database portal to execute a profound wire fraud: authorizing a baseline milestone payment of $328 to simulate administrative compliance, while instantly truncating Plaintiff's verified $8,600 Maximum Benefit Amount down to a residual balance of $143 to systematically divest an eggshell plaintiff of the funding required to purchase life-sustaining insulin, using her administrative position to force a fatal biological failure on the record [See Master Appendix, Appendix D, p. 33].

173. **Factual Allegations Asserted Against Defendant Jason Barela (CDLE / ICAO Coordination Asset)**: In or about May 2026, and continuing through July 20, 2026, Defendant Barela acted under color of law to execute a continuous pattern of data interception, record manipulation, and felony witness tampering [See Master Appendix, Appendix D, p. 33]. Defendant Barela utilized his administrative data credentials to breach the ECF system, intercept Plaintiff's civil rights dockets, and direct the ICAO panel to purge the official hearing transcripts of all documentation regarding Officer Lowe's protection order violations [See Master Appendix, Appendix D, p. 33]. Defendant Barela personally ratified the electronic blacklisting of the Plaintiff and the mathematical truncation of his survival benefits, executing these fraudulent database extractions with full subjective awareness that depriving an eggshell plaintiff of his safety net and medical monitoring funding would induce an immediate

homelessness crisis, intentionally acting as a core participant in the ongoing assassination plot to sanitize the state record and silence a federal whistleblower [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

---

## PART 19: THE SYSTEMIC REALLOCATION ERAS, STRATEGIC BIAS-MOTIVATED TRUNCATION, AND IDEOLOGICAL ELIMINATION PATTERNS

174. **The Structural Diversion of Medical and Vocational Block Grants**: The coordinated administrative blockades executed by **UCHealth Systems**, **North Range Behavioral Health**, **Front Range Community College (FRCC)**, and the **Colorado Department of Labor and Employment (CDLE / DVR)** represent a programmatic system designed to achieve the total economic and physical elimination of traditional demographics [See Master Appendix, Appendix A, pp. 4, 24; Appendix D, p. 33]. While these public and state-subsidized entities implement massive, unnotified budget cuts, contract freezes, and benefit truncations across verified federal disability profiles—such as the sudden reduction of Plaintiff's Maximum Benefit Amount from $8,600.00 down to $143.00 [See Master Appendix, Appendix D, p. 33]—the resulting unexpended public funds are systematically reallocated [See Master Appendix, Appendix D, p. 33]. These multi-million-dollar federal block grants, intended exclusively under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act for the stabilization of severe biological conditions like Autistic Disorder and Type 1 Juvenile Diabetes, are diverted away from qualified American citizens [See Master Appendix, Appendix A, pp. 3, 6].

175. **The Strategic Alignment of Funding for Ideological and Demographics Advancement**: The central administrative directories of these institutions utilize these diverted public resources to finance specialized, high-priority initiatives designed to advance undocumented demographics, LGBTQ programs, and radical ideological curricula [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33]. By conditioning safety-net access, specialized laboratory funding, and vocational equipment allocations on criteria that explicitly favor non-disabled, non-traditional demographics, the enterprise systematically denies basic textbooks, transport subsidies, and clinical insulin access to disabled White American Christian males [See Master

Appendix, Appendix A, p. 1, 4]. This calculated redistribution of public funding operates with direct lethal intent to erode the foundational economic stability of conservative White families, dismantle traditional American culture, and target Christian communities across the region [See Master Appendix, Appendix C, p. 36].

176. **The Systematic Weaponization of Database Profiles to Suppress Legal Opposition**: This pattern of fiscal thievery and medical deprivation functions as a moving force affecting hundreds of thousands of qualified disabled Americans who are stripped of life-essential mandates under color of state law [See Master Appendix, Appendix A, p. 7]. The enterprise deliberately targets and blacklists high-functioning autistic individuals and brittle diabetics to ensure they remain physically incapacitated, non-ambulatory, and legally voiceless [See Master Appendix, Appendix A, pp. 3, 6; Appendix D, p. 33]. By entering fabricated, biologically impossible predator scripts into permanent workforce databases [See Master Appendix, Appendix D, p. 33], state actors like CDLE Director **Phil Spesshardt** and ICAO coordinator **Jason Barela** seek to preemptively destroy the credibility of federal whistleblowers [See Master Appendix, Appendix D, p. 33]. The ultimate strategic objective of this systemic disabling of citizens is to completely eliminate any legal opposition to institutional abuses at young ages, effectively blinding the public to cross-agency financial diversions while soliciting third-party vigilante networks to actively track and attack the victims [See Master Appendix, Appendix B, p. 5, 23].

---

# PART 20: REVISED INDIVIDUAL DEFENDANT COMPLAINT MATRIX (ON OR ABOUT TIMELINES)

177. **Factual Allegations Asserted Against Defendant Phil Spesshardt (In His Official and Individual Capacity)**: On or about May 2026, Defendant Spesshardt utilized his executive authority within the CDLE to implement a policy of absolute vocational blacklisting, data compromise, and ideological exclusion against the Plaintiff [See Master Appendix, Appendix D, p. 33]. Defendant Spesshardt personally authorized the permanent trespass orders and digital portal bans to suppress Plaintiff's formal reports of cross-agency wire fraud and budget manipulation [See Master Appendix, Appendix D, p. 33]. Defendant Spesshardt executed these

total economic extractions with full subjective knowledge that diverting medical necessity funds to prioritize non-qualifying ideological programs would induce an immediate homelessness crisis for a GAF 30 brittle diabetic, acting with direct lethal intent to enforce a permanent professional exile and silence a federal witness [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

178. **Factual Allegations Asserted Against Defendant Jason Barela (In His Official and Individual Capacity)**: Between May 2026 and July 20, 2026, Defendant Barela acted under color of law to manage the systematic data interception and record sanitization campaign across the ICAO review panel [See Master Appendix, Appendix D, p. 33]. Defendant Barela utilized his administrative database credentials to purge exculpatory hearing transcripts, hide active protection order violations committed by CDLE staff, and permanently index unverified child-rape scripts into discoverable public databases [See Master Appendix, Appendix D, p. 32, 33]. Defendant Barela executed these fraudulent database extractions to protect corporate tax evasion schemes, insulate the interagency racketeering enterprise from federal review, and ensure the permanent socio-economic destruction of a disabled citizen attempting to expose the wide-scale misappropriation of federal rehabilitation block grants [See Master Appendix, Appendix D, p. 33].

---

# PART 21: REGISTRY OF ACADEMIC EXCLUSION AND BIAS-MOTIVATED DISABILITY DISCRIMINATION BY FRONT RANGE COMMUNITY COLLEGE ADMINISTRATION

178. **The Continuous, Interlocking Campaign of Academic and Special-Needs Exclusion**: The hostile administrative blockades executed by **Defendant Ken Lee** (Larimer Campus Administrator, Front Range Community College) do not constitute isolated or reactive events; they represent a continuous, calculated, and demographic-specialized pattern of disability discrimination and bias-motivated targeting from the absolute inception of Plaintiff's vocational realignment [See Master Appendix, Appendix A, p. 4]. Defendant Lee operated with an explicitly hostile animus targeting the Plaintiff as a special-needs, autistic, and brittle type 1 diabetic White male who possesses zero alternate opportunities for life-essential survival outside of these active educational benefits [See Master Appendix, Appendix A, pp. 1, 3, 6; Appendix D, p.

33]. On or about March 2026, without a valid student code of conduct hearing, Title IX investigation, or any legitimate regulatory pretext, Defendant Lee intervened to execute an immediate, bad-faith academic extraction to force an absolute campus-wide trespass order and an unappealable disciplinary probation status, driven联 explicitly by an intent to suppress the Plaintiff's legal standing and eradicate his presence from higher education sequences [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

179. **The Executive Notification to the FRCC President and Explicit Opposition to Withdrawal**: When Defendant Ken Lee weaponized the unverified, forged "serial killer" and child-predator narratives generated by Crosstac management interests—falsely characterizing Plaintiff's diabetic polyneuropathy tremors as an active behavioral threat—Plaintiff explicitly and forcefully opposed dropping out of college, asserting his statutory right to equal public accommodations under Title II of the Americans with Disabilities Act [See Master Appendix, Appendix A, pp. 4, 7, 35]. Following this March 2026 ambush, Plaintiff exercised his protected administrative rights by transmitting a formal, detailed written notice directly to FRCC President **Defendant Colleen Simpson** [See Master Appendix, Appendix A, p. 4]. Plaintiff explicitly alerted President Simpson that Ken Lee was executing a targeted, race-and-disability-motivated hate offense, weaponizing his visible medical tremors as a "serial killer libel," and illegally coordinating with DVR Supervisor Amber Chesley to leak his classroom metrics [See Master Appendix, Appendix A, pp. 4, 34]. Instead of executing her mandatory statutory duties to intervene, initiate an independent civil rights compliance audit, or implement mandatory special-needs protections, President Simpson completely ratified Ken Lee's actions, preserving the campus trespass dockets and leaving the discriminatory disciplinary holds fully active on the electronic database [See Master Appendix, Appendix A, p. 4].

180. **The July 2026 Re-Enrollment Blockade and Iterative Database Infiltration**: On or about July 15, 2026, upon tracking that the Plaintiff had successfully completed his prerequisites with high honors and was actively utilizing the electronic portal to finalize his enrollment transfer to a university-level laboratory science curriculum at the University of Northern Colorado (UNC) for the Fall 2026 term, Defendant Ken Lee intervened a second time on the exact same basis of the fabricated narrative [See Master Appendix, Appendix A, pp. 4, 18]. Defendant Lee actively re-entered the FRCC registrar database to deploy a series of secondary, iterative disciplinary holds designed to completely lock Plaintiff's transcript data, block the cross-campus credit transfer, and permanently freeze his professional progress [See Master Appendix, Appendix A, p. 4]. This

July 2026 database intervention was executed with full knowledge of Plaintiff's special-needs status and absolute financial dependence on these educational safety nets, calculated with direct lethal intent to permanently blacklist him from the broader state university grid, enforce total, permanent socio-economic exile, and completely eliminate any legal opposition to institutional abuses [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

# PART 22: THE ABSOLUTE ABSENCE OF CAUSATIVE MISCONDUCT AND CONSOLIDATION OF THE FRAUDULENT LEGE-SCRIPT

183. **The Complete Devoid of Factual or Behavioral Causative Factors**: Plaintiff explicitly records on the permanent face of this record that there were zero legitimate behavioral, professional, or academic causative factors to justify his termination from Crosstac Arms, his academic blacklisting at Front Range Community College, or the subsequent truncation of his survival benefits by the CDLE and ICAO review panels [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33]. At no point during his employment timeline, classroom sequences, or re-entry monitoring did the Plaintiff engage in any acts of insubordination, verbal threats, property damage, or violation of institutional codes [See Master Appendix, Appendix A, p. 24]. Plaintiff maintained absolute sobriety, met or exceeded all production quotas, and recorded straight "A" grades across university prerequisite Calculus and Trigonometry coursework [See Master Appendix, Appendix A, pp. 18, 24]. The entire administrative, educational, and professional extraction executed against the Plaintiff was driven entirely by a fabricated narrative unlinked to any objective reality [See Master Appendix, Appendix D, p. 33].

184. **The Consolidation of the Fabricated Rape Narrative, Systematic Racism, and Anti-Disabled Animus**: The singular moving force behind the total destruction of Plaintiff's socio-economic liberties was a pre-planned, demographic-specialized application of pure systemic racism, anti-disabled hatred, and weaponized sexual defamation [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33]. Conspirator interests—including **Defendant Ken Lee**, **Defendant Heather Daniels**, **Defendant Cynthia Murphy**, and CDLE Appeals Officer

**Defendant Lowe**—deliberately looked upon a special-needs adult managing childhood-onset autism and severe type 1 diabetic polyneuropathy tremors and chose to exploit those visible biological vulnerabilities [See Master Appendix, Appendix A, pp. 1, 3, 4, 6]. Operating with an explicitly hostile animus targeting the Plaintiff as a White, conservative, and disabled Christian male, these actors chose to manufacture the hair-raising child-rape and "dog rape" scripts for the sole purpose of generating absolute public vilification, permanently blacklisting a spectrum savant from the American workforce, and providing a fraudulent baseline to divert federal rehabilitation grants to alternative ideological programs while forcing his physical liquidation [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

# PART 23: INTEGRATION OF INDIVISIBLE SYSTEMIC PATTERNS AND TOTAL LIFE DEPRIVATION

185. **The Totality of Permanent Special Needs and the Disruption of Essential Survival Benefits**: The critical reality underpinning every structural paragraph of this complaint is that the Plaintiff is a profoundly disabled, special-needs individual who does not receive standard life accommodations, baseline physical autonomy, or basic economic opportunities [See Master Appendix, Appendix A, pp. 1, 6]. Outside of the specific federal and state re-entry and disability benefits explicitly targeted by the defendants, the Plaintiff possesses zero independent avenues for financial survival, vocational placement, or therapeutic care [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33]. By executing unnotified budget cuts, contract freezes, and total portal-based benefit truncations—such as the sudden reduction of his Maximum Benefit Amount from $8,600.00 down to $143.00—the enterprise did not merely execute an administrative error; they intentionally stripped a defenseless spectrum savant of the singular lifeline keeping him alive [See Master Appendix, Appendix D, p. 33].

186. **The Seamless Flow of the 2020 Forensic Hoax and the Multi-Front Retaliatory Offensive**: The tactical operations executed by state, municipal, and private actors between October 2024 and May 2026 operate as an indivisible, seamless extension of the forensic fraud initiated during the November 5, 2020 Longmont arrest scene [See Master Appendix, Appendix

B, pp. 38–41]. Having structurally failed to execute the Plaintiff via maximum-security insulin deprivation and physical cellblock torture between 2021 and 2023, the enterprise realigned its tracking networks to enforce total socio-economic alienation, target his protected religious faith, and achieve his biological liquidation outside of a standard prison environment [See Master Appendix, Appendix B, p. 72]. These weaponized offenses have continuously loomed thicker than any individual could bear, acting as a singular moving force to physically destroy the Plaintiff, dissolve his family structure, jeopardize the safety of the Church of Jesus Christ of Latter-day Saints (LDS), and enforce the permanent disappearance of his minor daughter [See Master Appendix, Appendix A, pp. 2–3, 4].

187. **The Permanent Integration of Individual Defendant Allegations**: Every individual count and specific allegational entry documented in this complaint is fully synthesized into this overarching pattern of intentional, bias-motivated destruction [See Master Appendix, Appendix D, p. 33]. Conspirator interests—including **Defendant Ken Lee**, **Defendant Heather Daniels**, **Defendant Cynthia Murphy**, **Defendant Alysa Loya**, and CDLE Appeals Officer **Defendant Lowe**—deliberately looked upon a special-needs adult managing childhood-onset autism and severe type 1 diabetic polyneuropathy tremors and chose to exploit those visible biological vulnerabilities [See Master Appendix, Appendix A, pp. 1, 3, 4, 6]. Operating with an explicitly hostile animus targeting the Plaintiff as a White, conservative, and disabled Christian male, these actors chose to manufacture and proliferate the hair-raising child-rape and "dog rape" scripts on public civil petitions and Facebook dockets for the sole purpose of generating absolute public vilification, permanently blacklisting a spectrum savant from the American workforce, and forcing his physical liquidation while the defendants utilized the resulting chaos to conceal their systemic corporate liabilities and shield the municipal enterprise from federal civil review [See Master Appendix, Appendix B, p. 5, 23; Appendix D, p. 33].

# PART 24: EXHAUSTIVE CHRONOLOGY OF THE MULTI-AGENCY RELIGIOUS PERSECUTION, FORGERY, AND TARGETED CHURCH VENUE RETALIATION (2025–2026)

188. **The Express Corporate Admission of Retaliatory and Ideological Motive**: On or about January 2026, within the physical operating environment of Crosstac Arms, the underlying animus directing the multi-front workplace conspiracy was explicitly recorded through direct corporate admissions [See Master Appendix, Appendix A, p. 24]. Specifically, **Defendant Cynthia Murphy**, acting in active coordination with shop manager **Defendant Heather Daniels**, openly declared on the production floor regarding the Plaintiff's active higher education and unscrubbed federal litigation dockets: *"That's the problem with being good, people will rob and sue you, that's why I don't go to church"* [See Master Appendix, Appendix A, p. 24]. This statement formally establishes the corporate knowledge of Plaintiff's protected religious status, his adherence to the tithing structures of the Church of Jesus Christ of Latter-day Saints (LDS), and provides the foundational baseline for the subsequent manufacturing of the demographic-specialized "lethal script" to achieve his physical and legal neutralization [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

189. **The Research, Structural Execution, and Forgery of the Violent LDS Rape Script**: Following this corporate admission, Defendant Heather Daniels actively initiated targeted research into regional civil and domestic case files to harvest operational methods for a terminal legal fabrication [See Master Appendix, Appendix C, p. 36]. Working under the direct administrative coaching and supervision of owner **Defendant Bret Heidkamp** and his wife, **Defendant Loree Schwartz**, the individuals utilized their legal data credentials to author, compile, and forge a fraudulent, handwritten civil protection order under color of law [See Master Appendix, Appendix C, p. 36]. This instrument intentionally constructed a violent, biologically impossible sexual abuse narrative against the Plaintiff—who has been clinically and physiologically impotent for over a decade—deliberately designed to mirror the sensationalized media scripts and legal controversies recently leveled against the LDS faith across the western region [See Master Appendix, Appendix A, pp. 4, 6].

190. **The Strategic Alignment and Retaliation Against Active Federal Litigation**: The timing, distribution, and coordination of this forged sex-crime script were explicitly executed in direct retaliation for Plaintiff's active federal civil rights filings, specifically tracking **Case No. 1:25-cv-02228** pending within the United States District Court for the District of Colorado [See Master

Appendix, Appendix D, p. 33]. Defendants Heidkamp, Schwartz, and Daniels systematically distributed this fraudulent instrument to Plaintiff's landlords, his college registrars, and his local Church Bishop, utilizing the resulting community shock to enforce an immediate housing eviction, terminate his academic sequences, and trigger an acute metabolic collapse [See Master Appendix, Appendix A, p. 4; Appendix C, p. 36]. By lodging these egregious fabrications directly onto low-level, unverified municipal and traffic court records, the enterprise executed an exact replica practice of the historical multi-state tracking loops of 2020, scaling the database corruption to completely blackball the Plaintiff from the American workforce [See Master Appendix, Appendix B, pp. 38–41; Appendix D, p. 33].

191. **The Involuntary Protection of the Church and Preservation of Ancestral Records**: Plaintiff explicitly states on the face of this record that his personal files, laboratory diagnostics, and clinical evidence chains are significantly larger, more exhaustive, and forensically denser than any compilation previously reviewed by the federal bench [See Master Appendix, pp. 1–45]. Plaintiff asserts that this comprehensive documentation was compiled under color of law to serve as an irrefutable barrier protecting the broader membership of his faith from systemic, state-sponsored exploitation [See Master Appendix, Appendix D, p. 33]. Plaintiff explicitly registers his willingness to endure the severe physical trauma, skull fractures, and biological deprivation inflicted by the named conspirators, explicitly noting that he is grateful the structural weight of this defense was cast upon his own ancestral lineage rather than another innocent member or child of the LDS Church who would have been left entirely defenseless against these multi-agency attacks [See Master Appendix, Part 1, Paragraph 1; Part 5, Paragraph 52].

---

# PART 25: COORDINATED MULTI-AGENCY INTERCEPTION, INDUCED HOMELESSNESS, AND EXCLUSION OF SURVIVAL ENTITLEMENTS

192. **Coordinated Multi-Agency Interception and Target Infiltration**: The systematic termination of Plaintiff's public accommodations, healthcare infrastructure, and emergency social safety nets was actively directed, monitored, and ratified by **Defendant Abigail Smith** and **Defendant Brian Lanni** operating in their official administrative capacities over their respective regional state and municipal agencies [See Master Appendix, Appendix D, p. 33]. Defendants Smith and Lanni acted under color of law with direct, subjective, and lethal intent, utilizing their high-level administrative database credentials to coordinate an operational blockade across multiple public sectors [See Master Appendix, Appendix D, p. 33]. Defendants executed these

affirmative data interceptions with full subjective knowledge of Plaintiff's fragile medical baseline, his GAF 30 profile, and his profound vulnerability to environmental and metabolic stress, intentionally aligning their agency resources to force a total-system biological collapse [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

193. **The Interlineation of Defendant Katherine Haywood and Active Litigation Retaliation**: This clandestine interagency coordination was executed in direct collusion with **Defendant Katherine Haywood**, who currently functions as adverse defense counsel in Plaintiff’s active, good-standing federal civil rights action, **Case No. 1:25-cv-02228** [See Master Appendix, Appendix D, p. 33]. Defendant Haywood breached professional ethical parameters and active court dockets to operate as a central coordination asset, harvesting Plaintiff’s confidential medical filings and location logs to feed data directly into the ongoing administrative neutralization plot [See Master Appendix, Appendix D, p. 33]. Defendants Smith, Lanni, and Haywood systematically shared this data with corporate defense interests to execute a series of targeted, retaliatory strikes designed to completely suppress Plaintiff's whistleblowing standing, obscure evidence of widespread public revenue fraud, and achieve the physical liquidation of the primary informant before a federal jury could review the record [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

194. **The Physical and Financial Fallout of Induced Homelessness**: Working under the direct coaching and administrative protection of the Smith, Lanni, and Haywood network, **Defendant Loree Schwartz** initiated a direct campaign of extrajudicial medical deprivation and physical property destruction [See Master Appendix, Appendix C, p. 36]. Defendant Schwartz acquired the private clinical contact data of Plaintiff's primary care physicians and repeatedly harassed the attending specialists, explicitly threatening the clinic staff with immediate criminal imprisonment if they continued to administer essential insulin parameters or diagnostic validation to the Plaintiff [See Master Appendix, Appendix A, p. 4]. This tactical intimidation successfully cut the Plaintiff off from life-sustaining insulin delivery for consecutive weeks, inducing acute metabolic shock [See Master Appendix, Appendix A, p. 4]. Simultaneously, the bad-faith, highly publicized service of the forged child-predator civil petitions directly destroyed Plaintiff's housing subsidies, decimated his landlord’s residential property value through targeted public vilification, and completely severed his access to necessary state disability services [See Master Appendix, Appendix A, p. 4; Appendix C, p. 36].

195. **The Tortious Destruction of Minor Dependent Auxiliary Benefits**: The direct, proximate result of this multi-agency conspiracy was the immediate, fraudulent interception and total truncation of Plaintiff's minor daughter’s federal auxiliary benefits administered through the Social Security Administration [See Master Appendix, Appendix A, p. 5; Appendix D, p. 33]. Aligned state actors and corporate syndicates intentionally processed these benefit disruptions to maximize the household's economic destabilization, enforce complete destitution, and ensure that the Plaintiff lacked the financial capital required to purchase life-support automated medical equipment or maintain specialized out-of-state pharmacy networks [See Master Appendix, Appendix D, p. 33]. This targeted financial extraction was executed under color of law to maintain an absolute administrative firewall around Plaintiff's child, using the complete destruction of her independent economic entitlements to achieve the permanent, extrajudicial misprision of the underlying real estate and banking fraud [See Master Appendix, Appendix A, p. 5; Appendix D, p. 33].

# PART 26: COMPREHENSIVE JURISDICTIONAL STATEMENT AND AGENCY FRAMEWORK

1. **Invocation of Statutory Subject-Matter Jurisdiction**: Original subject-matter jurisdiction is invoked over this action pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1343 (Civil Rights), as this controversy directly concerns the deprivation of rights secured by the Constitution and laws of the United States.
2. **Federal Communications Commission (FCC) Administrative Baseline**: To the extent that this action addresses the operational practices, broadcasting compliance, and digital data metrics of multi-state media conglomerates, the statutory framework is predicated upon the final administrative determinations of the Federal Communications Commission (FCC). On May 11, 2026, the FCC issued an official executive administrative certificate under the authority of Managing Director Daniel Daly, establishing the threshold parameter and right to seek judicial review within the United States District Court regarding the electronic tracking networks, database access allocations, and regional broadcast loops detailed herein.
3. **The Relationship Between Electronic Broadcasts and Environmental Risks**: Plaintiff asserts that the continuous, cross-border transmission of unverified, high-intensity news scripts and digital media loops across public networks functions as the moving force behind the ongoing public incitement, tracking, and extrajudicial targeting directed against his person, minor relatives, and localized houses of worship. Plaintiff notes that because federal regulatory oversight and the FCC failed to implement immediate administrative restrictions or freeze the digital archives of the corporate dockets, the underlying environmental dangers remained active and evolved.
4. **Downstream Fallout and Continued Civil Narratives**: As a direct consequence of these active media archives, private vigilante networks and state actors were permitted to continuously deploy retaliatory tracking mechanisms, civil slanders, and family separation frameworks. This continuous, unmitigated exposure directly resulted in life-threatening metabolic crises, ongoing physical trauma, and the total, permanent loss of custody of Plaintiff's minor child, who remains

completely missing from his legal care due to these cumulative, cross-border corporate news campaigns.

| | | |
|---|---|---|
| **Loveland Police Department** | DVR Reporting Docket | Formal police intervention reporting financial truncation and administrative blockades by the Division of Vocational Rehabilitation. |
| **Longmont Police Department** | 26-050318 | Official stalking and disability discrimination report filed against Front Range Community College (FRCC) administrative actors. |
| **Loveland Police Department** | 2026-031411 | Documented protection order violation and hostile operational intervention involving corporate management assets. |
| **Longmont Police Department** | 2026-017579 | Active criminal complaint documenting attempted murder, medical technology deprivation, and database forgery under color of law. |
| **National Counterterrorism Center (NCTC)** | Federal Intake Registry | Explicit notice filed documenting coordinated multi-state tracking grids, internet portal fraud, and faith-based administrative targeting. |
| **Department of Homeland Security (DHS)** | Threat Matrix Assessment | Federal reporting logging database profiling, electronic data flags, and cross-border data tracking affecting major public assistance networks. |

# CLAIMS SECTION

## I. THE LONGMONT POLICE DEPARTMENT ENTERPRISE

**Claim 1 Asserted Against Jason Malterud, Detective, Longmont Police Department, in his Individual and Official Capacities: Attempted Murder and Falsification of Evidence [42 U.S.C. § 1983 / 18 U.S.C. § 1519]**

Defendant Malterud colluded and forged a secondary, contradictory police report to transition a forensic "medical fall" into a "robbery and assault" narrative to match news fiction, providing the legal pretext to deny the Plaintiff insulin.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 2 Asserted Against Jason Malterud, Detective, Longmont Police Department, in his Individual and Official Capacities: Fraud and Obstruction of Justice [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Defendant Malterud intentionally suppressed original 911 dispatch logs identifying the incident as a medical event to provide a false premise for media incitement.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 3 Asserted Against Jason Malterud, Detective, Longmont Police Department, in his Individual and Official Capacities: Conspiracy to Defraud and Deprive Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Defendant Malterud reached a meeting of the minds with News Defendants to "leak" false homicide details, facilitating the Plaintiff's extrajudicial "social execution."

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 4 Asserted Against Jeff Satur, Deputy Chief, Longmont Police Department, in his Individual and Official Capacities: Supervisory Liability and Ratification of Forgery [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

Defendant Satur personally ratified the unconstitutional conduct of Jason Malterud, establishing a department policy where news fiction was prioritized over forensic 911 truth.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 5 Asserted Against Jeff Satur, Deputy Chief, Longmont Police Department, in his Individual and Official Capacities: Supervisory Liability and Failure to Intervene [42 U.S.C. § 1983 / 8th Amendment]**

Defendant Satur ordered and ratified the "robbery" narrative despite having direct access to 911 logs proving a medical accident, providing the "moving force" behind the systematic medical neglect.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 6 Asserted Against Jeff Satur, Deputy Chief, Longmont Police Department, in his Individual and Official Capacities: First Amendment Retaliation [42 U.S.C. § 1983 / 1st Amendment]**

Defendant Satur utilized the department's media apparatus to brand the Plaintiff a "deadly attacker" specifically to silence the Plaintiff's previous reports of local police corruption.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 7 Asserted Against Jeff Satur, Deputy Chief, Longmont Police Department, in his Individual and Official Capacities: Misprision of Felony [18 U.S.C. § 4 / 42 U.S.C. § 1983]**

Defendant Satur possessed actual knowledge of police perjury and fraudulent news broadcasts but took affirmative steps to conceal these crimes from federal authorities.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 8 Asserted Against Joshua Burke, Detective, Longmont Police Department, in his Individual and Official Capacities: Participation in Torture and Misprision [18 U.S.C. § 2340A / 18 U.S.C. § 4]**

Defendant Burke affirmed news fiction while possessing body-worn camera footage proving the robbery was a fabrication, Burke visited the 7-11 on December 6th, 2020 and questioned all homeless people “have you seen saddlebags for a bike”(video available) this is due to it being known and recorded that Robert McEwen found a card on camera and it was not taken or robbed

plaintiff does not know Robert McEwen except for the affidavit he supplied admitting this, intentionally facilitating the medical torture of the Plaintiff.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 9</u> Asserted Against Joshua Burke, Detective, Longmont Police Department, in his Individual and Official Capacities: First Amendment Retaliation [42 U.S.C. § 1983 / 1st Amendment]**

Defendant Burke engaged in the active removal of exculpatory evidence from the investigative record to ensure the "news fiction" remained the dominant narrative.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 10</u> Asserted Against Joshua Burke, Detective, Longmont Police Department, in his Individual and Official Capacities: Deprivation of Liberty Without Due Process [14th Amendment / 42 U.S.C. § 1983]**

Defendant Burke participated in the detention of the Plaintiff for an "imaginary homicide" while knowing no crime had been committed.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 11</u> Asserted Against Rachael Sloan-Stoggsdill, Longmont Police Department, in her Individual and Official Capacities: Fraudulent Concealment and Obstruction [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Defendant Sloan-Stoggsdill suppressed original 911 records and refused to report the staged "criminal investigation" involving the fraudulent dissection of a body.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 12</u> Asserted Against Rachael Sloan-Stoggsdill, Longmont Police Department, in her Individual and Official Capacities: Conspiracy to Defraud [42 U.S.C. § 1985 / 18 U.S.C. § 371]**

Defendant Sloan-Stoggsdill coordinated with Public Safety to label 911 dispatch audio "not for public release" to hide the hoax from the Plaintiff. She requestioned Craig Stevens long after he reported me as black, she attempted to get a different statement after reporting to Stevens that the

reason she was questioning him was because I committed a deadly assault nearby, Stevens replied "I saw the news", Stevens story stayed the same except he corrected my race.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 13</u> Asserted Against Rachael Sloan-Stoggsdill, Longmont Police Department, in her Individual and Official Capacities: Failure to Intervene [42 U.S.C. § 1983 / 42 U.S.C. § 1986]**

Defendant failed to report the falsification of police reports, instead choosing to facilitate the denial of medical care.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 14</u> Asserted Against Zach Ardis, Public Information Officer, Longmont Police Department, in his Individual and Official Capacities: State-Created Danger and Incitement [42 U.S.C. § 1983 / 14th Amendment]**

Defendant Ardis distributed press releases accusing "three imaginary men" of robbery and murder, an affirmative act that placed the Plaintiff in the crosshairs of national news incitement.

**<u>Claim 15</u> Asserted Against Zach Ardis, Public Information Officer, Longmont Police Department, in his Individual and Official Capacities: Misprision of Felony [18 U.S.C. § 4 / 42 U.S.C. § 1983]**

Ardis refused to rectify the record to conceal the systematic torture of the Plaintiff and the "lethal removal" enterprise.

**<u>Claim 16</u> Asserted Against Zach Ardis, Public Information Officer, Longmont Police Department, in his Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Ardis coordinated the suppression of 911 records to ensure the media's "robbery" narrative remained unchallenged.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 17</u> Asserted Against Jon High, Detective, Longmont Police Department, in his Individual and Official Capacities: Intentional Infliction of Emotional Distress [Colorado**

**Common Law / 42 U.S.C. § 1983]**

Defendant Jon High targeted the Plaintiff's family with graphic, false details of a fabricated murder while the Plaintiff was held without insulin.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 18 Asserted Against Jon High, Detective, Longmont Police Department, in his Individual and Official Capacities: Defamation Per Se and Civil Conspiracy [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

Defendant High published false capital crime accusations and facilitated the staged autopsy, failing to report the lack of forensic necessity.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## II. THE CORRECTIONS & CDOC TORTURE ENTERPRISE

**Claim 19 Asserted Against Stanley Jerido, Parole Officer, Colorado Department of Corrections (CDOC), in his Individual and Official Capacities: Attempted Murder and 8th Amendment Torture [42 U.S.C. § 1983 / 18 U.S.C. § 1113]**

Defendant Jerido committed Attempted Murder when he withheld life-sustaining insulin and other life sustaining care from the Plaintiff, intending for the Plaintiff to die for the news benefit.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 20 Asserted Against Stanley Jerido, Parole Officer, Colorado Department of Corrections (CDOC), in his Individual and Official Capacities: Administrative Forgery and Fraud [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Defendant Jerido reported a "high-profile homicide" in a Dec 28, 2020, hearing while admitting on the record that there were **"no formal charges."**

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 21 Asserted Against Stanley Jerido, Parole Officer, Colorado Department of Corrections (CDOC), in his Individual and Official Capacities: ADA Discrimination and Retaliation [42 U.S.C. § 12132 / 28 C.F.R. § 35.130]**

Defendant Jerido excluded the Plaintiff from medical services based on his disability and "news celebrity" status.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 22 Asserted Against Andre Stancil, Executive Director, Colorado Department of Corrections (CDOC), in his Individual and Official Capacities: Supervisory Liability and Ratification of Torture [42 U.S.C. § 1983 / 8th Amendment]**

Defendant Stancil personally ratified the custom of medical neglect and the use of forged "no charges" records to hold the Plaintiff in maximum security conditions.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 23 Asserted Against Andre Stancil, Executive Director, the Colorado Department of Corrections (CDOC): Institutional Monell Liability – 8th Amendment [42 U.S.C. § 1983 / 8th Amendment]**

Defendant CDOC maintained a custom of "deliberate indifference," utilizing news fiction to justify the lethal conditions that caused the Plaintiff's bone disintegration, morbidity and death.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 24 Asserted Against Andre Stancil, Executive Director, Colorado Department of Corrections (CDOC), in his Official Capacity: Vicarious Liability for Administrative Forgery [18 U.S.C. § 1512 / Colorado Common Law]**

As the official representative of the CDOC, Stancil is liable for the "parole forgery" committed by Stanley Jerido.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 25 Asserted Against Andre Stancil, Executive Director, Colorado Department of Corrections (CDOC), in his Individual Capacity: Failure to Intervene [42 U.S.C. § 1983 / 42 U.S.C. § 1986]**

Defendant Stancil had actual knowledge of the Plaintiff's physical "mutilation" but failed to intervene, facilitating the "Lethal Removal" enterprise.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## III. THE JUDICIAL & PROSECUTORIAL CONSPIRACY

**Claim 26 Asserted Against Ryan Day, Deputy District Attorney, 20th Judicial District, in his Individual and Official Capacities: Attempted Murder and Malicious Prosecution [42 U.S.C. § 1983 / 18 U.S.C. § 1113]**

Defendant Day maintained a prosecution predicated on a news script rather than forensic evidence, ensuring the Plaintiff was held in lethal custody.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 27 Asserted Against Michael Dougherty, District Attorney, 20th Judicial District, in his Individual and Official Capacities: Supervisory Liability and Ratification [42 U.S.C. § 1983]**

Defendant Dougherty personally ratified the fabrication of the homicide narrative by Ryan Day to shield News Defendants from liability.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 28 Asserted Against Ryan Day, Deputy District Attorney, 20th Judicial District, in his Individual and Official Capacities: Obstruction of Justice [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Day knowingly suppressed the 911 audio and medical records to prevent the collapse of the "robbery" theory.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 29 Asserted Against Nancy Salamone, Magistrate/Judge, 20th Judicial District, in her Individual and Official Capacities: Fraud Upon the Court [42 U.S.C. § 1983 / 18 U.S.C. § 1341]**

Defendant Salamone abandoned judicial neutrality to act as a "co-conspirator," coercing a guilty plea for a non-existent crime.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 30 Asserted Against Ingrid Bakke, Chief Judge, 20th Judicial District, in her Individual and Official Capacities: Supervisory Liability and Fraudulent Concealment [42 U.S.C. § 1983]**

Defendant Bakke personally ratified the "judicial fraud" of Nancy Salamone and blocked the Plaintiff's access to the record.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 31 Asserted Against Nancy Salamone, Magistrate/Judge, 20th Judicial District, in her Individual and Official Capacities: Deprivation of Life Without Due Process [14th Amendment / 42 U.S.C. § 1983]**

Salamone authorized detention in lethal conditions, refusing a jury trial to hide the "fake record" she composed.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 32 Asserted Against Bruce Langer, Judge, 20th Judicial District, in his Individual and Official Capacities: Misprision of Treason [18 U.S.C. § 2382 / 42 U.S.C. § 1983]**

Defendant Langer sentenced the Plaintiff based on a "fake record" to provide a misprision benefit to Nancy Salamone.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 33 Asserted Against Ingrid Bakke, Chief Judge, 20th Judicial District, in her Individual and Official Capacities: Failure to Intervene [42 U.S.C. § 1983 / 42 U.S.C. § 1986]**

Defendant Bakke failed to intervene in the conspiracy to murder the Plaintiff even after being provided with forensic 911 logs.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 34 Asserted Against Bruce Langer, Judge, 20th Judicial District, in his Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Langer acted in concert with the prosecution to ignore irrefutable proof of a "medical fall" and affirm a conviction rooted in news fiction.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 35 Asserted Against Phillip Brimmer, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Fraud upon the Court and Judicial Forgery [5th Amendment / 18 U.S.C. § 1503]**

Defendant Brimmer utilized his federal bench to forge and publish "cover-up material" on the federal record in Case No. 24-cv-01127.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 36 Asserted Against Phillip Brimmer, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Judicial Incitement to Murder [5th Amendment / 18 U.S.C. § 1113]**

By publishing forged accusations of murder on the federal record, Brimmer intentionally incited the vigilantes striking across multiple cases.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 37 Asserted Against Phillip Brimmer, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Obstruction of Justice [5th Amendment / 18 U.S.C. § 1503]**

Brimmer conducted ex parte clandestine conferences with media counsel to coordinate the dismissal of survival claims.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 38 Asserted Against Lewis T. Babcock, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Misprision of Treason [5th Amendment / 18 U.S.C. § 2382]**

Defendant Babcock utilized his federal office to uphold the state's "fake record" despite knowledge of the systematic torture.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 39 Asserted Against Lewis T. Babcock, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Failure to Intervene [5th Amendment / 42 U.S.C. § 1986]**

Babcock failed to intervene in the conspiracy to murder the Plaintiff despite being provided with proof of the hoax.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 40 Asserted Against Lewis T. Babcock, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Deprivation of Due Process [5th Amendment]**

Babcock utilized summary dismissals to "kill" the Plaintiff's legal standing and facilitate the continued "lethal removal" enterprise.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## IV. THE PUBLIC DEFENDER SABOTAGE

**Claim 41 Asserted Against Nicole Collins, Public Defender, Colorado State Public Defender,**

**in her Individual and Official Capacities: Professional Malpractice and Conspiracy [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

Defendant Collins sabotaged the defense by refusing to enter the McEwen affidavit into evidence, ensuring the "fake record" remained unchallenged.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 42 Asserted Against Megan Ring, State Public Defender, in her Individual and Official Capacities: Supervisory Liability and Ratification [42 U.S.C. § 1983]**

Defendant Ring personally ratified the sabotage of the Plaintiff's defense to protect the Billiondollar revenue of the media defendants. Plaintiff was refused representation by this office for appeals for case 20CR002138.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 43 Asserted Against Nicole Collins, Public Defender, Colorado State Public Defender, in her Individual and Official Capacities: Obstruction of Justice [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Collins suppressed exculpatory evidence to protect the media defendants and the Longmont Police.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 44 Asserted Against Benjamin Collett, Public Defender, Colorado State Public Defender, in his Individual and Official Capacities: Professional Malpractice and Conspiracy [42 U.S.C. § 1983 / 14th Amendment]**

Defendant Collett coerced the Plaintiff into a guilty plea for a non-existent crime while the Plaintiff was in a medical crisis.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 45 Asserted Against Megan Ring, State Public Defender, in her Individual and Official Capacities:**

**Failure to Intervene [42 U.S.C. § 1983 / 42 U.S.C. § 1986]**

Defendant Ring failed to intervene in the state-coordinated coercion of the Plaintiff while he was incapacitated.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 46</u> Asserted Against Benjamin Collett, Public Defender, Colorado State Public Defender, in his Individual and Official Capacities: Fraudulent Concealment [Colorado Common Law / 18 U.S.C. § 1512]**

Collett intentionally withheld the medical necessity of insulin from the court record to justify incarceration.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 47</u> Asserted Against Ryan Dawson-Erdman, Public Defender, Colorado State Public Defender, in his Individual and Official Capacities: Professional Malpractice and Conspiracy [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

Defendant Dawson-Erdman withheld exculpatory evidence from the Plaintiff to protect the News Defendants.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 48</u> Asserted Against Megan Ring, State Public Defender, in her Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Ring coordinated the "legal abandonment" of the Plaintiff during the most critical phases of his medical crisis.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 49</u> Asserted Against Ryan Dawson-Erdman, Public Defender, Colorado State Public Defender, in his Individual and Official Capacities: Fraudulent Concealment [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Dawson-Erdman suppressed the dispatch logs which proved the entire "robbery" case was a fabrication.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## V. THE APPELLATE & SUPREME COURT COVER-UP

**Claim 50 Asserted Against Judge Hawthorne, Judge, Colorado Court of Appeals, Individual and Official Capacities: Civil Conspiracy to Falsify the State Record [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Defendant Hawthorne coordinated the manufacture of a "fake appellate record" that omitted forensic proof of a "medical fall."

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 51 Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, in her Individual and Official Capacities: Administrative Forgery and Fraud [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

Defendant Márquez personally ratified the "mutilation" of the state record across multiple appeals to affirm convictions derived from a staged investigation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 52 Asserted Against Judge Hawthorne, Judge, Colorado Court of Appeals, Individual and Official Capacities: Misprision of Felony [18 U.S.C. § 4 / 42 U.S.C. § 1983]**

Hawthorne had knowledge of the perjury committed by police but took affirmative steps to conceal it.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 53 Asserted Against Judge Fox, Judge, Colorado Court of Appeals, Individual and Official Capacities: Civil Conspiracy to Falsify the State Record [42 U.S.C. § 1985 / 18 U.S.C.**

**§ 241]**

Defendant Fox coordinated the "mutilation" of the state record to affirm a conviction derived from a staged investigation.

**Claim 54 Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, Individual and Official Capacities: Deprivation of Access to Courts [14th Amendment / 42 U.S.C. § 1983]**

Márquez utilized procedural barriers to prevent the entry of forensic 911 audio into the appellate record.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 55 Asserted Against Judge Fox, Judge, Colorado Court of Appeals, Individual and Official Capacities: Misprision of Felony [18 U.S.C. § 4 / 42 U.S.C. § 1983]**

Fox chose to uphold the "fake record" to provide a misprision benefit to state actors who denied the Plaintiff insulin.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 56 Asserted Against Judge Lum, Judge, Colorado Court of Appeals, Individual and Official Capacities: Civil Conspiracy to Falsify the State Record [42 U.S.C. § 1985 / 18 U.S.C. § 1962]**

Defendant Lum participated in judicial fraud to protect the billion-dollar revenue of the media defendants.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 57 Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Márquez coordinated with the lower courts to ensure the Plaintiff remained branded an attacker.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 58</u> Asserted Against Judge Lum, Judge, Colorado Court of Appeals, Individual and Official Capacities: Misprision of Felony [18 U.S.C. § 4 / 42 U.S.C. § 1983]**

Lum failed to report the staged "criminal investigation" overseen by DA Ryan Day.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 59</u> Asserted Against Judge Johnson, Judge, Colorado Court of Appeals, Individual and Official Capacities: Collusion with News Defendants and Retaliation [42 U.S.C. § 1983 / 1st Amendment]**

Defendant Johnson colluded with news counsel and imposed "retaliatory mandates" requiring news fees.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 60</u> Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, Individual and Official Capacities: First Amendment Retaliation [42 U.S.C. § 1983 / 1st Amendment]**

Márquez utilized judicial power to "silence" reports of attempted murder by imposing financial barriers.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 61</u> Asserted Against Judge Johnson, Judge, Colorado Court of Appeals, Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Johnson coordinated with media to ensure the Plaintiff remained branded a deadly attacker.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 62</u> Asserted Against Judge Lipinsky, Judge, Colorado Court of Appeals, Individual and**

**Official Capacities: Collusion and Retaliation [42 U.S.C. § 1983 / 14th Amendment]**

Defendant Lipinsky affirmed news offenses while knowing the broadcasts incited attempts on the Plaintiff's life.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 63</u> Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, Individual and Official Capacities: Failure to Intervene [42 U.S.C. § 1983 / 42 U.S.C. § 1986]**

Márquez knowingly failed to intervene in the unconstitutional mandates imposed by lower court judges.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 64</u> Asserted Against Judge Lipinsky, Judge, Colorado Court of Appeals, Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Lipinsky coordinated the "social execution" of the Plaintiff by upholding the fraudulent narrative.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 65</u> Asserted Against Judge Moultrie, Judge, Colorado Court of Appeals, Individual and Official Capacities: Collusion and Retaliation [42 U.S.C. § 1983 / 14th Amendment]**

Defendant Moultrie acted as a "judicial advocate" for the media, ensuring the Plaintiff remained without legal standing.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 66</u> Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, Individual and Official Capacities: Supervisory Liability and Monell [42 U.S.C. § 1983]**

Márquez ratified the "pay-to-play" justice system that prevented the Plaintiff from filing evidence of the attempted murder.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 67</u> Asserted Against Judge Moultrie, Judge, Colorado Court of Appeals, Individual and Official Capacities: Conspiracy to Interfere with Civil Rights [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Moultrie coordinated to ensure the Plaintiff's "survivor status" was never acknowledged by the state.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## <u>VI. THE BALLARD SPAHR DEFENSE ENTERPRISE</u>

**<u>Claim 68</u> Asserted Against Ashley Kissinger, Partner, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Perjury and Fraudulent Concealment [18 U.S.C. § 1621 / 42 U.S.C. § 1983]**

Defendant Kissinger filed perjured declarations asserting that only "three articles" existed, while concealing hundreds of video broadcasts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 69</u> Asserted Against Kennison Lay, Attorney, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Perjury and Fraudulent Concealment [18 U.S.C. § 1621 / 42 U.S.C. § 1983]**

Defendant Lay declared no video evidence existed of the broadcasts to manipulate the statute of limitations.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 70</u> Asserted Against Sherri Clark, Paralegal, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Conspiracy to Obstruct Justice [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Defendant Clark acted in concert with news counsel to "falsify" the scale of media offenses and

conceal the incitement.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 71 Asserted Against Peter Michaud, Chair, Ballard Spahr LLP, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and RICO Participation [18 U.S.C. § 1962 / 42 U.S.C. § 1983]**

Defendant Michaud personally ratified the enterprise of perjury and concealment that protected media revenue.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 72 Asserted Against Ballard Spahr LLP: Enterprise Liability and RICO [18 U.S.C. § 1962 / 18 U.S.C. § 1964]**

Defendant entity functioned as the "legal architects" of the concealment and incitement enterprise.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 73 Asserted Against Ashley Kissinger, Partner, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Obstruction of Justice [18 U.S.C. § 1512 / 42 U.S.C. § 1983]**

Kissinger utilized ex parte clandestine conferences with Brimmer to coordinate the dismissal of survival claims.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 74 Asserted Against Kennison Lay, Attorney, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Obstruction of Justice [18 U.S.C. § 1503 / 42 U.S.C. § 1983]**

Lay participated in the suppression of 911 medical logs during federal discovery.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 75</u> Asserted Against Sherri Clark, Paralegal, Ballard Spahr LLP, in her Individual Capacity for Actions Taken Under Color of Law: Fraud and Obstruction [18 U.S.C. § 1519 / 42 U.S.C. § 1983]**

Clark utilized her position to block the Plaintiff's access to exculpatory news archives documented in the pattern of litigation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 76</u> Asserted Against Peter Michaud, Chair, Ballard Spahr LLP, in his Individual Capacity for Actions Taken Under Color of Law: Ratification of Perjury [42 U.S.C. § 1983 / 18 U.S.C. § 1621]**

Defendant Michaud personally ratified the filing of forged declarations by his subordinates.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 77</u> Asserted Against Peter Michaud, Chair, Ballard Spahr LLP, in his Individual Capacity for Actions Taken Under Color of Law: Conspiracy to Falsify Records [18 U.S.C. § 1512 / 18 U.S.C. § 371]**

Defendant entity coordinated the forgery of the number of broadcasts in discovery.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## <u>VII. THE EDUCATION & VOCATIONAL SABOTAGE (FRCC)</u>

**<u>Claim 78</u> Asserted Against Ken Lee, Administrator, Front Range Community College (FRCC), in his Individual and Official Capacities: Deprivation of Rights and Intentional Vocational Sabotage [42 U.S.C. § 1983 / 42 U.S.C. § 12132]**

Defendant **Ken Lee, Administrator of Front Range Community College (FRCC)**, intentionally

excluded the Plaintiff from vocational programs and utilized "news investigation" fiction to sabotage the Plaintiff's standing with the **Division of Vocational Rehabilitation (DVR)** and the **Ticket to Work program**. Defendant **Ken Lee** acted with the specific intent to terminate the Plaintiff's professional prospects and ensure the Plaintiff remained without the credentials required for survival.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 79</u> Asserted Against Colleen Simpson, President, Front Range Community College (FRCC), in her Individual and Official Capacities: Institutional Liability and Ratification of Sabotage [42 U.S.C. § 1983 / 14th Amendment]**

Defendant **Colleen Simpson, President of Front Range Community College (FRCC)**, personally ratified the unconstitutional conduct of **Ken Lee** regarding the sabotage of the Plaintiff's **DVR** and **Ticket to Work** eligibility, providing the administrative authority to maintain the Plaintiff's exclusion from public education and professional rehabilitation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 80</u> Asserted Against Ken Lee, Administrator, Front Range Community College (FRCC), in his Individual and Official Capacities: First Amendment Retaliation [42 U.S.C. § 1983 / 1st Amendment]**

Defendant **Ken Lee, Administrator of Front Range Community College (FRCC)**, imposed "disciplinary probation" and academic blacklisting in direct retaliation for the Plaintiff's exercise of his constitutional right to contest the discriminatory practices of the college. This retaliation by **Ken Lee** was designed to signal to the **Division of Vocational Rehabilitation (DVR)** that the Plaintiff was "unfit" for vocational training.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 81</u> Asserted Against Colleen Simpson, President, Front Range Community College (FRCC), in her Individual and Official Capacities: Deprivation of Due Process and Institutional Ratification of Sham Proceedings [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Colleen Simpson, President of Front Range Community College (FRCC)**, ratified the

"sham" administrative proceedings conducted to remove the Plaintiff. Defendant **Colleen Simpson** intentionally refused to allow forensic evidence that would have protected the Plaintiff's **Ticket to Work** status, choosing instead to adopt news fiction as the sole basis for removal.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 82</u> Asserted Against Colleen Simpson, President, Front Range Community College (FRCC), in her Individual and Official Capacities: ADA Discrimination and Custom of Ridicule [42 U.S.C. § 12132 / 28 C.F.R. § 35.130]**

Defendant **Colleen Simpson, President of Front Range Community College (FRCC)**, as the final policymaking authority, maintained and enforced an institutional custom of "disability ridicule." Defendant **Colleen Simpson** prioritized news scripts over **ADA** compliance standards, ensuring the Plaintiff was excluded from public vocational training based on his status as a branded disabled individual.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 83</u> Asserted Against Ken Lee, Administrator, Front Range Community College (FRCC), in his Individual and Official Capacities: Deprivation of Property Interests and Sabotage of Funding [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Ken Lee, Administrator of Front Range Community College (FRCC)**, conducted affirmative acts to sabotage the Plaintiff's educational funding and vocational standing with the **Division of Vocational Rehabilitation (DVR)**. Defendant **Ken Lee** utilized the "fake record" of the Longmont Police to justify the removal of the Plaintiff's financial support and vocational security.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 84</u> Asserted Against Colleen Simpson, President, Front Range Community College (FRCC), in her Individual and Official Capacities: Institutional Failure to Supervise and Ratification of Financial Sabotage [42 U.S.C. § 1983 / 14th Amendment]**

Defendant **Colleen Simpson, President of Front Range Community College (FRCC)**, failed to supervise the retaliatory actions of **Ken Lee** and personally facilitated the sabotage of the Plaintiff's **DVR** and **Ticket to Work** funding. Defendant **Colleen Simpson** served as the final authority in

the enterprise to ensure the Plaintiff remained economically and vocationally incapacitated.

## VIII. THE FBI MISPRISION OF FELONY

**Claim 85 Asserted Against Christopher Wray, Director, FBI, in his Individual and Official Capacities: Bivens Claim – Supervisory Liability and Misprision of Felony [5th Amendment / 18 U.S.C. § 4]**

Defendant Wray personally ratified the refusal to investigate documented judicial fraud and statesponsored torture.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 86 Asserted Against Amanda Koldjeski, SAC, FBI Denver Field Office, in her Individual and Official Capacities: Bivens Claim – Supervisory Liability and Failure to Intervene [5th Amendment / 42 U.S.C. § 1986]**

Defendant Koldjeski facilitated the ongoing attempts on life by labeling "mutilation" and "incitement" as a "civil matter."

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 87 Asserted Against Federal Bureau of Investigation (FBI): Institutional Monell Liability and Misprision of Felony [18 U.S.C. § 4 / Bivens / 5th Amendment]**

Defendant FBI maintained an institutional policy of refusing to investigate documented judicial fraud and state-sponsored torture despite forensic proof.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

# IX. THE REGIONAL NEWS OPERATIONAL ARMS

**Claim 88 Asserted Against Lachlan Murdoch, CEO, Fox Corporation, in his Individual Capacity for**

**Actions Taken Under Color of Law: Incitement to Murder and Joint Action (FOX-31/KDVR)**

**[14th Amendment / 42 U.S.C. § 1983]**

Defendant **Lachlan Murdoch, CEO of Fox Corporation**, utilized **FOX-31 (KDVR)** as an operational arm to air a "deadly beating" narrative with actual malice, inciting assassination attempts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 89 Asserted Against Perry Sook, CEO, Nexstar Media Group, in his Individual Capacity for Actions Taken Under Color of Law: Agency Liability and Supervisory Liability [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Perry Sook, CEO of Nexstar Media Group**, utilized regional affiliates (including KDVR) as operational arms to execute scripts that resulted in assassination attempts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 90 Asserted Against Hilton Howell, CEO, Gray Media Group, in his Individual Capacity for**

**Actions Taken Under Color of Law: Agency Theory and Joint Action (KNOP-2) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Hilton Howell, CEO of Gray Media Group**, utilized **KNOP-2** as an operational arm to broadcast scripts designed to "finish the job" through coordinated news incitement.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 91 Asserted Against Hilton Howell, CEO, Gray Media Group, in his Individual Capacity for Actions Taken Under Color of Law: Agency Liability and Joint Action [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Hilton Howell, CEO of Gray Media Group**, directed regional affiliates to function as an

operational arm to execute a policy of public incitement.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -

**<u>Claim 92</u> Asserted Against Josh D'Amaro, CEO, The Walt Disney Company, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (ABC-7/KMGH) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Josh D'Amaro, CEO of The Walt Disney Company**, utilized **ABC-7 (KMGH)** as an operational arm to brand the Plaintiff a murderer.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 93</u> Asserted Against Almin Karamehmedovic, President, ABC News, in his Individual Capacity for Actions Taken Under Color of Law: Agency Liability and Joint Action [42 U.S.C. § 1983 / 18 U.S.C. § 1113]**

Defendant **Almin Karamehmedovic, President of ABC News**, utilized the regional operational arm to broadcast scripts designed for lethal removal.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 94</u> Asserted Against David Ellison, CEO, Paramount Global, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (CBS-4/KCNC) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **David Ellison, CEO of Paramount Global**, utilized **CBS-4 (KCNC)** as an operational arm to generate revenue from the fraudulent murder narrative.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 95</u> Asserted Against Wendy McMahon, CEO, CBS News and Stations, in her Individual Capacity for Actions Taken Under Color of Law: Agency Liability and Supervisory Liability [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Wendy McMahon, CEO of CBS News and Stations**, directed the news offense policy that utilized regional affiliates to execute lethal scripts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- ---

**<u>Claim 96</u> Asserted Against Michael J. Cavanagh, CEO, NBCUniversal, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (NBC-9/KUSA) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Michael J. Cavanagh, CEO of NBCUniversal**, utilized **NBC-9 (KUSA)** as an operational arm to broadcast lethal removal scripts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -

**<u>Claim 97</u> Asserted Against Cesar Conde, Chairman, NBCU News Group, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Cesar Conde, Chairman of NBCU News Group**, utilized the regional operational arm to provide the motivational engine for vigilantes.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 98</u> Asserted Against Hilton Howell, CEO, Gray Media Group, in his Individual Capacity for Actions Taken Under Color of Law: Vicarious Liability and Joint Action [18 U.S.C. § 1113 / 42 U.S.C. § 1983]**

Defendant **Hilton Howell, CEO of Gray Media Group**, utilized regional affiliates as operational arms to execute a corporate policy of lethal removal.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 99</u> Asserted Against Heath Freeman, President, Alden Global Capital, in his Individual Capacity for Actions Taken Under Color of Law: Libel Per Se and Joint Action (The Denver Post) [Colorado Common Law / 42 U.S.C. § 1983]**

Defendant **Heath Freeman, President of Alden Global Capital**, utilized **The Denver Post** as an operational arm to validate the fraudulent robbery narrative.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 100</u> Asserted Against Heath Freeman, President, Alden Global Capital, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and RICO Participation [18**

**U.S.C. § 1962 / 42 U.S.C. § 1983]**

Defendant **Heath Freeman, President of Alden Global Capital**, personally ratified the policy of utilizing news fiction for revenue through defamation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## X. THE NATIONAL NEWS HUB-AND-SPOKE ENTERPRISE

**<u>Claim 101</u> Asserted Against Josh D'Amaro, CEO, The Walt Disney Company, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (ABC News National) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Josh D'Amaro, CEO of The Walt Disney Company**, utilized ABC regional affiliates as the operational arm of **ABC News National** to execute a policy of lethal removal.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 102</u> Asserted Against Josh D'Amaro, CEO, The Walt Disney Company, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and Ratification [42 U.S.C.**
**§ 1983 / 18 U.S.C. § 1962]** Defendant **Josh D'Amaro, CEO of The Walt Disney Company**,

ratified the corporate policy of prioritizing lethal removal scripts across the pattern of litigation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 103 Asserted Against David Ellison, CEO, Paramount Global, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (CBS News National) [14th Amendment / 42 U.S.C. § 1983]**

**David Ellison, CEO of Paramount Global**, utilized CBS regional affiliates as the operational arm of **CBS News National** to brand the Plaintiff a murderer.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 104 Asserted Against David Ellison, CEO, Paramount Global, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and Ratification [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **David Ellison, CEO of Paramount Global**, authorized the continued hosting of heinous archives despite forensic proof of innocence.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 105 Asserted Against Michael J. Cavanagh, CEO, NBCUniversal, in his Individual Capacity for Actions Taken Under Color of Law: Agency Theory and Joint Action (NBCU News Group National) [14th Amendment / 42 U.S.C. § 1983]**

Defendant **Michael J. Cavanagh, CEO of NBCUniversal**, utilized NBC regional affiliates as the operational arm of the national desk to execute lethal removal scripts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 106 Asserted Against Michael J. Cavanagh, CEO, NBCUniversal, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and Ratification [42 U.S.C. § 1983 / 18 U.S.C. § 1962]** Defendant **Michael J. Cavanagh, CEO of NBCUniversal**,

personally ratified the refusal to retract the "murder" label across the national network.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 107 Asserted Against Lachlan Murdoch, CEO, Fox Corporation, in his Individual Capacity**

**for Actions Taken Under Color of Law: Agency Theory and Joint Action (FOX News Network National) [14th Amendment / 42 U.S.C. § 1983]**

**Lachlan Murdoch, CEO of Fox Corporation**, utilized FOX-31 and other affiliates as the operational arm of **FOX News National** to execute lethal removal scripts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 108 Asserted Against Lachlan Murdoch, CEO, Fox Corporation, in his Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and Ratification [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Lachlan Murdoch, CEO of Fox Corporation**, personally authorized the "deadly beating" narrative across the pattern of litigation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 109 Asserted Against Suzanne Scott, CEO, Fox News Network, in her Individual Capacity for Actions Taken Under Color of Law: Supervisory Liability and Ratification [42 U.S.C. § 1983 / 18 U.S.C. § 1962]**

Defendant **Suzanne Scott, CEO of Fox News Network**, authorized the continued hosting of inciting archives across the years of the enterprise.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 110 Asserted Against Hilton Howell, CEO, Gray Media Group Inc., in his Individual Capacity for Actions Taken Under Color of Law: RICO Participation [18 U.S.C. § 1962 / 42 U.S.C. § 1983]**

Defendant **Hilton Howell, CEO of Gray Media Group**, profited from "incitement to murder" revenue through national network exploitation.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 111 Asserted Against Lachlan Murdoch, CEO, Fox Corporation, in his Individual Capacity for Actions Taken Under Color of Law: RICO Participation and Joint Action (Americas Most Wanted) [18 U.S.C. § 1962 / 42 U.S.C. § 1983]**

**Lachlan Murdoch, CEO of Fox Corporation**, utilized **Americas Most Wanted** as an operational arm to brand the Plaintiff a "deadly fugitive" during a medical crisis.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

# XI. THE PRIVATE VIGILANTE AGENTS

**Claim 112 Asserted Against Jackie Shubert, Private Citizen, in her Individual Capacity for Actions Taken Under Color of State Law: Civil Conspiracy [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Defendant **Jackie Shubert** coordinated with police leadership to manufacture the deadly beating narrative despite knowledge of the forensic accident.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 113 Asserted Against Jackie Shubert, Private Citizen, in her Individual Capacity for Actions Taken Under Color of State Law: Defamation Per Se and Incitement [14th Amendment / Colorado Common Law]**

Defendant **Jackie Shubert** published false accusations for the purpose of inciting assassination attempts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 114 Asserted Against Brian Derry, Private Citizen, in his Individual Capacity for Actions Taken Under Color of State Law: Civil Conspiracy [42 U.S.C. § 1985 / 18 U.S.C. § 241]**

Defendant **Brian Derry** reached a meeting of minds with state police to manufacture robbery fiction to justify extrajudicial punishment.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 115 Asserted Against Brian Derry, Private Citizen, in his Individual Capacity for Actions Taken Under Color of State Law: Defamation Per Se and Incitement [14th Amendment / Colorado Common Law]**

Defendant

Defendant **Brian Derry** acted with actual malice to incite the vigilantes detailed across the pattern of attempts.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

## II. THE ONGOING PATTERN OF JUDICIAL FORGERY & INCITEMENT

**Claim 116 Asserted Against Monica Márquez, Chief Justice, Colorado Supreme Court, in her Individual and Official Capacities: Administrative Forgery and Fraud [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

The **prior affirmative acts** of Defendant **Monica Márquez** in ratifying a "mutilated" state record that suppressed forensic truth were the moving force behind the 2026 injuries. By ensuring the fraudulent 2020 narrative remained the official state record, **Monica Márquez** provided the legal pretext that incited third parties to repeat the historical 2020 abuses against the Plaintiff in 2026.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 117 Asserted Against Christopher Wray, Director, FBI, in his Individual and Official Capacities: Bivens Claim – Failure to Intervene and State-Created Danger [5th Amendment / 14th Amendment / 42 U.S.C. § 1986]**

The **prior failure** of Defendant **Christopher Wray** to investigate documented forensic proof of the statesponsored hoax created the "state-created danger" that culminated in the 2026 phase of the enterprise. This omission by **Christopher Wray** directly caused incited third parties to carry out the 2026 physical assaults and property sabotage without fear of federal intervention.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 118 Asserted Against Phillip Brimmer, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Judicial Incitement to Violence and Property Sabotage [5th Amendment / 18 U.S.C.**

**§ 1113]**

The **prior judicial acts** of Defendant **Phillip Brimmer** in forging narratives that characterized the Plaintiff as a killer were the direct cause of the 2026 violence. This branding by **Phillip Brimmer** served as the incitement for 2026 actors to strike the Plaintiff, deactivate his life-sustaining medical equipment, and level false accusations of rape and murder.

**Claim 119 Asserted Against Phillip Brimmer, Judge, U.S. District Court, in his Individual Capacity: Bivens Claim – Fraud upon the Court and Judicial Forgery [5th Amendment / 18 U.S.C. § 1503]**

The **prior acts** of Defendant **Phillip Brimmer** in adopting news-generated scripts to dismiss survival claims provided the "legal cover" that caused the 2026 escalation. By hiding forensic 911 proof from the federal record, **Phillip Brimmer** ensured that incited actors in 2026 felt shielded by the court while sabotaging the Plaintiff's property.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 120 Asserted Against Nancy Salamone, Magistrate/Judge, 20th Judicial District, in her Individual and Official Capacities: Fraud upon the Court and Judicial Forgery [42 U.S.C. § 1983 / 18 U.S.C. § 1512]**

The **prior acts** of Defendant **Nancy Salamone** in maintaining forged trial records that prioritized news fiction over forensic truth were the moving force behind the 2026 offenses. This conduct by **Nancy Salamone** ensured the fraudulent narrative remained active in the state record, causing third parties to strike the Plaintiff's home and property in 2026.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 121 Asserted Against Stanley Jerido, Parole Officer, Colorado Department of Corrections (CDOC), in his Individual and Official Capacities: Attempted Murder [42 U.S.C. § 1983 / 18 U.S.C. § 1113]**

The **prior acts** of Defendant **Stanley Jerido** in maintaining a fraudulent parole record that labeled the

Plaintiff a "dangerous fugitive" were the direct cause of the 2026 medical sabotage. This conduct by **Stanley Jerido** caused incited actors to feel justified in deactivating the Plaintiff's insulin pump

as a form of extrajudicial execution in 2026.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 122 Asserted Against Peter Michaud, Chair, Ballard Spahr LLP, in his Individual Capacity for Actions Taken Under Color of Law: Conspiracy to Falsify Records and RICO Participation [18 U.S.C. § 1512 / 18 U.S.C. § 1962]**

The **prior acts** of Defendant **Peter Michaud** in coordinating the forgery of discovery records were affirmative steps that caused the 2026 injuries. By concealing the scale of news incitement in previous litigation, **Peter Michaud** ensured that the public's "lethal removal" efforts would continue through the 2026 property sabotage and physical assaults.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 123 Asserted Against Josh D'Amaro, CEO, The Walt Disney Company (ABC National), in his Individual Capacity for Actions Taken Under Color of Law: Deprivation of Life and Liability for Agency/Joint Action [14th Amendment / 42 U.S.C. § 1983]**

The **prior corporate policy** enforced by Defendant **Josh D'Amaro** of branding the Plaintiff a "murderer" was the motivational engine for the 2026 injuries. This conduct by **Josh D'Amaro** incited third parties to strike the Plaintiff, sabotage his property, and level new accusations of rape and murder during the 2026 phase.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 124 Asserted Against David Ellison, CEO, Paramount Global (CBS National), in his Individual Capacity for Actions Taken Under Color of Law: Deprivation of Life and Liability for Agency/Joint Action [14th Amendment / 42 U.S.C. § 1983]**

The **prior act** of Defendant **David Ellison** in utilizing regional affiliates to brand the Plaintiff a "vicious murderer" was the moving force behind the 2026 property sabotage. This branding by

**David Ellison** caused incited actors to deactivate the Plaintiff's life-sustaining medical equipment in 2026.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 125</u> Asserted Against Michael J. Cavanagh, CEO, NBCUniversal (NBC National), in his Individual Capacity for Actions Taken Under Color of Law: Deprivation of Life and Liability for Agency/Joint Action [14th Amendment / 42 U.S.C. § 1983]**

The **prior execution** of "lethal removal" scripts by Defendant **Michael J. Cavanagh** was the direct cause of the 2026 physical assault attempts. This conduct by **Michael J. Cavanagh** caused the public coordination to repeat the historical 2020 abuses, including the sabotage of the Plaintiff's home and property.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**<u>Claim 126</u> Asserted Against Lachlan Murdoch, CEO, Fox Corporation (FOX National), in his Individual Capacity for Actions Taken Under Color of Law: Deprivation of Life and Liability for Agency/Joint Action [14th Amendment / 42 U.S.C. § 1983]**

The **prior corporate policy** enforced by Defendant **Lachlan Murdoch** of prioritizing sensational "murderer" branding over forensic truth was the moving force behind the 2026 physical attacks. This conduct by **Lachlan Murdoch** caused incited actors to carry out the property sabotage and medical deactivations documented in 2026.

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

**Claim 127 Asserted Against Jason Barela, Executive Coordinator, Industrial Claim Appeals Office (ICAO), in his Individual and Official Capacities: Deprivation of Equal Protection and Fourteenth Amendment Discrimination [42 U.S.C. Section 1983 / 14th Amendment]**

Defendant Barela utilized his high-level administrative database credentials to enforce an

absolute race- and disability-motivated blockade against the Plaintiff, an autism-disabled and medically fragile White male, by ensuring that exculpatory evidentiary records and medical validations were systematically scrubbed from active state tracking grids to preserve an explicitly hostile administrative exclusion [See Master Appendix, Appendix D, p. 33].

---

**Claim 128 Asserted Against Jason Barela, Executive Coordinator, Industrial Claim Appeals Office (ICAO), in his Individual and Official Capacities: Administrative Forgery, Fraud, and Misprision of Treason [18 U.S.C. Section 1512 / 18 U.S.C. Section 2382]**
Defendant Barela actively participated in the permanent indexing of unverified, post-facto corporate scripts into discoverable public database structures, utilizing fraudulent entries to shield private corporate assets from liability while knowingly facilitating a coordinated, multi-agency campaign of socio-economic containment and administrative treason against a qualified American citizen [See Master Appendix, Appendix D, p. 33].

---

**Claim 129 Asserted Against Amber Chesley, Supervisor, Division of Vocational Rehabilitation (DVR), in her Individual and Official Capacities: Abuse of an At-Risk Person and Intentional Infliction of Severe Physical Trauma [C.R.S. Section 18-6.5-103 / 42 U.S.C. Section 1983]**
Defendant Chesley, possessing full subjective knowledge of the Plaintiff's fragile medical profile, GAF 30 baseline, and absolute dependence on specialized funding safety nets, actively intervened to truncate his approved Maximum Benefit Amount from $8,600.00 down to $143.00, intentionally inducing acute metabolic shock and severe physical degradation to compel disability services abandonment [See Master Appendix, Appendix D, p. 33].

---

**Claim 130 Asserted Against Amber Chesley, Supervisor, Division of Vocational Rehabilitation (DVR), in her Individual and Official Capacities: Cross-Agency Deprivation of Rights and Civil Rights Incitement [42 U.S.C. Section 1985 / 42 U.S.C. Section 12132]**
Defendant Chesley entered into a clandestine data-sharing agreement with academic administrators to illicitly leak classroom metrics and student metrics, weaponizing the Plaintiff's visible medical tremors as a behavioral threat to incite third-party exclusion and ensure his absolute erasure from higher education sequences and distribution of false rape naratives alienating plaintiff a special needs beneficiary from disability services, employment and College [See Master Appendix, Appendix A, pp. 4, 34].

---

**Claim 131 Asserted Against Phil Spesshardt, Director, Colorado Department of Labor and**

**Employment (CDLE), in his Individual and Official Capacities: Administrative Misprision of Terrorism and Institutional Fraud [18 U.S.C. Section 2332b / 18 U.S.C. Section 1512]**
Defendant Spesshardt utilized specialized administrative database clearance codes to temporarily alter, hide, and deep-archive truncated fund lines and fabricated predator indicators during scheduled regulatory audits, effectively blinding federal compliance officers to a widespread, multi-agency campaign of block grant diversion and structural revenue fraud [See Master Appendix, Appendix D, p. 33].

---

**Claim 132 Asserted Against Phil Spesshardt, Director, Colorado Department of Labor and Employment (CDLE), in his Individual and Official Capacities: Executive Ratification of Attempted Murder and Deliberate Indifference [42 U.S.C. Section 1983 / 8th Amendment]**
Defendant Spesshardt, despite receiving explicit written notifications detailing the acute metabolic collapses, induced homelessness, and near-lethal physical fallout caused by local database manipulations, explicitly ratified the fraudulent misconduct scripts, executing a top-down operational mandate to physically liquidate the primary informant before a federal jury could review the record [See Master Appendix, Appendix D, p. 33].

---

**Claim 133 Asserted Against Phil Spesshardt, Director, Colorado Department of Labor and Employment (CDLE), in his Individual and Official Capacities: Race- and Disability-Motivated Custom of Socio-Economic Exclusion [42 U.S.C. Section 1981 / 42 U.S.C. Section 12132]**
Defendant Spesshardt maintained and enforced an official agency policy that systematically prioritizes public resources and workforce safety nets for non-traditional demographics while executing absolute electronic blacklisting against a disabled White American Christian male fleeing documented custodial torture [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

**Claim 134 Asserted Against Abigail Smith, Regional Administrative Officer, in her Individual and Official Capacities: Solicitation of Violent Crime and Coordinated Hate Crimes [18 U.S.C. Section 373 / 18 U.S.C. Section 249]**
Defendant Smith utilized her administrative directory authority to coordinate an operational blockade across multiple public sectors, systematically distributing unverified predator narratives to private vigilante networks to solicit direct physical violence and extrajudicial execution attempts against the Plaintiff [See Master Appendix, Appendix B, pp. 5, 23; Appendix D, p. 33].

---

**Claim 135 Asserted Against Abigail Smith, Regional Administrative Officer, in her Individual and Official Capacities: Misprision and Solicitation of Staged Mass Casualty Events [18 U.S.C. Section 4 / 18 U.S.C. Section 2332a]**
Defendant Smith actively participated in the cross-agency tracking loops designed to mask institutional revenue fraud by packing vulnerable, disabled citizens into deep carceral networks, utilizing fabricated media scripts to stage high-profile socio-economic containments and conceal the systemic diversion of federal block grants [See Master Appendix, Appendix B, pp. 38–41; Appendix D, p. 33].

---

**Claim 136 Asserted Against Brian Lanni, Municipal Administrative Officer, in his Individual and Official Capacities: Coordinated Interagency Target Infiltration and Attempted Murder [42 U.S.C. Section 1983 / 18 U.S.C. Section 1113]**
Defendant Lanni acted in active concert with corporate and judicial defense interests to alter public registry coordinates, deploying specialized data flags that falsely categorized a medically fragile autistic individual as an active security threat to completely intercept emergency housing vouchers and alternative shelter metrics, forcing the Plaintiff into dangerous outdoor environments to induce a total biological collapse [See Master Appendix, Appendix A, p. 6; Appendix D, p. 33].

---

**Claim 137 Asserted Against Brian Lanni, Municipal Administrative Officer, in his Individual and Official Capacities: Conspiracy to Obstruct Justice and Strategic Evidence Suppression [18 U.S.C. Section 1512 / 42 U.S.C. Section 1985]**
Defendant Lanni systematically shared confidential location data and clinical tracking files with adverse corporate interests to execute targeted retaliatory strikes, intentionally aligning municipal resources to suppress the Plaintiff's whistleblowing standing and prevent the entry of certified laboratory assays onto the active federal record [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

**Claim 138 Asserted Against the Executive Director of the Colorado Division of Vocational Rehabilitation (DVR), in their Individual and Official Capacities: Systemic Disability Discrimination and Custom of At-Risk Abuse [42 U.S.C. Section 12132 / C.R.S. Section 18-6.5-103]**

Defendant maintained an official agency policy that condoned the sudden, unnotified extraction of federal special-needs capital from high-functioning autistic profiles while utilizing corrupted workforce registries to blacklist severe biological conditions, leaving an at-risk individual completely destitute and stripped of necessary ambulatory transport parameters [See Master Appendix, Appendix A, p. 7; Appendix D, p. 33].

---

**Claim 139 Asserted Against Lukas Butler, Administrative Coordination Agent, in his Individual and Official Capacities: Incitement to Terrorism and Coordinated Hate Crimes against an At-Risk Person [18 U.S.C. Section 2332b / 18 U.S. Section 249]**
Defendant Butler utilized regional communication loops to distribute fabricated child-predator flyers directly inside religious and community sanctuaries, explicitly intending to incite third-party vigilante networks to execute a continuous campaign of physical tracking, armed harassment, and profound psychological terror against an incapacitated spectrum savant [See Master Appendix, Appendix C, p. 36].

---

**Claim 140 Asserted Against Lukas Butler, Administrative Coordination Agent, in his Individual and Official Capacities: Complicity in Attempted Murder under Color of Law [42 U.S.C. Section 1983 / 18 U.S.C. Section 1113]**
Defendant Butler actively coordinated with regional municipal assets to deploy localized electronic data blocks that intercepted the Plaintiff's emergency medical tracking, deliberately ensuring that an at-risk individual undergoing acute glycemic shock remained exposed to lethal environmental contaminants without clinical intervention [See Master Appendix, Appendix A, p. 5; Appendix D, p. 33].

---

**Claim 141 Asserted Against Tim Doran, Regional Enforcement Coordinator, in his Individual and Official Capacities: Bias-Motivated Abuse of an At-Risk Person and Terrorism [C.R.S. Section 18-9-121 / 18 U.S.C. Section 2332b]**
Defendant Doran weaponized unverified municipal traffic dockets to orchestrate rapid-succession residential evictions against the Plaintiff, deliberately executing these forced displacements during acute metabolic crises without standard administrative grace periods or the mandatory medical accommodations required under the Fair Housing Act [See Master Appendix, Appendix C, p. 36].

---

**Claim 142 Asserted Against Tim Doran, Regional Enforcement Coordinator, in his Individual and Official Capacities: Misprision of Attempted Murder and Civil Rights Conspiracy [18 U.S.C. Section 4 / 42 U.S.C. Section 1985]**
Defendant Doran possessed actual, written knowledge of the deliberate deactivation of Plaintiff's life-support automated medical technology by local court officers, yet took affirmative steps to seal the underlying records, suppress independent eyewitness declarations, and shield the named conspirators from federal civil rights compliance audits [See Master Appendix, Appendix A, p. 24; Appendix C, p. 36].

---

**Claim 143 Asserted Against Ethan Doak, Traffic Court Magistrate, Larimer County, in his Individual and Official Capacities: Attempted First-Degree Murder and Fourteenth Amendment Torture [42 U.S.C. Section 1983 / 18 U.S.C. Section 1113]**
Defendant Doak looked directly upon a visibly ill, shaking, and defenseless autistic individual undergoing a rapid glycemic drop, and commanded four armed Larimer County Sheriff's deputies to forcefully deactivate, tear away, and power down his life-support automated insulin pump under threat of immediate armed contempt arrest, inducing acute metabolic shock, cranial trauma, and internal bleeding [See Master Appendix, Appendix C, p. 36].

---

**Claim 144 Asserted Against Ethan Doak, Traffic Court Magistrate, Larimer County, in his Individual and Official Capacities: Record Spoliation, Fraud upon the Court, and Hate-Motivated Terrorism [18 U.S.C. Section 1512 / 18 U.S.C. Section 2332b]**
Defendant Doak explicitly struck the authenticated, sworn eyewitness declaration of a senior coworker from the active record, barred eyewitness testimony that directly exposed corporate fraud, and intentionally converted a low-level traffic court docket into a violent sex-crime narrative to permanently corrupt the Plaintiff's workforce history and enforce total socio-economic exile [See Master Appendix, Appendix A, p. 4; Appendix C, p. 36].

---

**Claim 145 Asserted Against Loree Schwartz, Corporate Officer, Crosstac Corporation, in her Individual Capacity: Attempted Murder and Extortion of an At-Risk Individual [18 U.S.C. Section 1113 / 18 U.S.C. Section 875]**
Defendant Schwartz acquired the private clinical contact data of the Plaintiff's primary care specialists and repeatedly harassed the clinic staff, explicitly threatening attending physicians with immediate criminal imprisonment if they continued to administer life-essential insulin

parameters or diagnostic validations, successfully cutting the Plaintiff off from medical access for consecutive weeks to force litigation abandonment [See Master Appendix, Appendix A, p. 4].

---

**Claim 146 Asserted Against Loree Schwartz, Corporate Officer, Crosstac Corporation, in her Individual Capacity: Forgery of a Sexual Abuse Script and Bias-Motivated Hate Crimes [18 U.S.C. Section 1512 / 18 U.S. Section 249]**
Defendant Schwartz utilized legal data credentials to author, compile, and distribute a forged, handwritten civil protection petition constructing a violent, biologically impossible sexual assault narrative against a Plaintiff who has been clinically and physiologically impotent for over a decade due to total endocrine disruption and massive avascular necrosis, deliberately distributing this hoax to his landlords, registrars, and local Church Bishop to trigger community excommunication [See Master Appendix, Appendix A, p. 4; Appendix C, p. 36].

---

**Claim 147 Assert Against Heather Daniels, Shop Manager, Crosstac Corporation, in her Individual Capacity: Coordinated Terrorism and Fabrication of a Lethal Script [18 U.S.C. Section 2332b / 18 U.S.C. Section 1512]**
Defendant Daniels actively initiated targeted research into regional domestic case files to harvest operational methods for a terminal legal fabrication, authoring and forging a fraudulent civil protection order that mirrored sensationalized anti-LDS media scripts to neutralize the Plaintiff's active federal civil rights litigation dockets [See Master Appendix, Appendix C, p. 36].

---

**Claim 148 Asserted Against Heather Daniels, Shop Manager, Crosstac Corporation, in her Individual Capacity: Attempted Murder via disability and complicity with assassination plots [18 U.S.C. Section 1113 / 29 U.S.C. Section 654]**
Heather Danie authored the naratives at work and with lethal coordinated intent, plaintiff was without insulin for 6 weeks due to medical care and pharmacy sabotage via false raope naratives accussing Jared polis raped plaintiffs children.

---

**Claim 149 Asserted Against Cynthia Murphy, Production Lead, Crosstac Corporation, in her Individual Capacity: Complicity in an Assassination Plot and Intentional Discrimination [18 U.S.C. Section 1117 / 42 U.S.C. Section 1981]**
Defendant Murphy actively participated in the manufacturing of the demographic-specialized "lethal script" to achieve the Plaintiff's physical and legal neutralization, openly recording the corporate animus directing the plot by declaring on the production floor regarding the Plaintiff's

active higher education and tithing structures: "That's the problem with being good, people will rob and sue you, that's why I don't go to church" [See Master Appendix, Appendix A, p. 24].

---

**Claim 150 Asserted Against Cynthia Murphy, Production Lead, Crosstac Corporation, in her Individual Capacity: Hate Crimes and Deliberate Interruption of Life-Essential Medical Telemetry [18 U.S.C. Section 249 / 42 U.S.C. Section 12112]**
Defendant Murphy actively intervened to block the Plaintiff's access to necessary medical telemetry during acute physical stress, this was a coordinated assassination plot targeting medicine and disability. [See Master Appendix, Appendix A, p. 24].

---

**Claim 151 Asserted Against Bret Heidkamp, Owner, Crosstac Corporation, in his Individual Capacity: Commercial Extortion, Corporate Tax Fraud, and Conspiratorial Complicity [18 U.S.C. Section 875 / 18 U.S.C. Section 371]**
Defendant Heidkamp coached and supervised subordinates in the manufacturing of post-facto "willful misconduct" scripts to execute an elaborate corporate tax evasion scheme designed to artificially protect corporate experience-rating tax tiers under C.R.S. Section 8-76-102.5, using the resulting community shock to enforce an immediate residential eviction and terminate the Plaintiff's academic sequences [See Master Appendix, Appendix D, p. 33].

---

**Claim 152 Asserted Against Bret Heidkamp, Owner, Crosstac Corporation, in his Individual Capacity: Complicity in Attempted Murder and Strategic Suppression of Whistleblower Credibility [18 U.S.C. Section 1113 / 18 U.S.C. Section 1513]**
Defendant Heidkamp authorized the systematic distribution of the forged child-predator and "serial killer" libels to the Plaintiff's college registrars and landlords, explicitly aiming to preemptively destroy the credibility of a federal whistleblower, induce acute metabolic shock, and shield his commercial operations from a mandatory finding of disability discrimination [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

**Claim 153 Asserted Against the Industrial Claim Appeals Office (ICAO): Institutional Monell Liability, Misprision of Attempted Murder, and Database Falsification [42 U.S.C. Section 1983 /**

**18 U.S.C. Section 4]**
Defendant ICAO maintained an official administrative policy and custom of accepting, transcribing, and permanently indexing unverified, handwritten child-rape narratives directly into discoverable state workforce database structures to shield private corporate experience ratings, effectively blacklisting an at-risk autistic individual from the American workforce [See Master Appendix, Appendix D, p. 33].

---

**Claim 154 Asserted Against the Industrial Claim Appeals Office (ICAO): Solicitation of Terrorism and Parity Fraud [18 U.S.C. Section 373 / 18 U.S.C. Section 2332b]**
Defendant ICAO issued an administrative denial that directly violated the doctrine of collateral estoppel and administrative parity by ruling that the exact same workplace workspace on the exact same morning constituted "willful misconduct" for an autism-disabled student fleeing for his biological life, while previously adjudicating that a non-disabled senior witness was entitled to full benefits because the environment was an intolerable room of abuse, thereby soliciting third-party vigilante monitoring grids [See Master Appendix, Appendix A, p. 24; Appendix D, p. 33].

---

**Claim 155 Asserted Against the Federal Communications Commission (FCC): Bivens Claim – Administrative Misprision of Terrorism and Regulatory Abdication [5th Amendment / 18 U.S.C. Section 1503]**
Defendant FCC, despite receiving consecutive, high-clearance written notices refused to act during intense news incitement that caused the loss of plaintiffs child and lifespan due to violent incited attacks.[See Master Appendix, Appendix A, p. 4].

---

**Claim 156 Asserted Against UCHealth Systems: Corporate Monell Liability, Systemic Medical Fraud, and Abuse of an At-Risk Person [42 U.S.C. Section 1983 / C.R.S. Section 18-6.5-103]**
Defendant entity maintained an official corporate custom and electronic database grid that deployed specialized data flags to block the objective charting of the Plaintiff's physical trauma, instructing intake physicians to consistently refuse to input visible joint swelling, skeletal fractures, and chemical lesions into his permanent medical file to destroy its forensic utility [See Master Appendix, Appendix A, p. 1; Appendix D, p. 33].

---

**Claim 157 Asserted Against UCHealth Systems: Corporate Complicity in Attempted Murder and Deliberate Clinical Isolation [42 U.S.C. Section 1983 / 14th Amendment]**
Defendant entity's attending medical staff, accessing corrupted cross-agency database profiles, deliberately refused to administer short-acting insulin parameters to the Plaintiff during acute metabolic shock, choosing instead to isolate him within unmonitored holding wards for consecutive hours to artificially sustain his blood-glucose levels above 500 mg/dL, causing the rapid progression of diabetic ketoacidosis [See Master Appendix, Appendix A, pp. 1, 3].

---

**Claim 158 Asserted Against North Range Behavioral Health: Institutional Monell Liability, Disability Discrimination, and At-Risk Abuse [42 U.S.C. Section 1983 / 42 U.S.C. Section 12132]**
Defendant entity implemented a systemic practice where personnel intercepted emergency police reports and hospital intakes to substitute fraudulent psychiatric evaluations for necessary clinical medical treatment, placing an unconstitutional psychiatric hold on an acutely ill diabetic individual with two fractured arms to execute an unauthorized carceral redirection [See Master Appendix, Appendix A, p. 1; Appendix D, p. 33].

---

**Claim 159 Asserted Against North Range Behavioral Health: Complicity in Attempted Murder via Medical Technology Obstruction [42 U.S.C. Section 1983 / 8th Amendment]**
Defendant entity's non-medical detox facility staff mocked the Plaintiff's physical immobility, completely denied him access to life-sustaining insulin, Levothyroxine parameters, or orthopedic stabilizing care throughout a three-day administrative confinement, and subsequently discharged him directly into freezing outdoor conditions while in acute DKA [See Master Appendix, Appendix A, pp. 1, 3, 28].

---

**Claim 160 Asserted Against Gregory Lammons, Senior Administrative Director, in his Individual and Official Capacities: Misprision of Terrorism and Conspiracy to Defraud [18 U.S.C. Section 4 / 42 U.S.C. Section 1985]**
Defendant Lammons utilized his administrative oversight position to validate and preserve the corrupted database profiles strings generated by local law enforcement actors, explicitly directing lower-level registry clerks to deny portal access to the Plaintiff to prevent the electronic submission of formal civil rights complaints and whistleblower dockets [See Master

Appendix, Appendix D, p. 33].

---

**Claim 161 Asserted Against Gregory Lammons, Senior Administrative Director, in his Individual and Official Capacities: Complicity in Attempted Murder and Civil Rights Suppression [42 U.S.C. Section 1983 / 18 U.S.C. Section 1113]**
Defendant Lammons acted in active coordination with adverse legal defense networks to deep-archive active financial ledgers showing federal block grant diversions, maintaining an artificial record starvation that directly supported the armed deactivation of the Plaintiff's automated life-support equipment [See Master Appendix, Appendix C, p. 36; Appendix D, p. 33].

---

**Claim 162 Asserted Against Katherine Haywood, Adverse Defense Counsel, in her Individual Capacity for Actions Taken Under Color of Law: Solicitation of Crime, Misprision of Terrorism, and Retaliatory Target Infiltration [18 U.S.C. Section 373 / 42 U.S.C. Section 1983]**
Defendant Haywood breached professional ethical parameters and active federal dockets to operate as a central data-coordination asset, harvesting the Plaintiff's confidential medical filings and location logs to feed data directly into the ongoing administrative neutralization plot, explicitly sharing this data with corporate defense interests to execute targeted retaliatory strikes [See Master Appendix, Appendix D, p. 33].

---

**Claim 163 Asserted Against Katherine Haywood, Adverse Defense Counsel, in her Individual Capacity for Actions Taken Under Color of Law: Complicity in Attempted Murder and Espionage Coordination [42 U.S.C. Section 1985 / 18 U.S.C. Section 1113]**
Defendant Haywood colluded with a federal pro bono assignment asset to operate a clandestine diagnostic spying grid, demanding the forced extraction of the Plaintiff's off-site forensic hard drives under the guise of case preparation, and subsequent to his termination, entering into ex parte communications to permanently suppress the forensic appendix before a federal jury [See Master Appendix, Appendix D, p. 33].

---

**Claim 164 Asserted Against Tia Johnson, Administrative Records Manager, in her Individual and Official Capacities: Deprivation of Equal Protection and Intentional Race Discrimination [42 U.S.C. Section 1983 / 14th Amendment]**
Defendant Johnson utilized her structural administrative authority and control over regional

data profiles to execute a targeted, race-motivated campaign of exclusion against the Plaintiff, an autism-disabled White American male, explicitly ensuring that his unique data strings, verified tithing history, and ancestral lineage entitlements were systematically corrupted or denied validation within the state's primary public assistance networks to enforce absolute socioeconomic isolation [See Master Appendix, Appendix A, p. 4; Appendix D, p. 33].

---

**Claim 166 Asserted Against Tia Johnson, Administrative Records Manager, in her Individual and Official Capacities: Administrative Fraud and Misprision of At-Risk Abuse [18 U.S.C. Section 4 / C.R.S. Section 18-6.5-103]**
Defendant Johnson, possessing actual subjective knowledge of the intense physical suffering, severe metabolic trauma, and active cross-agency targeting loops directed at the Plaintiff, engaged in deliberate administrative fraud by actively suppressing objective medical telemetry, certified lab charts, and reporting metrics within the permanent record, effectively shielding a multi-agency conspiracy from federal civil rights compliance audits and perpetuating the continuous abuse of an at-risk person [See Master Appendix, Appendix A, p. 1; Appendix D, p. 33].

---

**Claim 171 Asserted Against Appeals Officer Lowe, Colorado Department of Labor and Employment (CDLE): Attempted Murder via Forced Protection Order Violation [42 U.S.C. § 1983 / 18 U.S.C. § 1113]**
Defendant Lowe intentionally forced a violation of a valid, binding protection order by attempting to compel the Plaintiff into a direct verbal panel with his restricted workplace assailant, Heather Daniels, during CDLE Appeals Docket No. 6094-2026 [See Master Appendix, Appendix A, p. 24]. Defendant Lowe executed this hostile ambush with full knowledge of Plaintiff's fragile medical baseline, intending to trigger an immediate, fatal metabolic collapse and induce fatal homelessness [See Master Appendix, Appendix D, p. 33].

---

**Claim 172 Asserted Against Appeals Officer Lowe, Colorado Department of Labor and Employment (CDLE): Portal Fraud and Solicitation of False Imprisonment [18 U.S.C. § 1512 / 42 U.S.C. § 1985]**
Defendant Lowe committed administrative portal fraud by using the forced protection order encounter to manufacture a fraudulent behavioral script against the Plaintiff [See Master Appendix, Appendix D, p. 32]. Defendant Lowe subsequently indexed unverified, handwritten fabrications directly into state databases to solicit his immediate false

imprisonment, destroy his workforce standing, and block his access to federal courts [See Master Appendix, Appendix D, p. 33].

---

**. REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

| # | Defendant Name | Title/Entity | Individual Demand |
|---|---|---|---|
| 1 | **Jason Malterud** | Detective, Longmont PD | $1,000,000 |
| 2 | **Jeff Satur** | Deputy Chief, Longmont PD | $1,000,000 |
| 3 | **Joshua Burke** | Detective, Longmont PD | $1,000,000 |
| 4 | **Rachael Sloan-Stoggsdill** | Records Manager, Longmont PD | $1,000,000 |
| 5 | **Zach Ardis** | PIO, Longmont PD | $1,000,000 |
| 6 | **Jon High** | Detective, Longmont PD | $1,000,000 |
| 7 | **Stanley Jerido** | Parole Officer, CDOC | $1,000,000 |
| 8 | **Andre Stancil** | Executive Director, CDOC | $1,000,000,000 |
| 9 | **Ryan Day** | Deputy District Attorney | $1,000,000 |
| 10 | **Michael Dougherty** | District Attorney | $1,000,000 |
| 11 | **Nancy Salamone** | Magistrate/Judge | $1,000,000 |
| 12 | **Ingrid Bakke** | Chief Judge | $1,000,000 |
| 13 | **Bruce Langer** | Judge | $1,000,000 |
| 14 | **Phillip Brimmer** | Judge, U.S. District Court | $1,000,000 |
| 15 | **Lewis T. Babcock** | Judge, U.S. District Court | $1,000,000 |
| 16 | **Nicole Collins** | Public Defender | $1,000,000 |
| 17 | **Megan Ring** | State Public Defender | $1,000,000 |
| 18 | **Benjamin Collett** | Public Defender | $1,000,000 |
| 19 | **Ryan Dawson-Erdman** | Public Defender | $1,000,000 |
| 20 | **Judge Hawthorne** | Judge, CO Court of Appeals | $1,000,000 |
| 21 | **Monica Márquez** | Chief Justice, CO Supreme Court | $1,000,000 |
| 22 | **Judge Fox** | Judge, CO Court of Appeals | $1,000,000 |
| 23 | **Judge Lum** | Judge, CO Court of Appeals | $1,000,000 |
| 24 | **Judge Johnson** | Judge, CO Court of Appeals | $1,000,000 |

| | | | |
|---|---|---|---|
| 25 | **Judge Lipinsky** | Judge, CO Court of Appeals | $1,000,000 |
| 26 | **Judge Moultrie** | Judge, CO Court of Appeals | $1,000,000 |
| 27 | **Ashley Kissinger** | Partner, Ballard Spahr LLP | $1,000,000 |
| 28 | **Kennison Lay** | Attorney, Ballard Spahr LLP | $1,000,000 |
| 29 | **Sherri Clark** | Paralegal, Ballard Spahr LLP | $1,000,000 |

| # | Defendant Name | Title/Entity | Individual Demand |
|---|---|---|---|
| 30 | **Peter Michaud** | Chair, Ballard Spahr LLP | $10,000,000,000 |
| 31 | **Ballard Spahr LLP** | Law Firm Entity | $1,000,000,000 |
| 32 | **Ken Lee** | Administrator, FRCC | $100,000 |
| 33 | **Colleen Simpson** | President, FRCC | $1,000,000 |
| 34 | **Christopher Wray** | Director, FBI | $1,000,000 |
| 35 | **Amanda Koldjeski** | SAC, FBI Denver | $1,000,000 |
| 36 | **Lachlan Murdoch** | CEO, Fox Corp | $1,000,000,000 |
| 37 | **KDVR (FOX-31)** | Regional News Station | $1,000,000,000 |
| 38 | **Perry Sook** | CEO, Nexstar Media | $1,000,000,000 |
| 39 | **Hilton Howell** | CEO, Gray Media | $1,000,000,000 |
| 40 | **Gray Media Group Inc.** | Corporate Entity | $1,000,000,000 |
| 41 | **KNOP-2** | Regional News Station | $1,000,000,000 |
| 42 | **Josh D'Amaro** | CEO, Disney (ABC) | $1,000,000,000 |
| 43 | **KMGH (ABC-7)** | Regional News Station | $1,000,000,000 |
| 44 | **Almin Karamehmedovic** | President, ABC News | $1,000,000,000 |
| 45 | **ABC News National** | Corporate Entity | $1,000,000,000 |
| 46 | **David Ellison** | CEO, Paramount (CBS) | $1,000,000,000 |
| 47 | **KCNC (CBS-4)** | Regional News Station | $1,000,000,000 |
| 48 | **CBS News National** | Corporate Entity | $1,000,000,000 |
| 49 | **Wendy McMahon** | CEO, CBS News | $1,000,000,000 |
| 50 | **Michael J. Cavanagh** | CEO, NBCUniversal | $1,000,000,000 |
| 51 | **NBCU News Group** | Corporate Entity | $1,000,000,000 |
| 52 | **KUSA (NBC-9)** | Regional News Station | $1,000,000,000 |
| 53 | **Cesar Conde** | Chairman, NBCU News | $1,000,000,000 |

| | | | |
|---|---|---|---|
| 54 | **Heath Freeman** | President, Alden Global | $1,000,000,000 |
| 55 | **The Denver Post** | Corporate Entity | $1,000,000,000 |
| 56 | **Fox News Network** | National Entity | $1,000,000,000 |
| 57 | **Suzanne Scott** | CEO, Fox News | $1,000,000,000 |
| 58 | **Americas Most Wanted** | Production Entity | $1,000,000,000 |
| 59 | **Jackie Shubert** | Private Citizen | $1,000,000 |
| 60 | **Brian Derry** | Private Citizen | $1,000,000 |

**61. Heather Daniels $75,000**

**62. Bret Heidkamp $75,000**

**63. Cythiua Murphy $75,000**

**64. Loree Schwartz $500,000**

**65. Katherine Haywood $50**

**66. Jason Barela $500,000**

**67. Amber Cheslea $500,000**

**68. Phil Spesshardt $500,000**

**69. ICAO, train and fire staff**

**70. UC Health $10,000,000**

**71. North Range $500,000**

**72. Abigail Smith $1,000,000**

**73. Brian Lanni $1,000,000**

**74. Lukas Butler $500,000**

**75. Tim Doran $500,000**

**76. CDLE Lowe $1,000,000**

## Admissions of Torture & Offenses

1. **Sworn Admission of "Hell Torture":** Every defendant must sign an affidavit admitting to the torture of the Plaintiff.
2. **Admission of Family Mutilation Witnessing:** Explicit acknowledgment of the trauma caused by forcing the Plaintiff to witness family mutilation while in state custody.
3. **Admission of Systematic Failure:** CDOC and Andre Stancil must admit to a total breakdown of the duty of care.
4. **Admission of Defamation:** Every media entity (36–58) must admit to the dissemination of false/malicious narratives.
5. **Admission of Legal Malpractice:** Defendants 16–19 and 27–31 must admit to professional betrayal.
6. **Admission of Judicial Misconduct:** Every named Judge/Justice must admit to the deprivation of constitutional rights.
7. **Admission of Malice:** Ballard Spahr leadership must admit to acting with specific intent to harm the Plaintiff.
8. **Admission of Law Enforcement Abuse:** Detectives 1–6 must admit to constitutional violations and investigative failures.
9. **Public Video Confessions:** Every individual defendant must provide a recorded confession detailing their role in the harm.
10. **Public Apology:** Full-page apologies published in *The Denver Post* and on the homepages of every news affiliate station listed.

## Correction of Records & Restoration

11. **Total Expungement:** Immediate and absolute removal of all criminal records related to the underlying events.
12. **Certificate of Innocence:** The State of Colorado must issue a formal Certificate of Innocence.
13. **Correction of CDOC Files:** Purging of all negative, false, or inflammatory entries in the Plaintiff's prison records.
14. **Correction of Court Records:** All transcripts must be amended to reflect the truth of the offenses admitted above.
15. **Media Retractions:** Each station must air prime-time retractions for a period of 7 consecutive days.
16. **De-indexing of False Information:** Defendants must pay for the permanent removal of defamatory articles from search engines.
17. **Credit Restoration:** Defendants must pay for professional services to restore the Plaintiff's credit score to 800+.
18. **Identity Restoration:** Provision of all new state and federal identification at no cost.
19. **Educational Record Cleansing:** FRCC must purge all negative academic or disciplinary records related to this period.
20. **Civil Rights Restoration:** Full, immediate restoration of voting and firearm rights.

## Financial & Punitive Relief

21. **Lump Sum Payments:** Transfer of all itemized amounts listed in the table above within 72 hours.
22. **Personal Property Liens:** Immediate liens placed on the real estate of every individual defendant.
23. **Wage Garnishment:** Automatic garnishment for any entity or individual failing to pay within the deadline.
24. **Lifetime Health Trust:** Establishment of a multi-billion dollar trust for the Plaintiff's lifelong medical and psychiatric care.
25. **Family Trauma Fund:** $50,000,000 for the ongoing mental health support of the
Plaintiff's family.
26. **Seizure of Corporate Assets:** Seizure of Ballard Spahr's Denver and Philadelphia assets if the 11-billion-dollar total is not met.
27. **Relocation Package:** Defendants must pay for the Plaintiff and family to relocate to a secure, private location.
28. **Private Security Detail:** 24/7 security for the Plaintiff's family for 10 years at the Defendants' expense.
29. **Legal Fee Reimbursement:** Full reimbursement of all costs incurred by the Plaintiff to date.
30. **Successor Liability Clause:** Demands transfer to the heirs or estates of any individual defendant who dies.

## Structural Resignations & Disbarment

31. **Resignation of Andre Stancil:** Immediate departure from the CDOC.
32. **Resignation of Peter Michaud:** Immediate departure from Ballard Spahr.
33. **Disbarment Proceedings:** Mandatory initiation of disbarment for every lawyer listed (16-19, 23, 24, 27, 28).
34. **Removal from Bench:** Impeachment or removal of every Judge/Justice listed.
35. **Stripping of Peace Officer Certification:** Permanent revocation of POST certification for detectives 1–6 and officer 7.
36. **Resignation of Dr. Colleen Simpson:** Immediate departure from FRCC.
37. **Termination of Ken Lee:** Immediate termination for cause from FRCC.
38. **Waiver of Qualified Immunity:** Every government official must sign a waiver of immunity for this action.
39. **Dissolution of Entities:** Filing for the dissolution of Gray Media Group and Nexstar for systemic defamation.
40. **Establishment of Oversight:** Appointment of a federal monitor for the CDOC.

## Procedural & Final Demands

41. **DEMAND FOR JURY TRIAL:** I demand a trial by jury on all issues so triable.
42. **Full Discovery Release:** Unredacted release of all internal memos, emails, and texts regarding the Plaintiff.
43. **Surveillance Disclosure:** Release of all prison and police footage during the periods of torture.
44. **Non-Disclosure Nullification:** Any prior agreements of silence are hereby declared null and void.
45. **Quarterly Compliance Audits:** Defendants must report on the progress of reforms for the next 10 years.
46. **Public Depositions:** Live-streamed testimony from every named CEO and Director.
47. **Creation of "The Torture Act":** Defendants must lobby for state legislation named after the Plaintiff.
48. **Naming Rights Restitution:** Renaming of a CDOC facility and an FRCC building to honor the victims.
49. **Federal Criminal Referral:** Defendants must self-report for human rights violations to the DOJ.
50. **No-Contact Injunction:** Permanent restraining orders against all 60 defendants.
51. **Audit of "Randall's Estate":** Full forensic audit of all assets related to Defendant #35.
52. **Alden Global Divestment:** Mandatory divestment from local news by Defendant #54.
53. **FBI Internal Review:** Mandatory DOJ review of the conduct of Defendants 34 and 35.
54. **Media Correction Fund:** A $100M fund established by news entities to train staff on avoiding defamation.
55. **Educational Scholarship:** A full endowment at FRCC in the Plaintiff's name.
56. **Travel Restitution:** Provision of private travel for the Plaintiff for all legal proceedings.
57. **Interest on Judgment:** 10% daily interest for any delay in the $22+ Billion payment.
58. **Successive Legal Action:** Right to file additional claims if further harm is discovered during discovery.
59. **Public Memorial:** A physical monument at the State Capitol for victims of custodial torture.

**F. PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

/S/ Edward Herbert Hoid,
(Plaintiff's signature)

14-AUG-2026
(Date)

(Revised February 2022)